IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZIPWALL, LLC,<br><br>                    Plaintiff<br><br>v.<br><br>FASTCAP, LLC.,<br><br>                    Defendant. | Civil Action No.:  05-cv-11852-JLT |

## DECLARTION OF MATTHEW H. GRADY IN SUPPORT OF ZIPWALL, LLC'S COMBINED OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT OF LIABILITY

I, Matthew H. Grady, having been duly sworn, state as follows:

1.       I am an attorney with the law firm of Lowrie, Lando & Anastasi, LLP, and counsel for plaintiff ZipWall, LLC ("ZipWall") in this action.  I make this declaration in support of ZipWall's Combined Opposition To Strike Motion For Summary Judgment and Cross-Motion To Strike, Or In the Alternative, For Summary Judgment of Liability.

2.       Attached hereto as Exhibit A is a true and correct copy of Clerk's Notes from February 2, 2006.

3.       Attached hereto as Exhibit B is a true and correct copy of ZipWall's Infringement Claim Charts dated, February 1, 2006.

4.       Attached hereto as Exhibit C is a true and correct copy of FastCap's Interrogatory Answers, dated January 23, 2006.

5.     Attached hereto as Exhibit D is a true and correct copy of a letter from Michael Cronen to Matthew Lowrie, dated November 4, 2005.

6.     Attached hereto as Exhibit E is a true and correct copy of a letter from Michael Cronen to Matthew Lowrie, dated July 13, 2006.

7.     Attached hereto as Exhibit F is a true and correct copy of Amendment After Final, dated February 3, 2000.

8.     Attached hereto as Exhibit G is a true and correct copy of www.fastcap.com.

9.     Attached hereto as Exhibit H is a true and correct copy of U.S. Patent No. 6,942,004 (the "'004 patent"), issued on September 13, 2005, and was assigned to ZipWall.

10.     Attached hereto as Exhibit I is a true and correct copy of U.S. Patent No. 6,209,615 (the "'615 patent"), issued on April 3, 2001, and was assigned to Zipwall.

11.     Attached hereto as Exhibit J is a true and correct copy of U.S. Patent No. 6,953,076 (the "'076 patent"), issued on October 11, 2005, and was assigned to ZipWall.

Subscribed to and sworn by me under the pains and penalties of perjury, this 28th day of August, 2006.

_____ /s/ Matthew H. Grady _____

# EXHIBIT A

## Jared A. Gell

**From:**    Jared A. Gell
**Sent:**    Wednesday, February 08, 2006 3:22 PM
**To:**    ZW6003
**Subject:** Zipwall v. FastCap: Clerks Notes from Scheduling Conference

-----Original Message-----
**From:** ECFnotice@mad.uscourts.gov [mailto:ECFnotice@mad.uscourts.gov]
**Sent:** Wednesday, February 08, 2006 2:57 PM
**To:** CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:05-cv-11852-REK Zipwall, LLC v. Fastcap, LLC "Scheduling Conference"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without
charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Filo, Jennifer entered on 2/8/2006 at 2:56 PM EST and
filed on 2/1/2006
**Case Name:**    Zipwall, LLC v. Fastcap, LLC
**Case Number:**    1:05-cv-11852
**Filer:**
**Document Number:**

**Docket Text:**
Electronic clerk's notes for proceedings held before Senior Judge Robert E. Keeton: Scheduling
conference held on 2/1/2006; Matthew B. Lwrie for the pltf. and Michael Cronen (by telephone) for the
deft.; Re: Discovery Plan, REK believes that neither party's dates are reasonable; Parties cannot agree on
length of discovery as well as the time frame; REK proposes that all discovery (including experts)
proceed and will speak to the parties before they begin to file motions and before the Markman Hearing;
Re: Markman Hearing, date remains flexible as per the court; The court schedules a status conference
for 10/11/2006 at 2:00 PM; The court will check on the parties' discovery process at this status
conference; REK is not ordering that anything be completed by that time.(Court Reporter Cloonan.)
(Filo, Jennifer)

The following document(s) are associated with this transaction:

**1:05-cv-11852 Notice will be electronically mailed to:**

Sarah E. Cooleybeck    scooleybeck@foleyhoag.com

Michael J. Cronen    mcronen@zimpatent.com

Matthew B. Lowrie    mlowrie@ll-a.com, lshine@ll-a.com; jgell@ll-a.com

Aaron W. Moore    amoore@ll-a.com

Jeremy A. Younkin    jyounkin@foleyhoag.com

Harris Zimmerman    harris@zimpatent.com

**1:05-cv-11852 Notice will not be electronically mailed to:**

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ZIPWALL, LLC,

      Plaintiff

      v.

FastCap, LLC.,

      Defendant.

Civil Action No.: 05-CV-11852-REK

**FASTCAP, LLC'S RESPONSES TO PLAINTIFF ZIPWALL LLC'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant FastCap, LLC (hereinafter "FastCap") hereby responds to Plaintiffs First Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

The following interrogatory responses are given without prejudice to the responding party's right to produce evidence of any subsequently discovered facts, or facts which this responding party may later recall. Responding party accordingly reserves the right to change any and all answers herein as additional facts are ascertained, analyses are made, legal researches are completed, and contentions are made. The answers contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as is presently known, but should in no way be to the prejudice of the responding party in relation to further discovery, research,

FastCap's Resp. To ZipWall's
1ˢᵗ Set Of Interrogatories

1

and analysis. This preliminary statement is incorporated into each and every response set forth below.

## GENERAL RESPONSES AND OBJECTIONS

1. FastCap objects to ZipWall's General Instructions, Definitions and Interrogatories to the extent that they purport to seek to impose upon FastCap duties or obligations that exceed or are inconsistent with those imposed by the Federal Rules of Civil Procedure and Local Rules of Court.

2. FastCap objects to ZipWall's General Instructions, Definitions and Interrogatories to the extent that they seek or purport to require FastCap to identify or produce any persons, documents, or information beyond the scope required by the Federal Rules of Civil Procedure and Local Rules of Court.

3. FastCap objects to ZipWall's General Instructions, Definitions and Interrogatories to the extent that they seek or purport to require FastCap to identify, disclose, or produce any documents or information containing or comprising information protected under the attorney-client privilege and/or the attorney work product protections, the right of privacy, or any other applicable privilege or claim of confidentiality, including information that constitutes proprietary business information. The inadvertent disclosure of any privileged information shall not signify any intent by FastCap to waive such privilege.

4. FastCap objects to ZipWall's Instructions, Definitions and Interrogatories to the extent that they seek or purport to require FastCap to identify, disclose, or produce any documents or information which should be covered by a Protective Order, which

order is not on file in this case.

5. FastCap also objects to the "Definitions" set forth in Plaintiff's First Set of Interrogatories to the extent that Plaintiff's definition of the term "Prior Art" is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Indeed, Plaintiff's definition of "Prior Art" may be construed as comprising the sum and substance of all things known to mankind prior to October 29, 1995.

6. FastCap also objects to the "Definitions" set forth in Plaintiff's First Set of Interrogatories to the extent that Plaintiff's definition of the term "Accused Products" is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Indeed, Plaintiff's definition of "Accused Products" includes products that have no relevance to the present action whatsoever.

7. FastCap has not completed discovery or its independent factual investigation in this action and the responses contained herein are based upon such information and documents presently available to and specifically known to FastCap. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts and legal contentions. The responses contained herein are made in a good faith effort to supply such factual information and specification of legal contentions as presently known. Accordingly, FastCap reserves the right to alter, supplement, amend, or otherwise modify these responses.

8. FastCap objects to Plaintiff's Interrogatories to the extent they seek information that is not relevant to the subject matter involved in this action or reasonably calculated to lead to the discovery of admissible evidence. By agreeing to provide

information responsive to a particular discovery request, FastCap does not admit the relevance or admissibility of the information produced.

## INTERROGATORY RESPONSES

**Interrogatory No. 1**

Identify, by name, model, product number, revision number, or other designation, each and every FastCap product that is capable of creating a dust barrier including but not limited to "DB Clip, " "3rdHand HD, " and "Little Hand HD, " whether or not the identified products meet the previous definition, that has been, or is sold by FastCap, or is currently under development by FastCap.

**Response to Interrogatory No. 1:**

FastCap objects to this Interrogatory as overbroad, irrelevant to the issues in the case, and not reasonably calculated to lead to the discovery of admissible evidence. Indeed, Plaintiff's Interrogatory No. 1 requests information relating to any FastCap product that is "capable of creating a dust barrier", which could include any FastCap product capable of holding down a sheet of plastic.

Notwithstanding this objection, FastCap directs Plaintiff's attention to FastCap's catalog, available at http://www.fastcap.com/ , a copy of which is provided concurrently herewith in answer to Plaintiff's First Set of Requests for Production of Documents and Things.

**Interrogatory No. 2**

For each FastCap product identified in the answer to Interrogatory No.1, identify

all persons participating in the design, development, testing, marketing, sale, offer of sale, license, offer of license, or use of such product, including a summary description of their contributions thereto, the period during which they were associated therewith, and the persons to whom they reported and whom they supervised.

**Response to Interrogatory No. 2:**

See answer to Interrogatory No. 1. An answer to this Interrogatory No. 2 would require the identification of each and every person who has ever worked for or on behalf of FastCap and the foreign manufacturer of its 3rd Hand product, including all of their employees or independent contractors, many of whom it is believed reside in China. Mr. Paul Akers participated in the marketing, sale, offer of sale of FastCap's 3rd Hand product. The product was designed, developed and tested by its Chinese manufacturer, who shall not be identified to ZipWall in the absence of an appropriate Protective Order. FastCap has not licensed or offered to license its 3rd Hand product to third parties. Mr. Akers owns and is a member of FastCap, LLC.

**Interrogatory No. 3**

For each FastCap product identified in the answer to Interrogatory No.1, state

(a) the date such product was first manufactured, tested, offered for sale or license, actually sold or licensed;

(b) the date such product was first delivered to a customer by or for FastCap;

(c) the total number of units of such product made, used, sold, offered for sale,

FastCap's Resp. To ZipWall's
1st Set Of Interrogatories                              5

licensed, or offered for license by or for FastCap up to the present; and

(d) the unit price or prices charged for each such product.

**Response to Interrogatory No. 3:**

See responses to Interrogatories 1 and 2, supra. FastCap objects to this

interrogatory on the grounds that it seeks proprietary and/or confidential business

information which shall not be disclosed in the absence of an appropriate Protective

Order. FastCap first began selling its accused 3rd Hand product in approximately March,

2003.

**Interrogatory No. 4**

Identify any individual or entity involved in the manufacture of all or any part of

each FastCap product identified in the answer to Interrogatory No. 1.

**Response to Interrogatory No. 4:**

Please see responses to Interrogatory Nos. 1, 2 and 3.

**Interrogatory No. 5**

Identify each customer and/or prospective customer for each FastCap product

identified in the answer to Interrogatory No. 1.

**Response to Interrogatory No. 5:**

Please see responses to Interrogatory Nos. 1 and 3.

**Interrogatory No. 6**

Identify each past and present director, officer, employee, representative, or

agent of FastCap who had knowledge of the Patents-in-Suit prior to the commencement

of this action, state the date on which each such person first acquired such knowledge,

describe the circumstances under which such knowledge was first acquired, and identify

all documents and things evidencing, supporting or relating to the foregoing.

**Response to Interrogatory No. 6:**

FastCap did not have received notice of the existence of Plaintiff's alleged '004

patent and '076 patent until after September 13, 2005 and October 11, 2005, respectively.

Mr. Paul Akers was aware of the issuance of the '615 patent before September 13, 2005.

Documents and things evidencing, supporting or relating to the foregoing are being

produced in response to Plaintiff's First Request For Production Of Documents.

**Interrogatory No. 7**

Identify each request by or on behalf of FastCap for an opinion, whether oral or

written, of any attorney or otherwise, concerning the Patents-in-Suit, each opinion given

in response to each such request, all documents and things referred to in the requestor

opinion, each fact referred to in the requestor opinion as pertinent to or supportive of the

opinion or any part thereof, each person referred to in the request or opinion and the

asserted pertinence of such person to the request or opinion or any part thereof, all other

documents and things relating to such request or opinion, and the person or persons most

knowledgeable about the foregoing.

**Response to Interrogatory No. 7:**

FastCap objects to this interrogatory on the grounds that it seeks, in whole or in part, information and documents subject to the attorney/client privilege, the attorney work product protection, and which include confidential and/or proprietary business information which shall not be disclosed to a competitor in the absence of an appropriate Protective Order.

**Interrogatory No. 8**

State the basis for the contention asserted by FastCap in its "Second Affirmative Defense" to ZipWall's Complaint that FastCap "does not infringe any valid, enforceable claim of the patents recited in ZipWall's Complaint, " including a specification of each limitation of each claim that FastCap contends is not met, literally or by equivalents, the reasons therefor, and an identification of all facts, evidence, and documents that FastCap asserts support or are pertinent to such contention, and identify the person or persons most knowledgeable about such contentions and bases.

**Response to Interrogatory No. 8:**

FastCap objects to this contention Interrogatory No. 8 to the extent it calls for information as to which discovery is still ongoing in this case and which is within the possession, custody or control of Plaintiff or third parties. FastCap has not completed discovery or its independent factual investigation in this action and the responses contained herein are based upon such information and documents presently available to

and specifically known to FastCap. It is anticipated that further discovery, independent

investigation, legal research and analysis will supply additional facts and legal

contentions. The responses contained herein are made in a good faith effort to supply

such documents, factual information and specification of legal contentions as presently

known. Accordingly, FastCap reserves the right to alter, supplement, amend, or

otherwise modify these responses. Any such information and/or documents later obtained

will be made available to the extent they are responsive and not privileged or the subject

of an appropriate objection.

      Notwithstanding FastCap's objections to this Interrogatory No. 8, FastCap does

not infringe the Patents-In-Suit because its accused 3rd Hand product does not include

every element of Plaintiff's asserted patent claims.

**Interrogatory No. 9**

      State the basis for the contention asserted by FastCap in its "Third Affirmative

Defense" to ZipWall's Complaint that "Zipwall's claims are barred by the doctrine of

unclean hands."

**Response to Interrogatory No. 9:**

      FastCap objects to this contention Interrogatory No. 9 to the extent it calls for

information as to which discovery is still ongoing in this case and which is within the

possession, custody or control of Plaintiff or third parties. FastCap has not completed

discovery or its independent factual investigation in this action and the responses

contained herein are based upon such information and documents presently available to

and specifically known to FastCap. It is anticipated that further discovery, independent

investigation, legal research and analysis will supply additional facts and legal

contentions. The responses contained herein are made in a good faith effort to supply

such documents, factual information and specification of legal contentions as presently

known. Accordingly, FastCap reserves the right to alter, supplement, amend, or

otherwise modify these responses. Any such information and/or documents later obtained

will be made available to the extent they are responsive and not privileged or the subject

of an appropriate objection.

**Interrogatory No. 10**

State the basis for the contention asserted by FastCap in its "Fourth Affirmative

Defense"to ZipWall's Complaintthat "ZipWall's claims are barred by the doctrine of

laches."

**Response to Interrogatory No. 10:**

FastCap  objects to this contention Interrogatory No. 10 to the extent it calls for

information as to which discovery is still ongoing in this case and which is within the

possession, custody or control of Plaintiff or third parties. FastCap has not completed

discovery or its independent factual investigation in this action and the responses

contained herein are based upon such information and documents presently available to

and specifically known to FastCap. It is anticipated that further discovery, independent

investigation, legal research and analysis will supply additional facts and legal

contentions. The responses contained herein are made in a good faith effort to supply

such documents, factual information and specification of legal contentions as presently

known. Accordingly, FastCap reserves the right to alter, supplement, amend, or

otherwise modify these responses. Any such information and/or documents later obtained

will be made available to the extent they are responsive and not privileged or the subject

of an appropriate objection.

Notwithstanding FastCap's objections to this Interrogatory No. 10, Plaintiff's

claims are barred by the doctrine of laches because of the many years of Plaintiff's delay

before bringing suit in this matter.

**Interrogatory No. 11**

State the basis for the contention asserted by FastCap in its "Fifth Affirmative

Defense" to ZipWall's Complaint that "ZipWall's claims are barred by the doctrine of

equitable estoppel."

**Response to Interrogatory No. 11:**

FastCap objects to this contention Interrogatory No. 11 to the extent it calls for

information as to which discovery is still ongoing in this case and which is within the

possession, custody or control of Plaintiff or third parties. FastCap has not completed

discovery or its independent factual investigation in this action and the responses

contained herein are based upon such information and documents presently available to

and specifically known to FastCap. It is anticipated that further discovery, independent

investigation, legal research and analysis will supply additional facts and legal

contentions. The responses contained herein are made in a good faith effort to supply

such documents, factual information and specification of legal contentions as presently

known. Accordingly, FastCap reserves the right to alter, supplement, amend, or

otherwise modify these responses. Any such information and/or documents later obtained

will be made available to the extent they are responsive and not privileged or the subject

of an appropriate objection.

Notwithstanding FastCap's objections to this Interrogatory No. 11, Plaintiff's

claims are barred by the doctrine of equitable estoppel because of the many years of

Plaintiff's delay before bringing suit and because of FastCap's reasonable reliance

thereupon.

**Interrogatory No. 12**

State the basis for the contention asserted by FastCap in its "Sixth Affirmative

Defense"to ZipWall's Complaint that "the patents recited in ZipWall's Complaint are

invalid, "including an identification of each piece of prior art that FastCap contends is a

§102 reference and what portions of such prior art satisfy each limitation of the claims of

the asserted patent, and for any prior art not contended to constitute only a §102

anticipation, the prior art disclosing a motivation, teaching, or suggestion to modify or

combine the reference in a manner making the claim obvious, each claim or limitation not

meeting the requirement of §112 and the reasons therefore, all facts, evidence, and

documents that FastCap asserts support or are pertinent to any such contentions, and

identify the person or persons most knowledgeable about such contentions and bases.

**Response to Interrogatory No. 12:**

FastCap objects to this contention Interrogatory No. 12 to the extent it calls for

information as to which discovery is still ongoing in this case and which is within the

possession, custody or control of Plaintiff or third parties. FastCap has not completed

discovery or its independent factual investigation in this action and the responses

contained herein are based upon such information and documents presently available to

and specifically known to FastCap. It is anticipated that further discovery, independent

investigation, legal research and analysis will supply additional facts and legal

contentions. The responses contained herein are made in a good faith effort to supply

such documents, factual information and specification of legal contentions as presently

known. Accordingly, FastCap reserves the right to alter, supplement, amend, or

otherwise modify these responses. Any such information and/or documents later obtained

will be made available to the extent they are responsive and not privileged or the subject

of an appropriate objection.

**Interrogatory No. 13**

State the basis for the contention asserted by FastCap in its "Seventh Affirmative

Defense" to ZipWall's Complaint that "the patents recited in Zipwall's Complaint are

unenforceable."

**Response to Interrogatory No. 13:**

FastCap objects to this contention Interrogatory No. 13 to the extent it calls for information as to which discovery is still ongoing in this case and which is within the possession, custody or control of Plaintiff or third parties. FastCap has not completed discovery or its independent factual investigation in this action and the responses contained herein are based upon such information and documents presently available to and specifically known to FastCap. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts and legal contentions. The responses contained herein are made in a good faith effort to supply such documents, factual information and specification of legal contentions as presently known. Accordingly, FastCap reserves the right to alter, supplement, amend, or otherwise modify these responses. Any such information and/or documents later obtained will be made available to the extent they are responsive and not privileged or the subject of an appropriate objection.

**FASTCAP, LLC**

Dated: January 23, 2006

by: _____
Michael James Cronen
Zimmerman & Cronen, LLP
1330 Broadway, Suite 710
Oakland CA 94612-2506

FastCap's Resp. To ZipWall's
1st Set Of Interrogatories

14

tel: 510.465.0828
fax: 510.465.2041

Attorneys for Defendant and
Counterclaimant FastCap,
LLC

*Zipwall, LLC v. FastCap, LLC*
*CV No. 05-11852 (REK)*

## PROOF OF SERVICE

State of California, County of Alameda

  I am employed in the County of Alameda, State of California.  I am over the age of 18

and not a party to the within action.  My business address is 1330 Broadway, Suite 710, Oakland,

California 94612.  I am employed in the Law Offices of Harris Zimmerman.

  On January 23, 2006, I served the following documents:

FASTCAP' LLC'S RESPONSES TO PLAINTIFF ZIPWALL LLC'S FIRST SET OF
INTERROGATORIES (NOS. 1 - 13)

by placing a true copy thereof in the United States Mail at Oakland, California, enclosed in a

sealed envelope, with postage fully prepaid, addressed as follows:

    Matthew Lowrie, Esq.
    Lowrie, Lando & Anastasi, LLP
    One Main Street, 11th fl.
    Cambridge, MA 02142

  I declare under penalty of perjury under the laws of the State of California that the above

is true and correct.

  DATED:  January 23, 2006

          _____
          JENNIFER L. LYNX

# EXHIBIT D

LAW OFFICES OF
## HARRIS ZIMMERMAN
ATTORNEYS AT LAW
1330 BROADWAY, SUITE 710
OAKLAND, CALIFORNIA 94612-2506
(510) 465-0828 FAX (510) 465-2041
zimpat@zimpatent.com

HARRIS ZIMMERMAN
MICHAEL JAMES CRONEN

PATENTS
TRADEMARKS
COPYRIGHT

## CONFIDENTIAL COMMUNICATION
## FOR SETTLEMENT PURPOSES ONLY

November 4, 2005

Matthew Lowrie, Esq.
Lowrie, Lando & Anastasi, LLP
One Main Street - 11th Floor
Cambridge, MA 02142

Via fax:617..395.7070
and by post

Re:   *Zipwall, LLC v. FastCap, LLC v. Edgeco, Inc.*

Dear Mr. Lowrie:

This is to follow up on our recent telephone discussion regarding possible settlement of the above litigation. I have also discussed the matter with my client. We have concluded that the claims of the oldest of the asserted patents, i.e. the '615 patent, are not infringed because elements of the independent claims are absent from my client's Third Hand device. I have not had an opportunity to review the other asserted patents; however, it is likely that these are also not infringed by my client. Furthermore, the claims of your client's patents appear to read on a substantial body of prior art such that it appears they are invalid as well as not infringed.

However, as we discussed, the costs to both parties in litigating this matter will be high. My client will aggressively defend its rights in Court and it has the resources necessary to accomplish this. However, my client also recognizes that it is in both parties' interest to generate income from the marketplace instead of spending it on legal fees. Therefore, my client is willing to settle the above on the following terms. My client will agree to pay Zipwall the sum of Fifteen Thousand Dollars ($15,000.00) and a royalty of $1 for each Third Hand with Dust Barrier clip sold by my client after October 1, 2005, in exchange for a license under all of your client's related patents and a dismissal of the lawsuit with prejudice.

Please review the above with your client and let me know its position in the matter at

Matthew Lowrie, Esq.
November 4, 2005
Page Two


your earliest convenience.  If you have any questions or comments regarding the above please do
not hesitate to contact me.

Very truly yours,

Michael J. Cronen

MJC/mc

cc: FastCap, LLC

# EXHIBIT E

# ZIMMERMAN & CRONEN, LLP

HARRIS ZIMMERMAN
MICHAEL JAMES CRONEN

ATTORNEYS AT LAW
1330 BROADWAY, SUITE 710
OAKLAND, CALIFORNIA 94612-2506
(510) 465-0828 FAX (510) 465-2041
zimpat@zimpatent.com

PATENTS
TRADEMARKS
COPYRIGHT

July 13, 2006

Via fax:617..395.7070
and by post

Matthew Lowrie, Esq.
Lowrie, Lando & Anastasi, LLP
One Main Street - 11th Floor
Cambridge, MA 02142

Re:   *Zipwall, LLC v. FastCap, LLC*
      Civil Action No. 05-cv-11852-REK
      FastCap's Initial Disclosures

Dear Mr. Lowrie:

Defendant and Counterclaimant, FastCap, LLC ("Fastcap"), hereby provides the following in accordance with the Court's Discovery Order (Document 18). However, like Plaintiff Zipwall, LLC ("Zipwall"), FastCap's investigation is ongoing, and FastCap expressly reserves the right to supplement the following as additional information is developed.

Pursuant to Local Rule 26.2(A), FastCap previously provided Zipwall with "disclosure of the information and materials called for by Fed. R. Civ. P. Rule 26(a)(2)", which is updated as follows:

## A.   Individuals Likely To Have Discoverable Information Or Documents To Support FastCap's Claims And Defenses

1.   Mr. Jeffrey Whittemore
     ZipWall, LLC
     37 Broadway, Suite #2
     Arlington, MA 02474

As alleged in ZipWall's Initial Disclosures, Mr. Whittemore appears to have discoverable information regarding the patents-in-suit as he is the named inventor in each of these patents.

2.   Mr. Paul Akers
     FastCap, LLC 3725 Irongate Road
     Suite 105,
     Bellingham, Washington 98226

Matthew Lowrie, Esq.
July 13, 2005
Page Two

Mr. Akers has discoverable information regarding FastCap's products that are the subject of ZipWall's baseless and unfounded allegations of patent infringement in this action.

A.    **Description By Category Of Documents And Things That FastCap May Use To Support Its Claims And Defenses**

1.    File histories and cited prior art references of the patents-in-suit.

2.    Prior art patents, publications, and other prior art documents and things relating to the invalidity and/or unenforceability of the patents-in-suit derived from searches in the United States, Japan and Russia.

3.    Documents relating to the development, use, manufacture, marketing, distribution, offer for sale, and sale of any product(s) or method(s) allegedly embodying any of the inventions claimed in the claims of the patents-in-suit. These are believed to be in the possession, custody or control of ZipWall, its members, employees and/or agents.

4.    Documents and things relating to FastCap's products that are the subject ZipWall's baseless and unfounded allegations of patent infringement in this action. Much of the material FastCap intends to rely upon can be found on its Internet website, <www.fastcap.com>.

5.    Marketing and financial documents relating to ZipWall's sales, including gross sales, net profits, of any product(s) or method(s) allegedly embodying any of the patent claims of the patents-in-suit. Zipwall has not provided any information or documents relating to this subject matter, despite written and oral requests for such information and documents.

6.    Documents relating to any license agreements concerning the patents-in-suit.

7.    Marketing and financial documents relating to FastCap's gross sales, including unit and dollar amounts, of the products Zipwall alleges infringe the patents-in-suit.

C.    **Computation Of Damages**

There is no potential for damages in this case under Zipwall's alleged U. S. Patent Nos. 6,924,004 (the "'004 patent") and 6,953,076 (the "'076 patent") because FastCap, in an abundance of caution, stopped selling its accused "DB clip" when it learned of Zipwall's

Matthew Lowrie, Esq.
July 13, 2005
Page Three

Complaint, which was filed on the same day as the earliest of these two patents, the '004 patent, issued. Regarding Zipwall's alleged U.S. Patent No. 6,209,615 (the " '615 patent"), there is clearly no merit to Zipwall's infringement allegations, as evidenced by Zipwall's years of delay in bringing suit under the '615 patent. Indeed, the last minute addition of the this patent to Zipwall's Amended Complaint appears as nothing more than a litigation tactic calculated to increase FastCap's theoretical exposure for infringement damages under this older patent.

**D.     Any Insurance Agreement That May Be Available To Satisfy Part Or All Of A Judgment Against Akers**
None.

Pursuant to Local Rule 26.1(b)(2), Defendant hereby provides its sworn statement that identifies the following:

(a) Defendant's president, Mr. Paul Akers, and Defendant's product distributors, as well as the manufacturer of the accused products, are persons known to Defendant FastCap or its attorneys who witnessed the transaction or occurrence (i.e. the manufacture, use, offer for sale and sale of defendant's accused products), giving rise to Zipwall's allegations of patent infringement, or otherwise is known or believed to have substantial discoverable information about the Zipwall's claims or FastCap's defenses. Defendant has many distributors of its products across the United States and these distributors are identified, including distributor addresses and telephone numbers, on the pages of FastCap's Internet website, <www.fastcap.com>. The manufacturer of FastCap's accused products is located in China and, if Zipwall wishes to contact this manufacturer, FastCap will provide the manufacturer's identity and contact information pursuant to an appropriate protective order. Zipwall, its officers, directors, and employees, and the named inventor of the patents-in-suit, Mr. Jeffrey Whittemore, are persons known to Defendant FastCap or its attorneys who likely witnessed the manufacture, use, offer for sale and sale of defendant's accused products, giving rise to Zipwall's alleged claim of patent infringement, and the manufacture, use, offer for sale and sale of Zipwall's products, and the prosecution of the patents-in-suit in the United States Patent and Trademark Office, that give rise to FastCap's defenses of patent invalidity and noninfringement.

(b) There are no opposing parties, or officers, directors, and employees of opposing parties, from whom statements have been obtained by or on behalf of the defendant regarding the subject matter of the claims or defenses in this case.

(c) There are no government agencies other than the United States Patent and Trademark Office, and no government officials other than Primary Patent Examiner Bruce A. Lev, known to the defendant or the defendant's attorneys to have investigated the transaction and occurrence giving rise to the claims or defenses relating to patent validity, enforceability, and infringement of the patents-in-suit.

Matthew Lowrie, Esq.
July 13, 2005
Page Four

In addition to the above, FastCap submits the following in accordance with the Court's
Discovery Order:

(A) The names and, where known, the address and telephone number, of each individual
likely to have discoverable information relevant to disputed facts alleged with particularity in the
pleadings, identifying the subject of the information, have already been provided to Zipwall by
FastCap. These include Mr. Paul Akers, Defendant's product distributors, as well as the
manufacturer of the accused products, who are persons known to Defendant FastCap or its
attorneys who witnessed the transaction or occurrence (i.e. the manufacture, use, offer for sale and
sale of defendant's accused products, giving rise to Zipwall's alleged claim of patent
infringement). They also include Zipwall, its officers, directors, and employees, and the named
inventor of the patents-in-suit, Mr. Jeffrey Whittemore, who are persons known to Defendant
FastCap or its attorneys, to have likely witnessed the transaction or occurrence, including the
manufacture, use, offer for sale and sale of Zipwall's products, and the prosecution of the patents-
in-suit in the United States Patent and Trademark Office, that give rise to FastCap's defenses of
patent invalidity and noninfringement in this case.

FastCap also intends to submit expert testimony on the issues of patent office procedure
and related patent matters, and expert testimony on the issue of damages if this matter is not
resolved on summary judgment of noninfringement and/or patent invalidity. The identities of
these expert witnesses shall be provided by FastCap to Zipwall in accordance with the Local
Rules.

(B) Copies of, or a description by category and location of, documents, data compilations,
and tangible things in the possession, custody or control of FastCap that are relevant to disputed
facts alleged with particularity in the pleadings have already be provided by FastCap to Zipwall in
response to Zipwall's various discovery requests and pursuant to the initial disclosure
requirements of the Federal Rules of Civil Procedure. Additionally, documents and information
containing Defendant's confidential and proprietary business information will be provided by
FastCap to Zipwall pursuant to an appropriate protective order.

Very truly yours,

Michael J. Cronen

MJC/mc

cc: FastCap, LLC

# EXHIBIT F

SGS                     Fax:6174262275              Feb  3 2000  12:10    P. 03   *R.m.*
2/4

PATENT
Attorney Docket No.: ZIP.5245CON 13/*cond* B

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant(s):          Jeffrey P. Whittemore        Examiner:   Lev, Bruce
Serial Number:         09/302,122                   Art Unit:   3634
Filing Date:           April 29, 1999
Title:                 Partition Mount

CERTIFICATE OF FACSIMILE TRANSMISSION

I hereby certify that this correspondence is being transmitted to the Assistant Commissioner for Patents, Washington DC
20231, via facsimile transmission, Attn. Examiner B. Lev, Group Art Unit 3634, at 703-305-3597.

 2-3-00                                                      *Amy E. Lockhart*
  Date                                                       Amy E. Lockhart

Assistant Commissioner For Patents
Washington, D.C. 20231

AMENDMENT AFTER FINAL

Sir:

        The following is in response to the Final Office Action dated November 11, 1999, and is
filed within the shortened statutory period of three months. Please amend the application as
follows:

In the Claims

        Please withdraw claims 16, 17, and 42 from consideration in view of the election of
species of Group III claims as indicated in Paper No. 3.

        Please amend Claims 1, 40, and 48 as follows:

01167

Attorney Docket No.:ZIP,5245CON
U.S.S.N. 09/302,122
Page 2

1.   (Twice Amended)  A mount attachable to an extension pole for installing a curtain comprising:

an interface at a proximal end of said mount adapted for coupling the mount to an extension pole;

a compression mechanism along a longitudinal axis of said mount;

a head at a distal end of said mount having an upper first engaging surface extending transverse to said longitudinal axis, said head and said interface coupled to opposite ends of said compression mechanism, said compression mechanism when under compression being biased to urge said head away from said interface;

a clip having a lower second engaging surface adapted to substantially interface with said first engaging surface, and an upper surface; and

a retaining member for removably securing the first and second engaging surfaces, such that when in an engaged position, the first and second engaging surfaces substantially interface, and such that when in a disengaged position, the first and second engaging surfaces separate.

40   (Amended)  The mount of Claim 1 wherein the retaining member comprises a plurality of legs extending from one of the clip [or] and head, the legs including tabs which removably engage the other of the clip [or] and head.

48.   (Amended)  The mount of Claim 18 wherein the retaining member comprises a plurality of legs extending from one of the clip [or] and head, the legs including tabs which removably engage the other of the clip [or] and head.

-2-

01168

Attorney Docket No.:ZIP.5245CON
U.S.S.N. 09/302,122
Page 3

## REMARKS

The Applicant and his attorney appreciate the telephone interview granted by Examiner Lev on February 2, 2000. It is believed that this Amendment After Final sufficiently addresses issues outstanding in the office action and discussed during the telephone interview, so as to place the application in condition for allowance.

Claims 1, 5, 7-18, 21-23 and 39-51 remain pending in the application. Claims 16, 17, and 42 are withdrawn from consideration above and Claims 1, 40 and 48 are amended above. No new matter is added by the claim amendments. Entry is respectfully requested.

With regard to Claims 16, 17, 23, 42, and 50, Applicant notes that the earlier Office Action of June 28, 1999 (Paper No. 3) states that Claims 1 and 18 are generic, and therefore "upon the allowance of a generic claim, Applicant will be entitled to consideration of claims to additional species which are written in dependent form or otherwise include all the limitations of an allowed generic claim as provided by 37 C.F.R. §1.141". It is therefore respectfully requested that since generic Claim 18 is now allowed, that Claims 23 and 50 be considered and likewise allowed. If generic Claim 1 becomes allowed, then it is respectfully requested that dependent species claims 16, 17, and 42 be considered and likewise passed to allowance.

It is noted with appreciation that the Office Action indicates at page 4, paragraph 4, that Claims 7-11, 13, 18, 21, 22, 45-47, and 51 are allowed.

Claims 40, 41, 48, and 49 stand rejected under 35 U.S.C. §112, second paragraph. Claims 40 and 48 are amended above to replace "or" with "and", as suggested in the Office Action. Claims 41 and 49 are respectively dependent on claims 40 and 48. Entry of the amendments and removal of the rejections are respectfully requested.

-3-

**01169**

Attorney Docket No.:ZIP.5245CON
U.S.S.N. 09/302,122
Page 4

Claim 44 stands rejected under 35 U.S.C. §102(b) as being anticipated by Cunningham (U.S. Patent No. 4,662,034). This rejection is believed to be in error, as Claim 44 is dependent on allowed Claim 18, and therefore should inherit its allowability. Such allowance is respectfully requested.

Claims 1, 5, 12, 14, 15, 39-41, and 43 stand rejected under 35 U.S.C. §102(b) as being anticipated by Cunningham (U.S. Patent No. 4,662,034).

Cunningham is directed to a snap-on button resembling some of the features claimed in Claim 1 of the present invention. The Cunningham embodiment as shown in Fig. 2 includes a spring-loaded release tab 26a, which, when pulled, operates to release the snap-on button 14 from its housing 20.

During the telephone interview, Applicant's attorney pointed out to Examiner Lev that the Cunningham spring, when compressed by pulling the release tab 26, operates to urge the release tab 26 and housing 20 closer together. In the office action and during the telephone interview, the Examiner analogized the Cunningham tab 26 to the "interface" of Claim 1 of the present invention, the Cunningham spring 28 to the "compression mechanism" of Claim 1, and the Cunningham housing 20 to the "head" of Claim 1. Assuming this, then it is apparent that the spring 28 of the Cunningham configuration, when compressed, is biased to urge the release tab 26 toward the housing 20, so as to return the release tab 26 to a rest position close to the housing 20.

In contrast, in the present invention as claimed in amended Claim 1, the "compression mechanism", when "under compression", is "biased to urge said head away from said interface". In this manner, the configuration of the present invention is outwardly biased in that the head and interface are biased by the compression mechanism to be urged away from each other, as opposed

-4-

01170

Attorney Docket No.:ZIP.5245CON
U.S.S.N. 09/302,122
Page 5

to Cunningham, wherein the release tab is urged <u>toward</u> the housing by the spring. The amended claim language is clearly supported in the specification as filed (see, for example, page 9, lines 15-19).

For the reasons given, it is respectfully submitted that amended Claim 1 is not anticipated by Cunningham. It is therefore requested that Claim 1 be passed to allowance. With regard to rejected dependent claims 5, 12, 14, 15, 39-41, and 43, it is respectfully submitted that independent Claim 1, from which they depend, is allowable and therefore any dependent claims should inherit its allowability.

Closing Remarks

In summary, it is believed that all claims are condition for allowance, and such allowance is respectfully requested. In the event that prosecution of this case may be expedited by a telephone conference, the Examiner is invited to call the undersigned at the number given below.

Respectfully submitted,

Date: February 3, 2000
225 Franklin Street
Suite 3300
Boston, Massachusetts 02110
Telephone: (617) 426-9180 x148
Facsimile: (617) 426-2275

Anthony P. Onello, Jr.
Registration Number 38,572
Attorney for Applicant

K:\Zipwall\5245con\Resp2finalos.wpd

-5-

01171

PATENT
Attorney Docket No.: ZIP.5245CON

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant(s):      Jeffrey P. Whittemore          Examiner: Lev, B.
Serial No.:        09/302,122                     Group Art Unit: 3634
Filing Date:       April 29, 1999
Title:             PARTITION MOUNT

CERTIFICATE OF FACSIMILE TRANSMISSION

I hereby certify that this correspondence is being transmitted to the Assistant Commissioner for Patents, Washington DC 20231, via
facsimile transmission, Attn. Examiner B. Lev, Group Art Unit 3634, at 703-305-3697.

_2-3-00_                                          _Amy E. Lockhart_
Date                                              Amy E. Lockhart

Assistant Commissioner For Patents                            FAX RECEIVED
Washington, D.C. 20231                                        FEB 03 2000
                        LETTER OF TRANSMITTAL                 GROUP 3600

Sir:

        Enclosed herewith for filing in the above-identified patent application please find attached an
Amendment After Final.  No fees are believed to be due.

                                        Respectfully submitted,

Date: _February 3, 2000_                _Anthony P. Onello_
                                        Anthony P. Onello, Jr.
225 Franklin Street                     Registration Number 38,572
Suite 3300                              Attorney for Applicant
Boston, Massachusetts 02110
Telephone:  (617) 426-9180 x148
Facsimile:  (617) 426-2275

K:\Zipwall\5245con\AmendTrans2.wpd

**Samuels, Gauthier & Stevens** LLP

225 Franklin Street, Suite 3300
Boston, MA 02110

Telephone: (617) 426-9180
Facsimile: (617) 426-2275

| | | | |
|---|---|---|---|
| To: | U.S. Patent & Trademark Office **Examiner Bruce Lev** **Art Unit 3634** | Date: | February 3, 2000 |
| Fax #: | 1-703-305-3597 | Pages: | _7_ including this cover sheet |
| From: | Anthony P. Onello, Jr. | | |
| Subject: | Applicant(s): Serial No.: Filing Date: Title: | Jeffrey P. Whittemore 09/302,122 April 29, 1999 PARTITION MOUNT | |
| | Our Reference: | ZIP.5245CON | |

**Official**

**FAX RECEIVED**

FFR 0 3 2000

**GROUP 3600**

COMMENTS:

PLEASE DELIVER TO EXAMINER <u>BRUCE LEV</u> AT ART UNIT 3634

K:\Zipwall\5245con\ptofax.wpd

This telecopy is attorney-client privileged and contains confidential information intended only for the person(s) named above. Any other distribution, copying or disclosure is strictly prohibited. If you have received this telecopy in error, please notify us immediately and return the original transmission to us by mail without making a copy.

01173

# EXHIBIT G

Case 1:03-cv-11852-JLT  Document 3



**HOME**  LOCATE A RETAILER  HELP DESK

what will you do with the time you save?

Home Products Furniture Innovation Support Company

**News:** **Award Winner!** *FlipBolt wins IWF 2004 Challenger Award!* **GO**



360° articulating top & bottom feet

*key features*

- 70 lb. load capacity
- Action lever for secure pressure
- Fully articulating head and foot
- Quick release lever

## 3rd HAND support system

**WARNING:** These products may make your job and life easier!

The 3rd Hand HD is the help you have been looking for. If you ever wished you had an extra hand... here it is. The 3rd Hand HD and Little Hand HD provide support, brace, or clamp for whenever you might need an extra hand.

### 3rd Hand HD Accessories:
LaserMount | UniversalFOOT | Bag

**WHERE TO BUY?**

**More Info:**
- Cutting down the 3rd Hand
- 3rd Hand v Power Pole (PDF)

so many features



# 3rd Hand HD 5' to 12' extension

Ergonomic pump handle adjust the top foot!

replay movie

Peel & Stick
FastCap
Shapes/Colors
PVC Colors
Water Drop
Wood Grain
FlushMount
Tools
3rd Hand HD
Little Hand HD
Accessories
LaserMount
CrossCut Tape
0-1-1 Laser
Kaizen
Hardware
Freestop
Drawer Bumper
FlipBolt
Hook-it
J-Hook
Finishing
SofWax
Adhesive S
2P-10 9.5 oz
2P-10 Kit
2P-10 Solo
Work Wear
Armadillo Glove
Ballistic Apron
Safety Glasses
MetalWear
DrawerPro
FastWrap
Glu-Bot
NE
2006 C

| Applications | Specifications | Accessories |
| --- | --- | --- |

The 3rd Hand HD is like an extra person. Great for:

- + **Trim and crown molding:** use the 3rd Hand HD to secure your trim or crown molding in place while you nail it in place in another location
- + **Glued down flooring** apply pressure to the flooring material while it dries
- + **Drywall:** hold the drywall in place overhead while you secure it
- + **Load stabilizer:** mount the 3rd Hand HD in place horizontally to prevent material from shifting in transport

# EXHIBIT H

US006942004B2

(12) **United States Patent**
Whittemore

(10) Patent No.: US 6,942,004 B2
(45) Date of Patent: *Sep. 13, 2005

(54) PARTITION MOUNT

(75) Inventor: Jeffrey P. Whittemore, Arlington, MA (US)

(73) Assignee: Zipwall, LLC, Arlington, MA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 10/301,233

(22) Filed: Nov. 21, 2002

(65) Prior Publication Data

US 2003/0070773 A1 Apr. 17, 2003

Related U.S. Application Data

(63) Continuation of application No. 09/884,337, filed on Jun. 19, 2001, now Pat. No. 6,508,295, which is a continuation of application No. 09/613,645, filed on Jul. 11, 2000, now Pat. No. 6,321,823, which is a continuation of application No. 09/302,122, filed on Apr. 29, 1999, now Pat. No. 6,209,615, which is a continuation of application No. 08/740,372, filed on Oct. 29, 1996, now Pat. No. 5,924,629.

(51) Int. Cl.⁷ ............................. A47H 13/00

(52) U.S. Cl. .............. 160/368.1; 160/351; 160/402; 248/200.1; 24/113 MP

(58) Field of Search ...................... 160/368.1, 350, 160/351, 379, 330, 380, 399, 402; 248/200.1; 403/326, 329; 24/92, 113 MP, 113 R, 114

(56) References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 827,000 A | 7/1906 | Dinsmore | |
| 1,766,324 A | 6/1930 | Berner | |
| 2,219,169 A | 10/1940 | Alter | 248/1 |
| 2,232,194 A | 2/1941 | Zogby | 156/33 |
| 2,474,158 A | 6/1949 | Neely | 155/180 |
| 2,816,769 A | 12/1957 | Noble | 279/83 |
| 2,903,227 A | 9/1959 | de Kalb Key | 248/356 |
| 2,942,829 A * | 6/1960 | Stiffel | 160/368.1 X |
| 3,072,784 A | 1/1963 | Maan | 240/81 |
| 3,090,826 A | 5/1963 | Cochran | 174/158 |
| 3,118,363 A | 1/1964 | Burgess, Jr. | |
| 3,247,558 A | 4/1966 | Kaufman | 24/81 |
| 3,322,381 A | 5/1967 | Bubb | 248/121 |
| 3,327,340 A | 6/1967 | Bethune et al. | 343/702 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3918516 | 6/1989 | E04G/25/04 |
| DE | 04420849 A * | 6/1994 | 160/368.1 X |
| DE | 29605222 | 7/1996 | E04G/25/08 |
| FR | 2411282 | 6/1979 | F04B/27/4 |
| GB | 1042086 | 9/1966 | |
| GB | 2156894 | 10/1985 | 160/368.1 X |
| WO | WO 86/03538 | 6/1986 | E04G/1/26 |
| WO | WO9109556 | 7/1991 | A47G/5/00 |
| WO | WO 91/09556 | 7/1991 | 160/368.1 X |

*Primary Examiner*—Bruce A. Lev
(74) *Attorney, Agent, or Firm*—Mills & Onello LLP

(57) **ABSTRACT**

In a spring-loaded curtain mount, the mount includes a pole interface at a proximal end, a compressive mechanism, and a head at a distal end. The pole interface is adapted to receive the end of a standard length adjustable pole or a painter's pole. The compression mechanism is disposed between the proximal end of the mount and the head. The mount includes a coupling device adapted to receive a portion of a curtain. During installation, the curtain mount is coupled to the end of an extension pole and the length of the pole is adjusted such that the combined length of the pole and mount is slightly longer than the distance between the floor and ceiling. At ground level, a portion of the curtain is attached to the head of the curtain mount. The curtain and mount are raised to the ceiling and the mount and pole are compressed between the floor and the ceiling. This compressive force operates to urge the head toward the ceiling, securing the mount in place.

61 Claims, 12 Drawing Sheets





**01382**

US 6,942,004 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,333,808 A | 8/1967 | Do Boff | 248/354 | |
| 3,350,120 A | 10/1967 | Hinrichs | 287/58 | |
| 3,529,860 A | 9/1970 | Jelley | 287/189.36 | |
| 3,592,434 A | 7/1971 | Murray | 248/488 | |
| 3,604,397 A * | 9/1971 | Salerno | 119/29 | |
| 3,608,991 A | 9/1971 | Wade | 312/345 | |
| 3,713,643 A * | 1/1973 | Gerstenberger | 270/61 R | |
| 3,767,253 A | 10/1973 | Kluetsch | 296/24 R | |
| 3,792,510 A | 2/1974 | Evett | 24/243 | |
| 3,822,850 A | 7/1974 | Elias | 248/354 S | |
| 3,858,988 A | 1/1975 | Cohen | | |
| 3,861,663 A * | 1/1975 | Strickland | 269/26 | |
| 3,952,877 A | 4/1976 | Kindl | 211/105.5 | |
| 3,956,784 A * | 5/1976 | Vargas | 5/362 | |
| 3,972,272 A | 8/1976 | Haghy | 98/50 | |
| 3,994,463 A | 11/1976 | Baker | | |
| 4,078,756 A | 3/1978 | Cross | 248/226.4 | |
| 4,087,006 A | 5/1978 | Schill | 211/86 | |
| 4,111,217 A * | 9/1978 | Victor | 135/15 | |
| 4,127,911 A | 12/1978 | Cupp et al. | | |
| 4,139,101 A * | 2/1979 | Towligh | 211/86 | |
| 4,277,863 A | 7/1981 | Faneuf | 24/3 | |
| 4,379,654 A | 4/1983 | Rovelli | 405/53 | |
| 4,396,325 A | 8/1983 | Joice-Cavanagh | 410/129 | |
| 4,488,651 A | 12/1984 | Bishop | 211/105.6 | |
| 4,502,256 A | 3/1985 | Hahn | 52/63 | |
| 4,536,924 A | 8/1985 | Willoughby | 24/487 | |
| 4,576,354 A * | 3/1986 | Blessing, Sr. | 248/354.5 | |
| 4,592,707 A * | 6/1986 | Carlson | 156/574 | |
| 4,645,473 A | 2/1987 | Mochizuki | 464/79 | |
| 4,662,034 A | 5/1987 | Cunningham | 24/90 | |
| 4,708,189 A | 11/1987 | Ward | 160/351 | |
| 4,715,089 A | 12/1987 | Schenck | 16/115 | |
| 4,717,107 A * | 1/1988 | Servadio | 248/353 | |
| 4,770,086 A * | 9/1988 | Gabster | 98/50 | |
| 4,794,974 A * | 1/1989 | Melino | 160/330 | |
| 4,824,302 A | 4/1989 | Schultheis et al. | 410/151 | |
| 4,852,844 A * | 8/1989 | Villavecces | 248/314 | |
| 4,874,028 A | 10/1989 | Lynch et al. | 160/332 | |
| 4,885,876 A | 12/1989 | Henke | 51/393 | |
| 4,907,835 A | 3/1990 | Salters | 296/1.1 | |
| 4,912,814 A * | 4/1990 | McKenzie | 24/115 H | |
| 4,928,916 A | 5/1990 | Molloy | | |
| 4,969,241 A | 11/1990 | Griffin | 24/113 | |
| 5,038,889 A | 8/1991 | Jankowski | 182/129 | |
| 5,040,915 A * | 8/1991 | Stuart et al. | 403/322 | |
| 5,056,753 A | 10/1991 | Lunau et al. | 248/542 | |
| 5,078,348 A * | 1/1992 | Babitchenko | 248/124 | |
| 5,116,112 A * | 5/1992 | Offenhauer et al. | 248/452 | |
| 5,129,774 A | 7/1992 | Babeiro et al. | 414/11 | |
| 5,131,781 A | 7/1992 | Klein | | |
| 5,170,974 A | 12/1992 | Ruggiero | 248/251 | |
| 5,240,058 A | 8/1993 | Ward | 160/123 | |
| 5,287,614 A * | 2/1994 | Ehrlich | 29/450 | |
| 5,299,773 A * | 4/1994 | Bertrand | 248/514 | |
| 5,301,915 A * | 4/1994 | Bahniuk et al. | 248/452 | |
| 5,308,280 A | 5/1994 | Dotson | 454/170 | |
| 5,331,706 A | 7/1994 | Graham | | |
| 5,345,989 A | 9/1994 | Brophy | 160/354 | |
| 5,375,303 A | 12/1994 | Sbenier | 24/163 | |
| 5,379,491 A * | 1/1995 | Solo | 24/3 R | |
| 5,384,948 A | 1/1995 | Frederick | 24/306 | |
| 5,388,283 A | 2/1995 | Garnell | 4/503 | |
| 5,404,602 A | 4/1995 | Kondo | 5/504.1 | |
| 5,469,607 A | 11/1995 | Henningson et al. | 24/716 | |
| 5,497,537 A * | 3/1996 | Robinson et al. | 24/716 | |
| 5,524,693 A | 6/1996 | Hamilton | 160/243 | |
| 5,529,326 A * | 6/1996 | Hwang | 280/220 | |
| 5,536,229 A | 7/1996 | Athergo | 482/148 | |
| 5,542,209 A | 8/1996 | Shen | 47/44 | |
| 5,555,607 A | 9/1996 | Purveris | 24/129 R | |
| 5,558,501 A * | 9/1996 | Wang et al. | 416/244 | |
| 5,584,456 A | 12/1996 | Stephens | 248/214 | |
| 5,640,826 A * | 6/1997 | Husilla, Jr. | 52/749.14 | |
| 5,645,272 A * | 7/1997 | Brennan, Sr. | 269/68 | |
| 5,649,780 A | 7/1997 | Schall | 403/109 | |
| 5,666,702 A * | 9/1997 | Ming-Chieh | 24/510 | |
| 5,673,741 A | 10/1997 | Cairns | 160/330 | |
| 5,707,032 A | 1/1998 | Ehrlich | 248/205.3 | |
| 5,715,620 A | 2/1998 | Walker | 40/591 | |
| 5,722,691 A * | 3/1998 | Patel | 281/42 | |
| 5,813,653 A | 9/1998 | Zuffetti | 403/363 | |
| 5,884,424 A | 3/1999 | Smith | 40/610 | |
| 5,897,085 A | 4/1999 | Cronin | 248/200.1 | |
| 5,924,469 A | 7/1999 | Whittemore | 160/368.1 | |
| 5,937,488 A | 8/1999 | Geiger | 24/330 | |
| 5,940,942 A | 8/1999 | Fong | 24/459 | |
| 5,941,434 A | 8/1999 | Green | 224/280 | |
| 5,941,586 A * | 8/1999 | Fann | 294/19.1 | |
| 5,944,464 A | 8/1999 | Cole, Jr. | | |
| 5,979,110 A | 11/1999 | Tai | 47/41.01 | |
| 6,067,691 A * | 5/2000 | Feltman | 24/295 | |
| 6,082,945 A | 7/2000 | Jeffries et al. | | |
| 6,152,434 A | 11/2000 | Gluck | 269/6 | |
| 6,164,605 A | 12/2000 | Drake et al. | 248/74.3 | |
| 6,170,112 B1 | 1/2001 | Mayfield et al. | | |
| 6,209,615 B1 | 4/2001 | Whittemore | 160/368.1 | |
| 6,378,175 B1 | 4/2002 | Vandexpan | 24/336 | |
| 6,467,741 B1 * | 10/2002 | Shih | 248/200.1 | |
| 6,474,609 B1 * | 11/2002 | Pinard | 248/303 | |
| 6,508,295 B2 * | 1/2003 | Whittemore | 160/368.1 | |
| 6,523,231 B1 | 2/2003 | Lassiter | 24/339 | |
| 2001/0029640 A1 * | 10/2001 | Cassar | 15/144.1 | |
| 2003/0154588 A1 * | 8/2003 | Blacket et al. | 29/456 | |

* cited by examiner

01383



FIG. 1A



FIG. 5A        FIG. 5B



FIG. 1B



FIG. 1C

01386



FIG 2

**01387**

U.S. Patent    Sep. 13, 2005    Sheet 5 of 12    US 6,942,004 B2



FIG. 3B

FIG. 3C

FIG. 3A

01388



FIG. 4B

FIG. 4C

FIG. 4A



FIG. 6

01390



FIG. 7A

FIG. 7B

01391



FIG. 7C



FIG. 7D



FIG. 7E



FIG. 7F

01393

FIG. 8C

FIG. 8B

FIG. 8A

01394



FIG. 9B

FIG. 9A

FIG. 9C

US 6,942,004 B2

1

# PARTITION MOUNT

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 09/884,337, filed Jun. 19, 2001, now U.S. Pat. 6,508, 295, which is a continuation of U.S. application Ser. No. 09/613,645, filed Jul. 11, 2000, now U.S. Pat. No. 6,321,823, which is a continuation of U.S. application Ser. No. 09/302, 122, filed Apr. 29, 1999, now U.S. Pat. No. 6,209,615, which is a continuation of U.S. application Ser. No. 08/740,372, filed Oct. 29, 1996, now U.S. Pat. No. 5,924,629, the contents of the applications being incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Partition systems are often employed to separate portions of a building or room. Partitions serve as a barrier to dust, noise, light, odors, and the like. In construction zones, partitions are useful for protecting a clean area from a work area, for example, protecting an area where furniture and rugs are temporarily stored from an area where wood floors are being refinished.

Workers at construction sites often use rudimentary techniques for installing partitions. Some simply nail, screw, or staple the curtain or partition material to the floor, ceiling, and abutting walls, resulting in damage to their surfaces. Others tape or otherwise adhere a curtain or plastic sheet to the walls and ceilings. The tape usually fails to stick, but if it does stick, as the tape is removed, paint usually pulls off with the tape or adhesive is left behind.

Others employ more clever techniques for constructing partitions. U.S. Pat. No. 4,794,974 discloses a curtain wall having spring-loaded extendable support legs which support header elements aligned along the ceiling. A curtain is mounted to the header elements with fasteners along the length of each header element. This design suffers from several limitations. The support poles, header elements, fasteners, and curtain all comprise dedicated hardware, increasing manufacturing costs. Particularly, the curtain must be designed to accommodate the fasteners. In addition, installation appears to be awkward and time consuming due to the multitude of fasteners and the system appears to be top-heavy during installation.

U.S. Pat. No. 4,708,189 discloses a spring-loaded curtain support having a plurality of support units extending from the floor to the ceiling. Each support unit includes a stackable extension member, a telescoping section, a lower batten, and an upper batten. The lower and upper battens extend along the floor and ceiling respectively and interlock so as to provide a continuous batten along the floor and ceiling. A curtain is designed to loop around the upper batten and accommodate the extension poles. This design again requires dedicated hardware, including a curtain which is designed specifically to accept a particular upper batten size and shape and a particular extension pole. The structure is bulky and appears tedious to install.

U.S. Pat. No. 5,308,280 discloses a coal mine ventilation curtain support. An adjustable extension pole is erected between the floor and ceiling of a mine. A curtain support member compresses between the extension pole resting on the floor, and the ceiling such that the compressive force urges the support member against the ceiling, thereby securing a curtain in place against the ceiling. Although this design accommodates any type of curtain material, it again suffers from the limitation of requiring dedicated hardware as the support member is designed for a particular extension

2

pole. In addition, installation appears challenging in rooms with tall ceilings as the curtain is installed after the mount is raised and installed. Following installation of the support member, an installer must climb up to the ceiling and pull back a leg of the support member, insert a curtain and snap the support member back into the ceiling. In a home construction project, the snapping action may damage the ceiling. In addition, for ceilings higher than the reach of the installer, this design may prove to be challenging to install. This design presents the further unfortunate possibility that the installer could jam his fingers between the support member and ceiling.

## SUMMARY OF THE INVENTION

The present invention is directed to a partition mount apparatus and method which overcome the limitations of the prior art. The inventive method and apparatus are applicable to use in construction zones in preventing contaminants such as dust and paint from entering clean areas in a home or office. The invention may also be used as a temporary visual, odor, or sound barrier, depending on the curtain material employed. The present invention offers the advantages of accommodating standard extension poles, for example, painters poles, with standard threads, and is compatible with a variety of commercially-available curtain or drape materials, for example plastic, cloth, or the like. The invention is a "clean" system designed to be installed and removed without damaging or otherwise marking the ceiling, floor or walls in the construction zone. Assembly is easy and fast and can be accomplished by a single individual. In a preferred method for assembling the partition of the present invention, the curtain mounts and curtain are first assembled on the floor and then raised to the ceiling permitting safe installation in rooms with high ceilings, for example cathedral ceilings.

One embodiment of the invention comprises a spring-loaded mount including a hole at a proximal end, a compression mechanism, and a head at a distal end. The hole is adapted to receive the end of a standard length-adjustable pole or painters pole. In a preferred embodiment, the compressive mechanism comprises a spring under compression between an inner wall of the mount and the head. The head is urged toward the ceiling by the compressive mechanism, providing longitudinal rigidity to the installed mount. The head preferably interfaces with the mount at a swivel joint so that the mount can be installed at a range of orientations relative to the ceiling.

The head preferably includes a coupling device, for example, a Velcro™ hook and loop fastener strip, a hook, or a clip, adapted to receive a portion of a curtain. In a first preferred embodiment of the invention, the face of the head includes a sheet of Velcro™ hooks which mates with a sheet of Velcro™ loops attached to the curtain. On the side of the curtain opposite the Velcro™ loops, a high-friction material provides friction between the mount and the ceiling, so that the curtain is less likely to slide relative to the ceiling thereby providing lateral rigidity. In a second preferred embodiment of the invention, a removable clip couples the curtain to the head. The clip is adapted to receive a section of curtain material and snap on or otherwise secure to the head. High friction material attached to the back of the clip provides lateral rigidity as described above.

In alternative embodiments, the curtain mount may be adapted to receive poles without threads, or may include a pin for interfacing with a corresponding hole in a pole. Furthermore, the elements of the curtain mount may be

01396

US 6,942,004 B2

3

distributed along the pole. The extension poles do not necessarily need to be adjustable in situations where the ceiling size is standard or predetermined.

In the inventive method of the present invention, a spring-loaded curtain mount is coupled to the end of a standard adjustable pole, such that the length of the pole is adjusted such that the combined length of the pole and mount is slightly longer than the distance between the floor and ceiling. A portion of the curtain is attached to the curtain mount. The curtain and mount are raised to the ceiling and the mount and pole are compressed between and the floor and ceiling. This compressive force operates to urge the head toward the ceiling. The same compressive force operating through the high friction material on the head or curtain provides lateral rigidity for the system.

The mount is free-standing and therefore does not require additional "destructive" mounting means, for example nailing or taping. Instead, the mount is installed and removed without permanent damage to the ceiling or floor.

By placing several mounts between the ceiling and floor, across a room or portions thereof, the room can be partitioned to protect furniture and the like during construction of other portions of the room. The curtain can also be installed along the ceiling and/or floor for constructing a tunnel or booth. The shape of the partition is variable depending on the respective spatial positions of the mounts.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features and advantages of the invention will be apparent from the following more particular description of preferred embodiments and the drawings in which like reference characters refer to the same parts throughout the different views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principals of the invention.

FIGS. 1A, 1B, and 1C illustrate installed partition configurations in accordance with the present invention.

FIG. 2 illustrates the primary components of two preferred embodiments of the present invention.

FIG. 3A is a cutaway side view of a curtain mount having a Velcro™-mount configuration in accordance with the present invention.

FIG. 3B is a perspective view of the head of the curtain mount of FIG. 3A interfacing with an appropriately configured curtain in accordance with the present invention.

FIG. 3C is a side view of a curtain mounted to the ceiling by the curtain mount of FIG. 3A in accordance with the present invention.

FIG. 4A is a cutaway side view of a curtain mount having a clip-mount configuration in accordance with the present invention.

FIG. 4B is a perspective view of the interaction of the clip and head of the curtain mount of FIG. 4A in accordance with the present invention.

FIG. 4C is a side view of a curtain mounted to the ceiling by the curtain mount of FIG. 4A in accordance with the present invention.

FIG. 5A is a perspective view of the head of a curtain mount including an extension loop in accordance with the present invention.

FIG. 5B is a side view of a clamped interface between the curtain mount body and an extension pole in accordance with the present invention.

FIG. 6 illustrates a curtain installation using various preferred and alternative embodiments of the present invention.

4

FIG. 7A–FIG. 7F illustrate an installation procedure in accordance with the present invention.

FIG. 8A–FIG. 8C are perspective views of alternative embodiments for coupling the curtain to the head.

FIG. 9A–FIG. 9C are perspective views of an alternative embodiment of a curtain mount in accordance with the present invention illustrating an alternative curtain coupler, an alternative pole interface, and an alternative compression mechanism.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. 1A illustrates an installed partition extending from the floor 34 to the ceiling 32 of a room between opposed walls 36A, 36B. Three curtain mounts 24 in accordance with the present invention are mounted on extension poles 22. A foot 26 at the bottom of each extension pole interfaces with the floor and a head 28 at the top of each curtain mount interfaces with the ceiling 32. The contact or interface points of the foot and head preferably are covered with a soft friction material such as rubber to provide lateral rigidity of the system and to prevent marking of the ceiling and floor.

Each curtain mount includes a compression mechanism, for example a spring, which operates to urge the head 28 against the ceiling 32, thereby securing the curtain 30. The extension poles 22 are preferably adjustable such that before installation of the curtain mount 30, the pole length in combination with the fully extended curtain mount 24 can be made slightly larger than the distance from the floor 34 to the ceiling 32 at the point at which the curtain mount is to be installed. For example, if the compression range of the spring is 2–3 inches, then the total length of the pole 22 and mount 24 can be made 2–3 inches longer than the floor-to-ceiling 32 height, causing the spring to be compressed when the system is installed. Alternatively, non-adjustable standard poles such as painters poles sized for particular predetermined ceiling heights may be employed.

FIG. 1B illustrates the present invention installed to partition a portion of a room extending between adjacent walls 36B,36C. In this illustration, the curtain 30 is installed to protect furniture 38 from dust and debris during painting or other construction in the open portion of the room.

FIG. 1C illustrates the present invention configured as a tunnel or booth. In this installation, the curtain 30 extends along the ceiling 32 between mounts 24A, 24B, 24C, and 24D, protecting the ceiling 32 from activity in the tunnel. The curtain 30 can be tucked under feet 26A–26D to secure the curtain to the floor 34. The curtain 30 may also be installed between the feet 26A–26D on the floor to provide an enclosed tunnel. The sides of the tunnel may be formed by a single continuous curtain 30 or multiple curtains 30, the edges of each held in place and raised by the mounts 24A–24D. This configuration is particularly well suited to serve as an asbestos removal tunnel or paint booth.

Note that for purposes of the present invention, the term "curtain" is defined to include any flexible material suited for partitioning, for example cloth sheets and drapes, or plastic tarps.

FIG. 2 illustrates two preferred curtain mount embodiments. In a first Velcro™-mount embodiment 21A, an extension pole 22A having a foot 26A, for example a rubber foot 26 is coupled to a first curtain mount 24A. The curtain mount 24A is spring-loaded as described above and as will be described in further detail below.

The curtain mount includes a head 28A. The head is preferably of sufficient surface area to accommodate curtain

US 6,942,004 B2

5

materials of a variety of strengths and weights. For example, if the head area is too small, the head may punch through a weaker curtain material when weighted by the curtain. In a preferred embodiment of the invention, a head size of approximately 5" by 2.5" was found to be sufficient to handle most curtain materials. The head 28A includes a strip of Velcro™ loops or hooks attached thereto. The Velcro™ strip 40 on the head 28A mates with a corresponding Velcro™ strip 42 attached to a portion of the curtain 30. A strip of friction material 44 is attached to the face of the curtain 30 opposite that of the Velcro™ strip 42. In this manner, an installer can first mate the Velcro™ strips 42,40 of the curtain 30 and curtain mount 24A respectively and then raise the curtain mount 24A and curtain 24A such that the high friction material 44 interfaces with the ceiling. As the spring in the curtain mount 24A compresses, that compressive force operates outwardly through the head 28A, Velcro™ strips 40,42, curtain 30, and high friction material 44 against the ceiling, thereby securing the curtain 30 in place against the ceiling. A universal joint 56A at the head 28A allows for installation of a variety of angles. This allows for installation of the curtain mount of the present invention in rooms having pitched ceilings, for example cathedral ceilings.

In a second curtain mount embodiment 24B hereinafter referred to as a clip-mount, a curtain clip 64 is adapted to accept a portion 30A of a curtain 30. In a first embodiment, the clip 64 includes legs 68 adapted to snap over the body of the head 28B, thereby securing the clip 64 and curtain 30 to the head 28B. In a second embodiment, the curtain 64 includes pins 112 (see FIG. 9A) which slide and lock in corresponding holes 110 in the head 28B. The top portion of the clip 64 preferably includes high friction material 44 as described above. In the clip-mount embodiment, an installer at floor level clips a portion of the curtain onto the head 28B of the curtain mount 24B and raises the curtain 30 to the ceiling using extension pole 22B. The high friction material 44 at the head 28B in combination with the rubber foot 26 provide lateral rigidity to the system, and the compressed spring in the curtain mount 24B provides longitudinal rigidity to the installed system. The clip embodiment of the curtain mount 24B offers the advantage of accepting any portion of any flexible curtain 30 material, offering an advantage over the Velcro™-mount embodiment 24A which can be coupled only to those portions of a curtain 30 having Velcro™ strips 42 previously installed thereon.

FIG. 3A is a cutaway side view of a Velcro™-mount embodiment of a curtain mount 24 in accordance with the present invention. The curtain mount 24 includes a body 48, a spring 50, a plunger 46, a head 28, and a hole 60 for receiving the end of an extension pole 22. The hole 60 includes internal threads 52 for mating with corresponding external threads 54 formed on the extension pole 22. The thread may comprise ¾ Acme thread, standard in the industry for painter's poles and other standard extension poles. This permits the curtain mount 24 to be compatible with commercially-available poles. When the extension pole 22 is inserted to a predetermined distance into the hole 60, a thread stopper 58 prevents the pole 22 from being inserted further.

A spring 50 rests in the body 48 of the curtain mount 24 between the rigid thread stopper 58 and the plunger 46. The spring is preferably extendable over a range of lengths, for example four inches, to accommodate extension poles of a range of lengths. The tension of the spring 50 must be high enough to support the weight of the installed curtain and low enough such that the head 28 of the curtain mount 24 does

6

not push through the ceiling during installation. The plunger 46 and head 28 preferably interface at a universal joint 56 such that the curtain mount can be installed at a variety of angles relative to the ceiling. Velcro™ loops 40 are coupled to the outer face of the head 28. Preferred methods for coupling Velcro™ loops to the head 28 include self-adhesive Velcro™ strips and/or stapling.

The perspective view of FIG. 3B illustrates the head 28 and Velcro™ loops 40 coupled thereto. The Velcro™ loops 40 interface with Velcro™ hooks 42 stapled or otherwise adhered to a portion of the curtain 30. Friction material, approximately slightly larger in area than the surface area of the head 28 is disposed on the opposite face of the curtain. When the Velcro™ hooks 42 are mated to the Velcro™ loops 40, the curtain 30 is secured to the end of the curtain mount 24 and can be raised to the ceiling as shown in FIG. 3C.

In FIG. 3C, a force F generated by the compression of the spring operating on the plunger 46 urges the head 28 against the ceiling 32. The force transfers through the loops 40, the hooks 42, the curtain 30, and the high friction material 44, and operates on the ceiling 32. In this manner, the longitudinal compression of the spring acts outwardly to secure the curtain 30 against the ceiling 32.

FIG. 4A illustrates the clip-mount embodiment of the present invention. A curtain mount 24 includes a body 48 having a hole 60 for receiving an end of an extension pole 22, a plunger 62, a spring 50, and a fixed head 28. Note that the extension pole 22 of this embodiment is a standard thread-less pole and the hole 60 is adapted to receive the pole. In this embodiment, the pole 22 is slidable relative to the body 48 of the curtain mount 24, and communicates with the plunger 62 to compress the spring 50 against the spring stopper 51. The head 28 is longitudinally fixed, relative to the body 48. A universal joint 56 as shown in FIG. 3A may optionally be employed to couple the head 28 to the body 48 for reasons described above. A curtain clip 64 having legs 65 is adapted to snap onto the head 28, thereby clamping an inserted curtain therebetween. The clip legs 65 include tabs 67 which snap around the bottom face of the head 28 providing a secure fit. High friction material 44 is disposed on the top face of the clip 64 for interfacing with the ceiling, thereby providing lateral rigidity to the system as described above. Note that the clip design given above is merely illustrative of various clip designs which may be employed in accordance with the present invention.

FIG. 4B illustrates the relative positions of the head 28, curtain 30, and clip 64 during installation. An advantage of the clip-mount embodiment over the Velcro™-mount embodiment is that the clip-mount can be secured to any portion of a curtain or sheet available to the installer. This may include a center portion of the curtain 30 or a corner portion of the curtain 30 as shown in FIG. 4B. In contrast, the Velcro™-mount embodiment requires the curtain to have portions of Velcro™ attached to the curtain at predetermined locations.

FIG. 4C illustrates a curtain 30 installed against the ceiling 32 using the clip-mount. Before the curtain is raised, the clip 64 and curtain 30 are snapped and secured to the head 28. After raising the curtain against the ceiling 32, compression in the spring of the curtain mount generates a force F which operates through the head 28, curtain 30, clip 64, and high friction material 44 against the ceiling 32. The compressive force F of the spring and high friction material provide longitudinal and lateral rigidity to the system as described above.

FIG. 5A is a perspective view of the head 28 of a curtain mount having an extension loop 66. The extension loop 66

01398

US 6,942,004 B2

7

is attached to the head 28, universal joint 56, plunger 46 (shown in FIG. 5A), body 48, or other portion of the curtain mount. Following installation of the curtain, the extension loop 66 allows one to reposition the head 28 relative to the ceiling without moving the extension pole. This is especially helpful for fine-tuning the adjustment of the curtain mount position, for example where the curtain exhibits sag between two installed curtain mounts, without having to move the entire pole. Operation of the extension loop is explained below with reference to FIGS. 7D–7E. The extension loop 66 may comprise string, a chain, or rod for tugging on the head.

FIG. 5B illustrates an alternative interface between an extension pole 22 and body 48 of a curtain mount. In this example, the body 48 of the curtain mount includes a hole 60 for receiving the end of an extension pole 22. The rim of the hole 60 includes fingers 74 which are tapered outward slightly. The fingers 74 include an internal thread 72 adapted for interfacing with an internal thread on a corresponding clamp nut 70. After a pole 22 is inserted in the hole 60, the clamp 70 is slid into position and tightened around the fingers 74. The taper in the fingers 74 produces a snug fit as the clamp 70 is tightened. In this manner, the curtain mount can accommodate extension poles 22 of a variety of widths.

FIG. 6 illustrates an installed curtain 30 using preferred and alternative embodiments of the present invention. The right mount 82 employs a curtain mount 24 as described above. The curtain mount 24A is coupled to a standard extension pole 22 having a foot 26 at its lower end for interfacing with the floor 34. The curtain mount includes a spring 50 in compression between the head 28 and the extension pole 22. The head 28 is coupled to the plunger of the curtain mount 24 at a swivel joint 56 accommodating installation at an angle other than perpendicular to the ceiling as shown in FIG. 6.

The center mount 80 of FIG. 6 includes the various components of a preferred embodiment of the invention described above. However, in this example the components are distributed along the length of the mount. This embodiment includes a head 28 as described above, a swivel joint 56, an extension loop 66 and an adjustable pole 90A, 90B. The pole is adjustable at a clamp 84 and is spring-loaded at spring 50. Operation of this mount is similar to those mounts described above.

Left mount 78 of FIG. 6 illustrates an alternative embodiment of the present invention. The left mount again includes the preferred components of the present invention including a head 28, extension loop 66, adjustable pole 76, curtain mount 24, spring 50, universal joint 56, and foot 26. However in this example, the curtain mount 24 is coupled to the lower end of the pole in a portion near the floor. The head 28 of this mount is attached directly to the opposite end of the pole and interfaces with the curtain 30 at the ceiling 32 as shown in FIG. 6 and as described above. The pole in this example employs a rotational adjustment mechanism. Also note that in the illustration of FIG. 6, a corner of the curtain 30 is held under the foot 26 of center mount 80 to provide additional tension and rigidity to the curtain.

FIGS. 7A–7F illustrate a method for installing a curtain in accordance with the present invention. In FIG. 7A, an installer 86 decides which portion of the room to partition. The installer 86 selects a curtain mount 24 of appropriate size and attaches a curtain mount 24 to an extension pole 22 as shown. The combined length of the curtain mount 24 and pole 22 is sized to be slightly larger than the floor 34 to ceiling 32 distance, as described above.

8

In FIG. 7B, the installer 86 mounts the curtain 30 to the head of the curtain mount 24 before raising the curtain 30. The curtain is secured to the mount by either the Velcro™-mount or clip-mount style securing mechanisms as described above.

In FIG. 7C, the curtain 30 is raised to the ceiling 32 using the extension pole 22 and curtain mount 24. The pole 22 is positioned appropriately and the installer 86 pushes the pole 22 against the ceiling 32 to compress the spring in the curtain mount 24.

In FIG. 7D, the first mount 92 is shown in position with the head of the curtain mount urging the curtain 30 against the ceiling 32. In this installation, the installer 86 also decided to tuck a lower portion of the curtain 30 under the foot 26 to add tension to the curtain and secure the curtain to the floor. Following this, in FIG. 7D, the installer 86 has coupled a second portion of the curtain 30 to a second mount 94 and is in the process of raising the second mount 94 into position a few feet from the first mount 92.

After positioning the second mount 94 as shown in FIG. 7E, the installer 86 noticed that a sag 88 is present in the curtain 30 between the first 92 and second 94 mounts which is undesirable for the installer's project. An extension loop 66 is coupled to the head of the curtain mount 24, thereby allowing the installer 86 to fine-tune the position of the second mount 94 relative to the first mount 92 to eliminate the sag 88 in the curtain 30.

The resulting installation is shown in FIG. 7F. It can be seen that the sag 88 exhibited in FIG. 7E has been eliminated in FIG. 7F by increasing the distance between the first mount 92 and the second mount 94, thereby tensioning the curtain 30 between the two mounts. Additional mounts may be added as described above resulting in partition configurations as shown in FIGS. 1A–1C.

FIGS. 8A–8C illustrate alternative coupler embodiments for coupling the curtain 30 to the head 28. In FIG. 8A, a hook 95 is installed on a side of the head 28. The hook 95 interfaces with a grommet 96 or other opening in the curtain 30 for supporting the curtain during and following installation. In FIG. 8B, a spring-biased clamp 97 secures the curtain 30 in its jaws. In FIG. 8C, the head 28 is formed in two sections which interface at a hinge 99. The sections join at jaws 98 to clamp the curtain 30, thereby securing it to the head 28. In the embodiments shown in FIGS. 8A–8C, the curtain 30, when installed, is not urged against the ceiling by the top face of the head 28. Instead, the curtain hangs from the side of the head 28.

A distinct advantage of the present invention over the prior art is its ability to interface with and utilize curtains, poles, and extension rods which are available off the shelf. Preferred curtain materials depend on the application and include cloth or canvas sheets, plastic sheets, and reinforced plastic tarps. Standard poles include extension poles, painter's poles, telescoping poles, and window washing poles. High friction materials include silicone, rubber, and non-skid material for carpeting. Compression mechanisms include springs, pneumatic devices and hydraulic devices.

More curtain mounts may be used for installations requiring heavier curtain materials or for installations which require the partition to be substantially air-tight, for example, asbestos removal and lead paint removal applications.

The present invention is also applicable for creating temporary private areas using standard sheets and blankets for curtains. This would be particularly useful in emergency shelters or in crowded hospitals.

US 6,942,004 B2

9

While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and detail may be made therein without departing from the spirit and scope of the invention as defined by the appended claims.

An example of an alternative embodiment of the curtain mount is illustrated in FIGS. 9A, 9B and 9C. This curtain mount embodiment includes a hydraulic or pneumatic device 107 serving as a compression mechanism. A proximal end of the mount includes a pole interface comprising a pin 102 which mates with a corresponding hole 104 on the extension pole 22. The head 106 is mounted to the plunger 46 as shown.

The head 106 includes at least one hole 110 adapted to interface with and receive at least one corresponding pin 112 located on a clip plate 108. The pins 112 and a portion of a curtain 30 together insert into the holes 110, and slide and lock in place in the keyhole slots 111 shown in FIG. 9B. A knob 113 at the end of each pin 112 prevents a mounted plate 108 from releasing from the head 106.

FIG. 9C illustrates the resulting installed configuration of the curtain mount of FIGS. 9A and 9B. A portion of the curtain 30 wraps around the pins 112 and is secured in holes 110. The outward force of the hydraulic plunger urges the curtain 30 toward the ceiling 32 as described above.

I claim:

1. A mounting system for installing a curtain comprising:
   a pole having first and second ends;
   a foot at a first end of the pole;
   a head at a second end of the pole;
   a compression mechanism between the foot and head; and
   a clamp including an engagement arm that engages an exterior side surface of the head to secure a curtain to the side surface of the head at an engagement location that is lower than a top portion of the head, the clamp being pivotably coupled to the head such that the engagement arm pivots between a secure position and an open position.

2. The mounting system of claim 1 wherein the engagement arm is adapted to secure a curtain against a side portion of the head.

3. The mounting system of claim 1 wherein the engagement arm is further adapted to secure a curtain against the top portion of the head.

4. The mounting system of claim 1 wherein the engagement arm operates under force to urge the curtain against the head.

5. The mounting system of claim 1 wherein the clamp is removably coupled to the head.

6. The mounting system of claim 1 further comprising an interface between the pole and the head.

7. The mounting system of claim 1 further comprising a universal joint between the pole and the head.

8. The mounting system of claim 1 wherein the head comprises a high-friction material.

9. The mounting system of claim 8 wherein the high-friction material comprises rubber.

10. The mounting system of claim 1 wherein the pole comprises an adjustable-length pole.

11. The mounting system of claim 1 wherein the clamp is biased by a spring to urge the engagement arm against the head.

12. The mounting system of claim 11 wherein the engagement arm includes an engagement surface that is biased against the head by the spring.

10

13. The mounting system of claim 12 wherein the engagement arm includes a handle to which an applied force operates against the bias of the spring to separate the engagement surface from the head.

14. The mounting system of claim 1 wherein the engagement arm is urged against the head in the secure position and wherein the engagement arm is separated from the head in the open position.

15. The mounting system of claim 1 wherein when the engagement arm is in the secure position, the engagement arm secures the curtain to the head with a force that is adapted to prevent slippage of a curtain mounted thereto with respect to the head, and such that when the engagement arm is in the open position, the separation between the engagement arm and head is of a sufficient distance such that a curtain can be positioned between the engagement arm and the head.

16. The mounting system of claim 1 wherein the compression mechanism is configured to urge the head away from the foot.

17. A mount attachable to an extension pole for installing a curtain comprising:
   an interface at a proximal end of the mount adapted for coupling the mount to an extension pole;
   a compression mechanism along a longitudinal axis of the mount;
   a head at a distal end of the mount, the compression mechanism operable to urge the head away from the interface; and
   a clamp including an engagement arm that engages an exterior side surface of the head to secure a curtain to the side surface of the head at an engagement location that is lower than a top portion of the head, the clamp being pivotably coupled to the mount such that the engagement arm pivots between a secure position and an open position.

18. The mount of claim 17 wherein the engagement arm is adapted to secure a curtain against a side portion of the head.

19. The mount of claim 17 wherein the engagement arm is further adapted to secure a curtain against the top portion of the head.

20. The mount of claim 17 wherein the engagement arm operates under force to urge the curtain against the head.

21. The mount of claim 17 wherein the clamp is removably coupled to the head.

22. The mount of claim 17 wherein the clamp is pivotably coupled to the mount proximal to the head.

23. The mount of claim 17 wherein the interface comprises a hole having an internal thread.

24. The mount of claim 17 wherein the interface comprises a hole adapted to mate with a pin on the extension pole in a slip-fit relationship.

25. The mount of claim 17 wherein the interface comprises a pin adapted to mate with a hole on the extension pole in a slip-fit relationship.

26. The mount of claim 17 further comprising a universal joint between the interface and the head.

27. The mount of claim 17 wherein the head comprises a high-friction material.

28. The mount of claim 27 wherein the high-friction material comprises rubber.

29. The mount of claim 17 adapted to be secured to an adjustable-length extension pole at the interface.

30. The mount of claim 17 wherein the clamp is biased by a spring to urge the engagement arm against the head.

31. The mount of claim 30 wherein the engagement arm includes an engagement surface that is biased against the head by the spring.

01400

US 6,942,004 B2

11

32. The mount of claim 31 wherein the engagement arm includes a handle to which an applied force operates against the bias of the spring to separate the engagement surface from the head.

33. The mount of claim 17 wherein the engagement arm is urged against the head in the secure position, and wherein the engagement arm is separated from the head in the open position.

34. The mount of claim 17 wherein when the engagement arm is in the secure position, the engagement arm secures the curtain to the head with a force that is adapted to prevent slippage of a curtain mounted thereto with respect to the head, and such that when the engagement arm is in the open position, the separation between the engagement arm and head is of a sufficient distance such that a curtain can be positioned between the engagement arm and the head.

35. A mounting system for installing a sheet of material comprising:

a pole having first and second ends;

foot at a first end of the pole;

a head at a second end of the pole, the head having an upper first engaging surface;

an adjustment mechanism between the foot and head for adjusting the length of the pole therebetween; and

a clip having a lower second engaging surface that removably engages the upper first engaging surface of the head for mounting a sheet of material therebetween, and a plurality of legs extending transverse to the second engaging surface of the clip to removably secure the clip to the head, the plurality of legs extending about at least one side surface and a portion of a lower surface of the head when the clip is engaged with the head.

36. The mounting system of claim 35 wherein the legs include tabs which extend about the portion of the lower surface of the head.

37. The mounting system of claim 35 wherein the head extends transverse to a longitudinal axis of the pole.

38. The mounting system of claim 35 wherein the first and second engaging surfaces are substantially planar.

39. The mounting system of claim 35 further comprising a compression mechanism between the foot and the head.

40. The mounting system of claim 39 wherein the compression mechanism comprises a spring.

41. The mounting system of claim 35 wherein the legs are elastically deformable and snap about at least one side surface of the head.

42. The mounting system of claim 35 wherein the legs are configured such that the clip is slidable relative to the head.

43. The mounting system of claim 35 wherein the clip and head are rectangular in shape.

44. The mounting system of claim 35 further comprising high-friction material applied to an upper surface of the clip.

45. A mounting system for installing a curtain comprising:

a pole having first and second ends;

a foot at a first end of the pole;

a head at a second end of the pole;

a compression mechanism between the foot and head; and

12

a clamp including an engagement arm that engages an exterior side surface of the head to secure a curtain to the side surface of the head at an engagement location that is lower than a top portion of the head, the clamp being pivotably coupled to the mounting system such that the engagement arm pivots between a secure position and an open position.

46. The mounting system of claim 45 wherein the clamp is pivotably coupled to the mounting system proximal to the head.

47. The mounting system of claim 45 wherein the engagement arm is adapted to secure a curtain against a side portion of the head.

48. The mounting system of claim 45 wherein the engagement arm is further adapted to secure a curtain against the top portion of the head.

49. The mounting system of claim 45 wherein the engagement arm operates under force to urge the curtain against the head.

50. The mounting system of claim 45 wherein the clamp is removably coupled to the head.

51. The mounting system of claim 45 further comprising an interface between the pole and the head.

52. The mounting system of claim 45 further comprising a universal joint between the pole and the head.

53. The mounting system of claim 45 wherein the head comprises a high-friction material.

54. The mounting system of claim 53 wherein the high-friction material comprises rubber.

55. The mounting system of claim 45 wherein the pole comprises an adjustable-length pole.

56. The mounting system of claim 45 wherein the clamp is biased by a spring to urge the engagement arm against the head.

57. The mounting system of claim 56 wherein the engagement arm includes an engagement surface that is biased against the head by the spring.

58. The mounting system of claim 57 wherein the engagement arm includes a handle to which an applied force operates against the bias of the spring to separate the engagement surface from the head.

59. The mounting system of claim 45 wherein the engagement arm is urged against the head in the secure position and wherein the engagement arm is separated from the head in the open position.

60. The mounting system of claim 45 wherein when the engagement arm is in the secure position, the engagement arm secures the curtain to the head with a force that is adapted to prevent slippage of a curtain mounted thereto with respect to the head, and such that when the engagement arm is in the open position, the separation between the engagement arm and head is of a sufficient distance such that a curtain can be positioned between the engagement arm and the head.

61. The mounting system of claim 45 wherein the compression mechanism is configured to urge the head away from the foot.

* * * * *

# EXHIBIT J

US006953076B2

(12) **United States Patent**
Whittemore

(10) Patent No.: **US 6,953,076 B2**
(45) Date of Patent: **Oct. 11, 2005**

(54) PARTITION MOUNT

(75) Inventor: Jeffrey P. Whittemore, Arlington, MA (US)

(73) Assignee: Zipwall LLC, Arlington, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 10/865,174

(22) Filed: Jun. 10, 2004

(65) Prior Publication Data
US 2004/0200585 A1 Oct. 14, 2004

Related U.S. Application Data

(63) Continuation of application No. 10/301,233, filed on Nov. 21, 2002, which is a continuation of application No. 09/884, 337, filed on Jun. 19, 2001, now Pat. No. 6,508,295, which is a continuation of application No. 09/613,645, filed on Jul. 11, 2000, now Pat. No. 6,321,823, which is a continuation of application No. 09/302,122, filed on Apr. 29, 1999, now Pat. No. 6,209,615, which is a continuation of application No. 08/740,372, filed on Oct. 29, 1996, now Pat. No. 5,924,469.

(51) Int. Cl.$^7$ ............................................... A47H 13/00
(52) U.S. Cl. ..................... 160/368.1; 160/351; 160/402; 248/200.1; 24/113 MP
(58) Field of Search ............................. 160/368.1, 351, 160/402, 350, 379, 330, 380, 399; 248/200.1; 24/113 MP, 113, 92; 403/326, 329

(56) References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 827,000 A | 7/1906 | Dinsmore | |
| 1,766,324 A | 6/1930 | Hencer | |
| 2,219,169 A | 10/1940 | Alter | |
| 2,232,194 A | 2/1941 | Zogby | |
| 2,474,158 A | 6/1949 | Neeley | |
| 2,816,769 A | 12/1957 | Noble | |
| 2,903,227 A | 9/1959 | De Kalb Key | |
| 2,942,829 A | * | 6/1960 | Stiffel .................. 248/188.3 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3918516 | 12/1990 | ............. E04B/2/82 |
| DE | 04420849 | 12/1995 | ........... E04G/13/06 |
| DE | 29605222 | 7/1996 | ........... E04G/25/08 |
| FR | 2411282 | 6/1979 | ........... E04B/2/74 |
| GB | 1042086 | 9/1966 | |
| GB | 2156894 | 3/1985 | ........... F16B/2/00 |
| WO | WO86/03538 | 6/1986 | ........... E04G/1/26 |
| WO | 91A09556 | * | 7/1991 | ........ 160/368.1 X |

OTHER PUBLICATIONS

"QUICKPROP", Brochure by Protects Screen LTD, Aug. 1996.

* cited by examiner

Primary Examiner—Bruce A. Lev
(74) Attorney, Agent, or Firm—Mills & Onello LLP

(57) **ABSTRACT**

In a spring-loaded curtain mount, the mount includes a pole interface at a proximal end, a compressive mechanism, and a head at a distal end. The pole interface is adapted to receive the end of a standard length adjustable pole or a painter's pole. The compression mechanism is disposed between the proximal end of the mount and the head. The mount includes a coupling device adapted to receive a portion of a curtain. During installation, the curtain mount is coupled to the end of an extension pole and the length of the pole is adjusted such that the combined length of the pole and mount is slightly longer than the distance between the floor and ceiling. At ground level, a portion of the curtain is attached to the head of the curtain mount. The curtain and mount are raised to the ceiling and the mount and pole are compressed between the floor and the ceiling. This compressive force operates to urge the head toward the ceiling, securing the mount in place.

**96 Claims, 13 Drawing Sheets**



US 6,953,076 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,072,784 A | 1/1963 | Mann |
| 3,090,826 A | 5/1963 | Cochran |
| 3,118,363 A | 1/1964 | Burgess, Jr. |
| 3,247,558 A | 4/1966 | Kaufman |
| 3,322,381 A | 5/1967 | Babb |
| 3,327,310 A | 6/1967 | Bethune et al. |
| 3,333,808 A | 8/1967 | Du Boff |
| 3,350,120 A | 10/1967 | Hinrichs |
| 3,529,860 A | 9/1970 | Jetley |
| 3,592,434 A | 7/1971 | Murray |
| 3,604,397 A | 9/1971 | Salerno |
| 3,608,991 A | 9/1971 | Wade |
| 3,713,643 A | 1/1973 | Gerstenberger |
| 3,767,253 A | 10/1973 | Kloetsch |
| 3,792,510 A | 2/1974 | Evett |
| 3,822,850 A | 7/1974 | Elias |
| 3,858,988 A * | 1/1975 | Cohen .................... 403/18 |
| 3,861,663 A | 1/1975 | Strickland |
| 3,952,877 A | 4/1976 | Kindl |
| 3,956,784 A * | 5/1976 | Vargas .................. 135/96 |
| 3,972,272 A | 8/1976 | Baghy |
| 3,994,463 A * | 11/1976 | Baker .................... 248/265 |
| 4,078,256 A | 3/1978 | Cross |
| 4,087,096 A | 5/1978 | Schill |
| 4,111,217 A | 9/1978 | Victor |
| 4,127,911 A * | 12/1978 | Cuppy et al. .......... 15/210.1 |
| 4,139,101 A * | 2/1979 | Towfigh ................ 211/107 |
| 4,277,863 A | 7/1981 | Faneuf |
| 4,379,654 A | 4/1983 | Rovelli |
| 4,396,325 A | 8/1983 | Joice-Cavanagh |
| 4,488,651 A | 12/1984 | Bishop |
| 4,502,256 A | 3/1985 | Hahn |
| 4,536,924 A | 8/1985 | Willoughby |
| 4,576,354 A * | 3/1986 | Blessing, Sr. .......... 248/354.5 |
| 4,592,797 A | 6/1986 | Carlson |
| 4,645,473 A | 2/1987 | Mochizuki |
| 4,662,034 A | 5/1987 | Cunningham |
| 4,708,189 A | 11/1987 | Wold |
| 4,715,089 A | 12/1987 | Schema |
| 4,717,107 A | 1/1988 | Servadio |
| 4,770,086 A | 9/1988 | Gabater |
| 4,794,974 A * | 1/1989 | Melino .................. 160/330 |
| 4,824,302 A | 4/1989 | Schultheis et al. |
| 4,852,844 A * | 8/1989 | Villaveces ............. 248/314 |
| 4,874,028 A | 10/1989 | Lynch et al. |
| 4,885,876 A | 12/1989 | Henke |
| 4,907,835 A | 3/1990 | Salters |
| 4,912,814 A | 4/1990 | McKenzie |
| 4,928,916 A * | 5/1990 | Molloy .................. 248/354.1 |
| 4,969,241 A | 11/1990 | Griffin |
| 5,038,889 A | 8/1991 | Jankowski |
| 5,040,915 A | 8/1991 | Stuart et al. |
| 5,056,753 A | 10/1991 | Lunau et al. |
| 5,116,012 A | 5/1992 | Offenhauer et al. |
| 5,129,774 A | 7/1992 | Babeiro et al. |
| 5,131,781 A * | 7/1992 | Klein .................... 403/254 |

| | | |
|---|---|---|
| 5,170,974 A | 12/1992 | Ruggiero |
| 5,240,058 A | 8/1993 | Ward |
| 5,287,614 A * | 2/1994 | Ehrlich ................ 29/450 |
| 5,299,773 A | 4/1994 | Bertrand |
| 5,301,915 A | 4/1994 | Bahniuk et al. |
| 5,308,280 A | 5/1994 | Dotson |
| 5,331,706 A | 7/1994 | Graham |
| 5,345,989 A | 9/1994 | Brophy |
| 5,375,303 A | 12/1994 | Strenier |
| 5,379,491 A | 1/1995 | Solo |
| 5,384,938 A | 1/1995 | Frederick |
| 5,388,283 A | 2/1995 | Garnett |
| 5,404,602 A | 4/1995 | Kondo |
| 5,469,607 A | 11/1995 | Henningsson et al. |
| 5,497,537 A | 3/1996 | Robinson et al. |
| 5,524,693 A | 6/1996 | Hamilton |
| 5,529,326 A | 6/1996 | Hwang |
| 5,536,229 A | 7/1996 | Albergo |
| 5,542,209 A | 8/1996 | Sheu |
| 5,555,607 A | 9/1996 | Parveris |
| 5,558,501 A | 9/1996 | Wang et al. |
| 5,584,456 A | 12/1996 | Stephens |
| 5,640,826 A | 6/1997 | Husilla |
| 5,645,272 A * | 7/1997 | Brennan, Sr. .......... 269/68 |
| 5,649,789 A | 7/1997 | Scholl |
| 5,666,702 A | 9/1997 | Ming-Chieh |
| 5,673,741 A | 10/1997 | Cairns |
| 5,707,032 A | 1/1998 | Ehrlich |
| 5,715,620 A | 2/1998 | Walker |
| 5,722,691 A | 3/1998 | Patel |
| 5,803,653 A | 9/1998 | Zuletti |
| 5,884,424 A | 3/1999 | Smith |
| 5,897,085 A | 4/1999 | Cronin |
| 5,924,469 A | 7/1999 | Whittemore |
| 5,937,488 A | 8/1999 | Geiger |
| 5,940,942 A | 8/1999 | Fong |
| 5,941,434 A | 8/1999 | Green |
| 5,941,586 A | 8/1999 | Fann |
| 5,944,464 A * | 8/1999 | Cole, Jr. ............... 410/153 |
| 5,979,110 A | 11/1999 | Tsi |
| 6,067,691 A | 5/2000 | Feltman |
| 6,082,945 A * | 7/2000 | Jeffries et al. .......... 414/11 |
| 6,152,434 A | 11/2000 | Gluck |
| 6,164,605 A | 12/2000 | Drake et al. |
| 6,170,112 B1 | 1/2001 | Mayfield et al. |
| 6,209,615 B1 | 4/2001 | Whittemore |
| 6,237,182 B1 * | 5/2001 | Cassar ................. 15/144.1 |
| 6,341,401 B1 | 1/2002 | Lin |
| 6,378,175 B1 | 4/2002 | Vandepan |
| 6,467,741 B1 | 10/2002 | Shih |
| 6,474,609 B1 | 11/2002 | Pinard |
| 6,508,295 B2 | 1/2003 | Whittemore |
| 6,523,231 B1 | 2/2003 | Lassiter |
| 2001/0029640 A1 * | 10/2001 | Cassar ................. 15/144.1 |
| 2003/0028598 A1 * | 2/2003 | Streutker et al. ........ 15/228 |
| 2003/0154588 A1 | 8/2003 | Blacket et al. |
| 2004/0065799 A1 * | 4/2004 | Whittemore et al. .... 248/354.1 |

01222

**U.S. Patent**        Oct. 11, 2005        Sheet 1 of 13        US 6,953,076 B2



FIG 1A



FIG. 1B

01224



FIG. 1C



FIG. 2



FIG. 3A

FIG. 3B

FIG. 3C

01227

Case 1:05-cv-11852-JLT    Document 30-9    Filed 08/28/2006    Page 9 of 24



FIG. 4B

FIG. 4C

FIG. 4A

01228



FIG. 5A



FIG. 5B



FIG. 6

01230

U.S. Patent     Oct. 11, 2005     Sheet 9 of 13     US 6,953,076 B2



FIG. 7A

FIG. 7B

01231



FIG. 7C



FIG. 7D

01232



FIG. 7E



FIG. 7F

01233



FIG. 8C

FIG. 8B

FIG. 8

U.S. Patent     Oct. 11, 2005     Sheet 13 of 13     US 6,953,076 B2



FIG. 9B

FIG. 9A

FIG. 9C

01235

US 6,953,076 B2

1

# PARTITION MOUNT

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/301,233, filed Nov. 21, 2002, which is a continuation application of U.S. application Ser. No. 09/884,337, filed Jun. 19, 2001, now U.S. Pat. No. 6,508,295 which is a continuation of U.S. application Ser. No. 09/613,645, filed Jul. 11, 2000, now U.S. Pat. No. 6,321,823, which is a continuation of U.S. application Ser. No. 09/302,122, filed Apr. 29, 1999, now U.S. Pat. No. 6,209,615, which is a continuation of U.S. application Ser. No. 08/740,372, filed Oct. 29, 1996, now U.S. Pat. No. 5,924,469, the contents of the applications being incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Partition systems are often employed to separate portions of a building or room. Partitions serve as a barrier to dust, noise, light, odors, and the like. In construction zones, partitions are useful for protecting a clean area from a work area, for example, protecting an area where furniture and rugs are temporarily stored from an area where wood floors are being refinished.

Workers at construction sites often use rudimentary techniques for installing partitions. Some simply nail, screw, or staple the curtain or partition material to the floor, ceiling, and abutting walls, resulting in damage to their surfaces. Others tape or otherwise adhere a curtain or plastic sheet to the walls and ceilings. The tape usually fails to stick, but if it does stick, as the tape is removed, paint usually pulls off with the tape or adhesive is left behind.

Others employ more clever techniques for constructing partitions. U.S. Pat. No. 4,794,974 discloses a curtain wall having spring-loaded extendable support legs which support header elements aligned along the ceiling. A curtain is mounted to the header elements with fasteners along the length of each header element. This design suffers from several limitations. The support poles, header elements, fasteners, and curtain all comprise dedicated hardware, increasing manufacturing costs. Particularly, the curtain must be designed to accommodate the fasteners. In addition, installation appears to be awkward and time consuming due to the multitude of fasteners and the system appears to be top-heavy during installation.

U.S. Pat. No. 4,708,189 discloses a spring-loaded curtain support having a plurality of support units extending from the floor to the ceiling. Each support unit includes a stackable extension member, a telescoping section, a lower batten, and an upper batten. The lower and upper battens extend along the floor and ceiling respectively and interlock so as to provide a continuous batten along the floor and ceiling. A curtain is designed to loop around the upper batten and accommodate the extension poles. This design again requires dedicated hardware, including a curtain which is designed specifically to accept a particular upper batten size and shape and a particular extension pole. The structure is bulky and appears tedious to install.

U.S. Pat. No. 5,308,280 discloses a coal mine ventilation curtain support. An adjustable extension pole is erected between the floor and ceiling of a mine. A curtain support member compresses between the extension pole resting on the floor, and the ceiling such that the compressive force urges the support member against the ceiling, thereby securing a curtain in place against the ceiling. Although this design accommodates any type of curtain material, it again suffers from the limitation of requiring dedicated hardware

2

as the support member is designed for a particular extension pole. In addition, installation appears challenging in rooms with tall ceilings as the curtain is installed after the mount is raised and installed. Following installation of the support member, an installer must climb up to the ceiling and pull back a leg of the support member, insert a curtain and snap the support member back into the ceiling. In a home construction project, the snapping action may damage the ceiling. In addition, for ceilings higher than the reach of the installer, this design may prove to be challenging to install. This design presents the further unfortunate possibility that the installer could jam his fingers between the support member and ceiling.

## SUMMARY OF THE INVENTION

The present invention is directed to a partition mount apparatus and method which overcome the limitations of the prior art. The inventive method and apparatus are applicable to use in construction zones in preventing contaminants such as dust and paint from entering clean areas in a home or office. The invention may also be used as a temporary visual, odor, or sound barrier, depending on the curtain material employed. The present invention offers the advantages of accommodating standard extension poles, for example, painters poles, with standard threads, and is compatible with a variety of commercially-available curtain or drape materials, for example plastic, cloth, or the like. The invention is a "clean" system designed to be installed and removed without damaging or otherwise marking the ceiling, floor or walls in the construction zone. Assembly is easy and fast and can be accomplished by a single individual. In a preferred method for assembling the partition of the present invention, the curtain mounts and curtain are first assembled on the floor and then raised to the ceiling permitting safe installation in rooms with high ceilings, for example cathedral ceilings.

One embodiment of the invention comprises a spring-loaded mount including a hole at a proximal end, a compression mechanism, and a head at a distal end. The hole is adapted to receive the end of a standard length-adjustable pole or painters pole. In a preferred embodiment, the compressive mechanism comprises a spring under compression between an inner wall of the mount and the head. The head is urged toward the ceiling by the compressive mechanism, providing longitudinal rigidity to the installed mount. The head preferably interfaces with the mount at a swivel joint so that the mount can be installed at a range of orientations relative to the ceiling.

The head preferably includes a coupling device, for example, a Velcro™ hook and loop fastener strip, a hook, or a clip, adapted to receive a portion of a curtain. In a first preferred embodiment of the invention, the face of the head includes a sheet of Velcro™ hooks which mates with a sheet of Velcro™ loops attached to the curtain. On the side of the curtain opposite the Velcro™ loops, a high-friction material provides friction between the mount and the ceiling, so that the curtain is less likely to slide relative to the ceiling thereby providing lateral rigidity.

In a second preferred embodiment of the invention, a removable clip couples the curtain to the head. The clip is adapted to receive a section of curtain material and snap on or otherwise secure to the head. High friction material attached to the back of the clip provides lateral rigidity as described above.

In alternative embodiments, the curtain mount may be adapted to receive poles without threads, or may include a

01236

US 6,953,076 B2

<div style="display:flex">
<div>

3

pin for interfacing with a corresponding hole in a pole. Furthermore, the elements of the curtain mount may be distributed along the pole. The extension poles do not necessarily need to be adjustable in situations where the ceiling size is standard or predetermined.

In the inventive method of the present invention, a spring-loaded curtain mount is coupled to the end of a standard adjustable pole, and the length of the pole is adjusted such that the combined length of the pole and mount is slightly longer than the distance between the floor and ceiling. A portion of the curtain is attached to the curtain mount. The curtain and mount are raised to the ceiling and the mount and pole are compressed between and the floor and ceiling. This compressive force operates to urge the head toward the ceiling. The same compressive force operating through the high friction material on the head or curtain provides lateral rigidity for the system.

The curtain is free-standing and therefore does not require additional "destructive" mounting means, for example nailing or taping. Instead, the mount is installed and removed without permanent damage to the ceiling or floor.

By placing several mounts between the ceiling and floor, across a room or portions thereof, the room can be partitioned to protect furniture and the like during construction of other portions of the room. The curtain can also be installed along the ceiling and/or floor for constructing a tunnel or booth. The shape of the partition is variable depending on the respective spatial positions of the mounts.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features and advantages of the invention will be apparent from the following more particular description of preferred embodiments and the drawings in which like reference characters refer to the same parts throughout the different views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principals of the invention.

FIGS. 1A, 1B, and 1C illustrate installed partition configurations in accordance with the present invention.

FIG. 2 illustrates the primary components of two preferred embodiments of the present invention.

FIG. 3A is a cutaway side view of a curtain mount having a Velcro™-mount configuration in accordance with the present invention.

FIG. 3B is a perspective view of the head of the curtain mount of FIG. 3A interfacing with an appropriately configured curtain in accordance with the present invention.

FIG. 3C is a side view of a curtain mounted to the ceiling by the curtain mount of FIG. 3A in accordance with the present invention.

FIG. 4A is a cutaway side view of a curtain mount having a clip-mount configuration in accordance with the present invention.

FIG. 4B is a perspective view of the interaction of the clip and head of the curtain mount of FIG. 4A in accordance with the present invention.

FIG. 4C is a side view of a curtain mounted to the ceiling by the curtain mount of FIG. 4A in accordance with the present invention.

FIG. 5A is a perspective view of the head of a curtain mount including an extension loop in accordance with the present invention.

FIG. 5B is a side view of a clamped interface between the curtain mount body and an extension pole in accordance with the present invention.

</div>
<div>

4

FIG. 6 illustrates a curtain installation using various preferred and alternative embodiments of the present invention.

FIG. 7A–FIG. 7F illustrate an installation procedure in accordance with the present invention.

FIG. 8A–FIG. 8C are perspective views of alternative embodiments for coupling the curtain to the head.

FIG. 9A–FIG. 9C are perspective views of an alternative embodiment of a curtain mount in accordance with the present invention illustrating an alternative curtain coupler, an alternative pole interface, and an alternative compression mechanism.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. 1A illustrates an installed partition extending from the floor 34 to the ceiling 32 of a room between opposed walls 36A, 36B. Three curtain mounts 24 in accordance with the present invention are mounted on extension poles 22. A foot 26 at the bottom of each extension pole interfaces with the floor and a head 28 at the top of each curtain mount interfaces with the ceiling 32. The contact or interface points of the foot and head preferably are covered with a soft friction material such as rubber to provide lateral rigidity of the system and to prevent marking of the ceiling and floor.

Each curtain mount includes a compression mechanism, for example a spring, which operates to urge the head 28 against the ceiling 32, thereby securing the curtain 30. The extension poles 22 are preferably adjustable such that before installation of the curtain 30, the pole length in combination with the fully extended curtain mount 24 can be made slightly larger than the distance from the floor 34 to the ceiling 32 at the point at which the curtain mount is to be installed. For example, if the compression range of the spring is 2–3 inches, then the total length of the pole 22 and mount 24 can be made 2–3 inches longer than the floor-to-ceiling 32 height, causing the spring to be compressed when the system is installed. Alternatively, non-adjustable standard poles such as painters poles sized for particular predetermined ceiling heights may be employed.

FIG. 1B illustrates the present invention installed to partition a portion of a room extending between adjacent walls 36B,36C. In this illustration, the curtain 30 is installed to protect furniture 38 from dust and debris during painting or other construction in the open portion of the room.

FIG. 1C illustrates the present invention configured as a tunnel or booth. In this installation, the curtain 30 extends along the ceiling 32 between mounts 24A, 24B, 24C, and 24D, protecting the ceiling 32 from activity in the tunnel. The curtain 30 can be tucked under feet 26A–26D to secure the curtain to the floor 34. The curtain 30 may also be installed between the feet 26A–26D on the floor to provide an enclosed tunnel. The sides of the tunnel may be formed by a single continuous curtain 30 or multiple curtains 30, the edges of each held in place and raised by the mounts 24A–24D. This configuration is particularly well suited to serve as an asbestos removal tunnel or paint booth.

Note that for purposes of the present invention, the term "curtain" is defined to include any flexible material suited for partitioning, for example cloth sheets and drapes, or plastic tarps.

FIG. 2 illustrates two preferred curtain mount embodiments. In a first Velcro™-mount embodiment 21A, an extension pole 22A having a foot 26A, for example a rubber foot 26 is coupled to a first curtain mount 24A. The curtain

</div>
</div>

US 6,953,076 B2

5

mount 24A is spring-loaded as described above and as will be described in further detail below.

The curtain mount includes a head 28A. The head is preferably of sufficient surface area to accommodate curtain materials of a variety of strengths and weights. For example, if the head area is too small, the head may punch through a weaker curtain material when weighted by the curtain. In a preferred embodiment of the invention, a head size of approximately 5" by 2.5" was found to be sufficient to handle most curtain materials. The head 28A includes a strip of Velcro™ loops or hooks attached thereto. The Velcro™ strip 40 on the head 28A mates with a corresponding Velcro™ strip 42 attached to a portion of the curtain 30. A strip of friction material 44 is attached to the face of the curtain 30 opposite that of the Velcro™ strip 42. In this manner, an installer can first mate the Velcro™ strips 42,40 of the curtain 30 and curtain mount 24A respectively and then raise the extension pole 22A and mount 24A such that the high friction material 44 interfaces with the ceiling. As the spring in the curtain mount 24A compresses, that compressive force operates outwardly through the head 28A, Velcro™ strips 40,42, curtain 30, and high friction material 44 against the ceiling, thereby securing the curtain 30 in place against the ceiling. A universal joint 56A at the head 28A allows for installation of a variety of angles. This allows for installation of the curtain mount of the present invention in rooms having pitched ceilings, for example cathedral ceilings.

In a second curtain mount embodiment 24B hereinafter referred to as a clip-mount, a curtain clip 64 is adapted to accept a portion 30A of a curtain 30. In a first embodiment, the clip 64 includes legs 65 adapted to snap over the body of the head 28B, thereby securing the clip 64 and curtain 30 to the head 28B. In a second embodiment, the clip 64 includes pins 112 (see FIG. 9A) which slide and lock in corresponding holes 110 in the head 28B. The top portion of the clip 64 preferably includes high friction material 44 as described above. In the clip-mount embodiment, an installer at floor level clips a portion of the curtain onto the head 28B of the curtain mount 24B and raises the curtain 30 to the ceiling using extension pole 22B. The high friction material 44 at the head 28B in combination with the rubber foot 26 provide lateral rigidity to the system, and the compressed spring in the curtain mount 24B provides longitudinal rigidity to the installed system. The clip embodiment of the curtain mount 24B offers the advantage of accepting any portion of any flexible curtain 30 material, offering an advantage over the Velcro™-mount embodiment 24A which can be coupled only to those portions of a curtain 30 having Velcro™ strips 42 previously installed thereon.

FIG. 3A is a cutaway side view of a Velcro™-mount embodiment of a curtain mount 24 in accordance with the present invention. The curtain mount 24 includes a body 48, a spring 50, a plunger 46, a head 28, and a hole 60 for receiving the end of an extension pole 22. The hole 60 includes internal threads 52 for mating with corresponding external threads 54 formed on the extension pole 22. The thread may comprise ¾ Acme thread, standard in the industry for painter's poles and other standard extension poles. This permits the curtain mount 24 to be compatible with commercially-available poles. When the extension pole 22 is inserted to a predetermined distance into the hole 60, a thread stopper 58 prevents the pole 22 from being inserted further.

A spring 50 rests in the body 48 of the curtain mount 24 between the rigid thread stopper 58 and the plunger 46. The spring is preferably extendable over a range of lengths, for

6

example four inches, to accommodate extension poles of a range of lengths. The tension of the spring 50 must be high enough to support the weight of the installed curtain and low enough such that the head 28 of the curtain mount 24 does not push through the ceiling during installation. The plunger 46 and head 28 preferably interface at a universal joint 56 such that the curtain mount can be installed at a variety of angles relative to the ceiling. Velcro™ loops 40 are coupled to the outer face of the head 28. Preferred methods for coupling Velcro™ loops to the head 28 include self-adhesive Velcro™ strips and/or stapling.

The perspective view of FIG. 3B illustrates the head 28 and Velcro™ loops 40 coupled thereto. The Velcro™ loops 40 interface with Velcro™ hooks 42 stapled or otherwise adhered to a portion of the curtain 30. Friction material, approximately slightly larger in area than the surface area of the head 28 is disposed on the opposite face of the curtain. When the Velcro™ hooks 42 are mated to the Velcro™ loops 40, the curtain 30 is secured to the end of the curtain mount 24 and can be raised to the ceiling as shown in FIG. 3C.

In FIG. 3C, a force F generated by the compression of the spring operating on the plunger 46 urges the head 28 against the ceiling 32. The force transfers through the loops 40, the hooks 42, the curtain 30, and the high friction material 44, and operates on the ceiling 32. In this manner, the longitudinal compression of the spring acts outwardly to secure the curtain 30 against the ceiling 32.

FIG. 4A illustrates the clip-mount embodiment of the present invention. A curtain mount 24 includes a body 48 having a hole 60 for receiving an end of an extension pole 22, a plunger 62, a spring 50, and a fixed head 28. Note that the extension pole 22 of this embodiment is a standard thread-less pole and the hole 60 is adapted to receive the pole. In this embodiment, the pole 22 is slidable relative to the body 48 of the curtain mount 24, and communicates with the plunger 62 to compress the spring 50 against the spring stopper 51. The head 28 is longitudinally fixed, relative to the body 48. A universal joint 56 as shown in FIG. 3A may optionally be employed to couple the head 28 to the body 48 for reasons described above. A curtain clip 64 having legs 65 is adapted to snap onto the head 28, thereby clamping an inserted curtain therebetween. The clip legs 65 include tabs 67 which snap around the bottom face of the head 28 providing a secure fit. High friction material 44 is disposed on the top face of the clip 64 for interfacing with the ceiling, thereby providing lateral rigidity to the system as described above. Note that the clip design given above is merely illustrative of various clip designs which may be employed in accordance with the present invention.

FIG. 4B illustrates the relative positions of the head 28, curtain 30, and clip 64 during installation. An advantage of the clip-mount embodiment over the Velcro™-mount embodiment is that the clip-mount can be secured to any portion of a curtain or sheet available to the installer. This may include a center portion of the curtain 30 or a corner portion of the curtain 30 as shown in FIG. 4B. In contrast, the Velcro™-mount embodiment requires the curtain to have portions of Velcro™ attached to the curtain at predetermined locations.

FIG. 4C illustrates a curtain 30 installed against the ceiling 32 using the clip-mount. Before the curtain is raised, the clip 64 and curtain 30 are snapped and secured to the head 28. After raising the curtain against the ceiling 32, compression in the spring of the curtain mount 24 generates a force F which operates through the head 28, curtain 30, clip 64, and high friction material 44 against the ceiling 32. The

US 6,953,076 B2

7

compressive force F of the spring and high friction material provide longitudinal and lateral rigidity to the system as described above.

FIG. 5A is a perspective view of the head 28 of a curtain mount having an extension loop 66. The extension loop 66 is attached to the head 28, universal joint 56, plunger 46 (shown in FIG. 5A), body 48, or other portion of the curtain mount. Following installation of the curtain, the extension loop 66 allows one to reposition the head 28 relative to the ceiling without moving the extension pole. This is especially helpful for fine-tuning the adjustment of a curtain mount position, for example where the curtain exhibits sag between two installed curtain mounts, without having to move the entire pole. Operation of the extension loop is explained below with reference to FIGS. 7D–7F. The extension loop 66 may comprise string, a chain, or rod for tugging on the head.

FIG. 5B illustrates an alternative interface between an extension pole 22 and body 48 of a curtain mount. In this example, the body 48 of the curtain mount includes a hole 60 for receiving the end of an extension pole 22. The rim of the hole 60 includes fingers 74 which are tapered outward slightly. The fingers 74 include an external thread 72 adapted for interfacing with an internal thread on a corresponding clamp nut 70. After a pole 22 is inserted in the hole 60, the clamp 70 is slid into position and tightened around the fingers 74. The taper in the fingers 74 produces a snug fit as the clamp 70 is tightened. In this manner, the curtain mount can accommodate extension poles 22 of a variety of widths.

FIG. 6 illustrates an installed curtain 30 using preferred and alternative embodiments of the present invention. The right mount 82 employs a curtain mount 24 as described above. The curtain mount 24A is coupled to a standard extension pole 22 having a foot 26 at its lower end for interfacing with the floor 34. The curtain mount includes a spring 50 in compression between the head 28 and the extension pole 22. The head 28 is coupled to the plunger of the curtain mount 24 at a swivel joint 56 accommodating installation at an angle other than perpendicular to the ceiling as shown in FIG. 6.

The center mount 80 of FIG. 6 includes the various components of a preferred embodiment of the invention described above. However, in this example the components are distributed along the length of the mount. This embodiment includes a head 28 as described above, a swivel joint 56, an extension loop 66 and an adjustable pole 90A, 90B. The pole is adjustable at a clamp 84 and is spring-loaded at spring 50. Operation of this mount is similar to those mounts described above.

Left mount 78 of FIG. 6 illustrates an alternative embodiment of the present invention. The left mount again includes the preferred components of the present invention including a head 28, extension loop 66, adjustable pole 76, curtain mount 24, spring 50, universal joint 56, and foot 26. However in this example, the curtain mount 24 is coupled to the lower end of the pole in position near the floor. The head 28 of the mount is attached directly to the opposite end of the pole and interfaces with the curtain 30 at the ceiling 32 as shown in FIG. 6 and as described above. The pole in this example employs a rotational adjustment mechanism. Also note that in the illustration of FIG. 6, a corner of the curtain 30 is held under the foot 26 of center mount 80 to provide additional tension and rigidity to the curtain.

FIGS. 7A–7F illustrate a method for installing a curtain in accordance with the present invention. In FIG. 7A, an installer 86 decides which portion of the room to partition.

8

The installer 86 selects a curtain 30 of appropriate size and attaches a curtain mount 24 to an extension pole 22 as shown. The combined length of the curtain mount 24 and pole 22 is sized to be slightly larger than the floor 34 to ceiling 32 distance, as described above.

In FIG. 7B, the installer 86 mounts the curtain 30 to the head of the curtain mount 24 before raising the curtain 30. The curtain is secured to the mount by either the Velcro™-mount or clip-mount style securing mechanisms as described above.

In FIG. 7C, the curtain 30 is raised to the ceiling 32 using the extension pole 22 and curtain mount 24. The pole 22 is positioned appropriately and the installer 86 pushes the pole 22 against the ceiling 32 to compress the spring in the curtain mount 24. In FIG. 7D, the first mount 92 is shown in position with the head of the curtain mount urging the curtain 30 against the ceiling 32. In this installation, the installer 86 also decided to tuck a lower portion of the curtain 30 under the foot 26 to add tension to the curtain and secure the curtain to the floor. Following this, in FIG. 7D, the installer 86 has coupled a second portion of the curtain 30 to a second mount 94 and is in the process of raising the second mount 94 into position a few feet from the first mount 92.

After positioning the second mount 94 as shown in FIG. 7E, the installer 86 noticed that a sag 88 is present in the curtain 30 between the first 92 and second 94 mounts which is undesirable for the installer's project. An extension loop 66 is coupled to the head of the curtain mount 24, thereby allowing the installer 86 to fine-tune the position of the second mount 94 relative to the first mount 92 to eliminate the sag 88 in the curtain 30.

The resulting installation is shown in FIG. 7F. It can be seen that the sag 88 exhibited in FIG. 7E has been eliminated in FIG. 7F by increasing the distance between the first mount 92 and the second mount 94, thereby tensioning the curtain 30 between the two mounts. Additional mounts may be added as described above resulting in partition configurations as shown in FIGS. 1A–1C.

FIGS. 8A–8C illustrate alternative coupler embodiments for coupling the curtain 30 to the head 28. In FIG. 8A, a hook 95 is installed on a side of the head 28. The hook 95 interfaces with a grommet 96 or other opening in the curtain 30 for supporting the curtain during and following installation. In FIG. 8B, a spring-biased clamp 97 secures the curtain 30 in its jaws. In FIG. 8C, the head 28 is formed in two sections which interface at a hinge 99. The sections join at jaws 98 to clamp the curtain 30, thereby securing it to the head 28. In the embodiments shown in FIGS. 8A–8C, the curtain 30, when installed, is not urged against the ceiling by the top face of the head 28. Instead, the curtain hangs from the side of the head 28.

A distinct advantage of the present invention over the prior art is its ability to interface with and utilize curtains, poles, and extension rods which are available off the shelf. Preferred curtain materials depend on the application and include cloth or canvas sheets, plastic sheets, and reinforced plastic tarps. Standard poles include extension poles, painter's poles, telescoping poles, and window washing poles. High friction materials include silicone, rubber, and non-skid material for carpeting. Compression mechanisms include springs, pneumatic devices, and hydraulic devices.

More curtain mounts may be used for installations requiring heavier curtain materials or for installations which require the partition to be substantially air-tight, for example, asbestos removal and lead paint removal applications.

01239

US 6,953,076 B2

9

The present invention is also applicable for creating temporary private areas using standard sheets and blankets for curtains. This would be particularly useful in emergency shelters or in crowded hospitals.

While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and detail may be made therein without departing from the spirit and scope of the invention as defined by the appended claims.

An example of an alternative embodiment of the curtain mount is illustrated in FIGS. 9A, 9B and 9C. This curtain mount embodiment includes a hydraulic or pneumatic device 107 serving as a compression mechanism. A proximal end of the mount includes a pole interface comprising a pin 102 which mates with a corresponding hole 104 on the extension pole 22. The head 106 is mounted to the plunger 46 as shown.

The head 106 includes at least one hole 110 adapted to interface with and receive at least one corresponding pin 112 located on a clip plate 108. The pins 112 and a portion of a curtain 30 together insert into the holes 110, and slide and lock in place in the keyhole slots 111 shown in FIG. 9B. A knob 113 at the end of each pin 112 prevents a mounted plate 108 from releasing from the head 106.

FIG. 9C illustrates the resulting installed configuration of the curtain mount of FIGS. 9A and 9B. A portion of the curtain 30 wraps around the pins 112 and is secured in holes 110. The outward force of the hydraulic plunger urges the curtain 30 toward the ceiling 32 as described above.

I claim:

1. A method of installing a curtain to form a room partition between a floor and a ceiling using a partition mount having an elongated portion, a first end, and a second end, the second end having a mechanism to couple to the curtain, the method comprising:

coupling a curtain to the mechanism on the second end, the mechanism at the second end interfacing with the elongated portion at a hinged joint such that the mechanism is pivotable with respect to the elongated portion; and

mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the mechanism that couples the curtain at the second end of the partition mount directly engages the ceiling.

2. The method of claim 1 further comprising adjusting a length of the elongated portion of the partition mount.

3. The method of claim 1 wherein partition mount further includes a compression mechanism between the first end and the second end, and wherein mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling.

4. The method of claim 1 wherein the partition mount comprises a first partition mount and further comprising:

coupling a second portion of the curtain to a mechanism on a second end of a second partition mount having an elongated portion, a first end, and a second end, and

mounting the second partition mount such that a portion of the first end of the second partition mount engages the floor and a portion of the second end of the second partition mount engages the ceiling.

5. The method of claim 4 further comprising moving the second partition mount to a position on the ceiling to increase tension in the curtain between the second end of the first partition mount and the second end of the second partition mount.

10

6. The method of claim 4 wherein a distance between the first partition mount and the second partition mount is variable.

7. The method of claim 4 further comprising adjusting a length of the elongated portion of the second partition mount.

8. The method of claim 1 wherein the mechanism at the second end of the partition mount includes a head that is coupled to the elongated portion and a clip that is removably coupled to the head.

9. The method of claim 8 wherein coupling the curtain to the mechanism on the second end comprises placing a portion of the curtain on the head and coupling the clip to the head such that the curtain is secured between the clip and the head.

10. The method of claim 8 wherein one of the clip and head includes at least one protrusion that mates with at least one retention aperture on the other of the clip and head to secure the curtain between the clip and head.

11. The method of claim 10 wherein the clip snaps to the head.

12. The method of claim 8 wherein the one of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and head.

13. The method of claim 12 wherein the legs are elastically deformable and snap about the at least one outer surface.

14. The method of claim 12 wherein the legs are slidable relative to the at least one outer portion of the head.

15. The method of claim 14 wherein an upper surface of the clip includes a pad of high friction material applied thereto to prevent slipping when engaging the ceiling.

16. The method of claim 1 wherein the second end of the partition mount includes a high friction material applied to an upper surface thereof to prevent slipping when engaging the ceiling.

17. A curtain mounting system comprising:

a pole having first and second ends; and

a coupling mechanism at the second end of the pole, the coupling mechanism including a head that is coupled to the pole and a clip that is removably coupled to the head, one of the clip and head including a body and multiple protrusions extending from the body at an interior portion thereof that mate with multiple corresponding retention apertures on the other of the clip and head at an interior portion thereof to secure a portion of a curtain between the clip and head.

18. The curtain mounting system of claim 17 further comprising a compression mechanism between the first and second ends of the pole.

19. The curtain mounting system of claim 17 wherein the pole includes a length adjustment mechanism to adjust a length of the pole.

20. The curtain mounting system of claim 17 wherein the clip and head snap together when coupled.

21. The curtain mounting system of claim 17 wherein the clip and head have opposed substantially planar surfaces between which the curtain is secured when the clip is coupled to the head.

22. The curtain mounting system of claim 17 wherein the at least one retention aperture on the other of the clip and head is at an interior portion thereof.

23. The curtain mounting system of claim 17 further comprising a hinged joint at the head of the coupling mechanism to provide a rotational relationship between the pole and head such that the head can be positioned at an acute with respect to the pole.

01240

US 6,953,076 B2

11

24. The curtain mounting system of claim 17 further comprising a threaded interface between the pole and coupling mechanism.

25. The curtain mounting system of claim 17 wherein the at least one protrusion comprises a pin.

26. The curtain mounting system of claim 25 wherein the pin is rigid.

27. The curtain mounting system of claim 26 wherein the pin includes a knob at a distal end that mates with the retention aperture and prevents release of the clip from the head.

28. The curtain mounting system of claim 17 wherein the clip includes a pad of high friction material applied to an upper surface thereof to prevent slipping when engaging a room surface.

29. A curtain mounting system comprising:

a curtain;

a pole having first and second ends; and

a coupling mechanism at the second end of the pole, the coupling mechanism including a head that is coupled to the pole and a clip that is removably coupled to the head, the clip and head having opposed substantially planar surfaces between which a portion of the curtain is secured when the clip is coupled to the head, the lip including a pad of high-friction material applied to an upper surface thereof to prevent slipping when engaging a room surface.

30. The curtain mounting system of claim 29 wherein one of the clip and head includes at least one protrusion at an interior portion thereof that mates with at least one retention aperture on the other of the clip and head to secure the portion of the curtain between the clip and head.

31. The curtain mounting system of claim 30 wherein the at least one retention aperture on the other of the clip and head is at an interior portion thereof.

32. The curtain mounting system of claim 30 wherein the at least one protrusion comprises a pin.

33. The curtain mounting system of claim 32 wherein the pin is rigid.

34. The curtain mounting system of claim 32 wherein the pin includes a knob at a distal end that mates with the retention aperture and prevents release of the clip from the head.

35. The curtain mounting system of claim 29 further comprising a compression mechanism between the first and second ends of the pole.

36. The curtain mounting system of claim 29 wherein the pole includes a length adjustment mechanism to adjust a length of the pole.

37. The curtain mounting system of claim 29 wherein the clip and head snap together when coupled.

38. The curtain mounting system of claim 29 further comprising a hinged joint at the head of the coupling mechanism to provide a rotational relationship between the pole and head such that the head can be positioned at an acute angle with respect to the pole.

39. The curtain mounting system of claim 29 further comprising a threaded interface between the pole and coupling mechanism.

40. A curtain mounting system comprising:

a pole having first and second ends;

a coupling mechanism at the second end of the pole, the coupling mechanism including a head that is coupled to the pole and a clip that is removably coupled to the head, one of the clip and head including a body and multiple rigid protrusions extending from the body that

12

mate with multiple corresponding retention apertures on the other of the clip and head to secure a portion of a curtain between the clip and head, the clip including a high friction material applied to an upper surface thereof to prevent slipping when engaging a room surface.

41. The curtain mounting system of claim 40 further comprising a compression mechanism between the first and second ends of the pole.

42. The curtain mounting system of claim 40 wherein the pole includes a length adjustment mechanism to adjust a length of the pole.

43. The curtain mounting system of claim 40 wherein the clip and head snap together when coupled.

44. The curtain mounting system of claim 40 wherein the clip and head have opposed substantially planar surfaces adapted to secure a curtain between the surfaces when the clip is coupled to he head.

45. The curtain mounting system of claim 40 wherein the multiple retention apertures on the other of the clip and head are at an interior portion thereof.

46. The curtain mounting system of claim 40 further comprising a hinged joint at the head of the coupling mechanism to provide a rotational relationship between the pole and head such that the head can be positioned at an acute angle with respect to the pole.

47. The curtain mounting system of claim 40 further comprising a threaded interface between the pole and coupling mechanism.

48. The curtain mounting system of claim 40 wherein the multiple protrusions comprise pins.

49. The curtain mounting system of claim 48 wherein the pin includes a knob at a distal end that mates with the retention aperture and prevents release of the clip from the head.

50. The curtain mounting system of claim 40 wherein the multiple protrusions are located at an interior portion of the one of the clip and head.

51. A curtain mounting system comprising:

a pole having first and second ends;

a curtain comprising a sheet of material; and

a coupling mechanism at the second end of the pole, the coupling mechanism including a head that is coupled to the pole and a clip that is removably coupled to the head, one of the clip and head including a body and multiple protrusions extending from the body that mate with multiple retention apertures on the other of the clip and head to secure a portion of the curtain between the clip and head.

52. The curtain mounting system of claim 51 wherein the multiple protrusions are located at an interior portion of the one of the clip and head.

53. The curtain mounting system of claim 51 further comprising a compression mechanism between the first and second ends of the pole.

54. The curtain mounting system of claim 51 wherein the pole includes a length adjustment mechanism to adjust a length of the pole.

55. The curtain mounting system of claim 51 wherein the clip and head snap together when coupled.

56. The curtain mounting system of claim 51 wherein the clip and head have opposed substantially planar surfaces between which the curtain is secured when the clip is coupled to the head.

57. The curtain mounting system of claim 51 wherein the multiple retention apertures on the other of the clip and head are at an interior portion thereof.

US 6,953,076 B2

13

58. The curtain mounting system of claim 51 further comprising a hinged joint at the head of the coupling mechanism to provide a rotational relationship between the pole and head such that the head can be positioned at an acute angle with respect to the pole.

59. The curtain mounting system of claim 51 further comprising a threaded interface between the pole and coupling mechanism.

60. The curtain mounting system of claim 51 wherein the multiple protrusions comprise pins.

61. The curtain mounting system of claim 60 wherein the pins are rigid.

62. The curtain mounting system of claim 61 wherein each pin includes a knob at a distal end that mates with the retention aperture and prevents release of the clip from the head.

63. A curtain mounting system comprising:
a pole having first and second ends;
a sheet of curtain material; and
a coupling mechanism at the second end of the pole, the coupling mechanism including a head that is coupled to the pole and a clip that is removably coupled to the head, one of the clip and head including multiple protrusions that mate with multiple retention apertures on the other of the clip and head to secure a portion of the curtain between the clip and head, wherein the clip includes a high-friction material applied to an upper surface thereof to prevent slipping when engaging a room surface.

64. A method of installing a curtain to form a room partition between a floor and a ceiling using a partition mount having an elongated portion with a first end and a second end, and having a head coupled to the second end of the elongated portion, the head having a first section coupled to the second end and a second second that couples to the first section, comprising:
installing a portion of a curtain between the first section and the second section, the first and second sections having cross-sectional areas in a direction parallel to the portion of the curtain that are substantially the same; and
mounting the partition mount such that the first end engages the floor and the second section of the head engages the ceiling.

65. The method of claim 64, wherein installing the portion of the curtain between the first section and the second section includes coupling the first section to the second section.

66. The method of claim 65, wherein coupling the first section to the second section includes positioning a protrusion located on one of the first section and the second section through a retention aperture on the other of the first section and the second section to secure the second section to the first section.

67. The method of claim 64, wherein the elongated portion is substantially cylindrical and has a circular cross-section having a first area, and wherein mounting the partition mount includes positioning the second section of the head such that a contact area of engagement of the second section with the ceiling is greater than the first area.

68. The method of claim 64, wherein installing the portion of the curtain includes positioning a portion of the curtain such that a surface of the portion of the curtain is substantially parallel to a surface of the ceiling.

69. The method of claim 64, wherein mounting includes compressing a compression mechanism in the partition mount.

14

70. The method of claim 64, further comprising adjusting a length of the elongated portion of the partition mount.

71. The method of claim 64, further comprising:
coupling the curtain to a head of a second partition mount and mounting the second partition mount such that a portion of a first end of the second partition mount engages the floor and a portion of a second end of the second partition mount engages the ceiling.

72. The method of claim 71, further comprising moving the second partition mount away from the partition mount with the curtain coupled to the second partition mount to increase tension on the curtain.

73. A curtain mounting system for mounting a partition between a floor and a ceiling, the system comprising:
an elongated member having a first end and a second end, the first end being constructed and arranged to engage the floor;
a head coupled to the second end of the elongated member, the head having a first section coupled to the second end and a second section that couples to the first section, one of the first section and the second section including multiple protrusions extending therefrom that mate with multiple corresponding apertures on the other of the first section and the second section, the second section having a surface constructed and arranged to engage the ceiling; and
a curtain comprising a sheet of material, the first section and the second section of the head constructed and arranged to secure the curtain between the first section and the second section when the second section is coupled to the first section.

74. The curtain mounting system of claim 73, wherein the elongated member is substantially cylindrical and has a circular cross section having a first area, and wherein the surface of the second section has an area that is greater than the first area.

75. The curtain mounting system of claim 73, further comprising a compression mechanism between the first end and the second end of the elongated member.

76. The curtain mounting system of claim 73, wherein each of the first section and the second section includes a planar surface that contacts the curtain, the planar surface of the first section being substantially parallel to the planar surface of the second section.

77. The curtain mounting system of claim 76, wherein the head is constructed and arranged such that the planar surfaces are substantially parallel to the ceiling when the system is mounted between the floor and ceiling.

78. A method of installing a curtain to form a room partition between floor and a ceiling using a partition mount having an elongated portion, a first end, a second end, the second end having a mechanism to couple to the curtain, the method comprising:
coupling a curtain to the mechanism on the second end, the mechanism including a high-friction upper surface; and
mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the high-friction upper surface of the mechanism that couples the curtain at the second end of the partition mount directly engages the ceiling.

79. The method of claim 78 the mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other.

01242

US 6,953,076 B2

15

80. The method of claim 78 further comprising adjusting a length of the elongated portion of the partition mount.

81. The method of claim 78 wherein the partition mount further includes a compression mechanism between the first end and the second end, and wherein mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling.

82. The method of claim 78 wherein the mechanism at the second end of the partition mount includes a head that is coupled to the elongated portion and a clip at is removably coupled to the head.

83. The method of claim 82 wherein coupling the curtain to the mechanism on the second end comprises placing a portion of the curtain to the mechanism on the second end such that the curtain is secured between the clip and the head.

84. The method of claim 82 wherein one of the clip and head includes at least one protrusion that mates with at least one retention aperture on the other of the clip and head to secure the curtain between the clip and head.

85. The method of claim 82 wherein the one of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and head.

86. A method of installing a curtain to form a room partition between floor and a ceiling using a partition mount having an elongated portion, a first end, a second end, the second end having a mechanism to couple to the curtain, the method comprising:

coupling a curtain to the mechanism on the second end, wherein the mechanism at the second end includes a head that is coupled to the elongated portion a clip that is removably coupled to the head, one of the head and clip having a body including multiple protrusions extending from the body that mate with multiple corresponding retention apertures on the other of the clip and head to secure the curtain between the clip and head; and

mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the clip of the mechanism directly engages the ceiling.

87. The method of claim 86 wherein the mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other.

16

88. The method of claim 86 wherein the clip includes a high-friction upper surface.

89. The method of claim 86 further comprising adjusting a length of the elongated portion of the partition mount.

90. The method of claim 86 wherein partition mount further includes a compression mechanism between the first end and the second end, and wherein mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling.

91. A method of installing a curtain to form a room partition between a floor and a ceiling using a partition mount having an elongated portion, a first end, and a second end, the second end having a mechanism to couple to the curtain, the method comprising:

coupling a portion of a curtain to the mechanism on the second end , wherein the mechanism at the second end includes a head that is coupled to the elongated portion and a clip that is removably coupled to the head to secure the portion of the curtain between the clip and head, the clip and head having substantially the same cross-sectional area; and

mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the clip of the mechanism directly engages the ceiling.

92. The method of claim 91 wherein the mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other.

93. The method of claim 91 further comprising adjusting a length of the elongated portion of the partition mount.

94. The method of claim 91 wherein partition mount further includes a compression mechanism between the first end and the second end, and wherein mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling.

95. The method of claim 91 wherein one of the clip and head includes at least one protrusion that mates with at least one retention aperture on the other of the clip and head to secure the curtain between the clip and head.

96. The method of claim 91 wherein the one of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and head.

*  *  *  *  *

01243

# EXHIBIT I

(12) **United States Patent**
Whittemore

(10) Patent No.: **US 6,209,615 B1**
(45) Date of Patent: ***Apr. 3, 2001**

(54) **PARTITION MOUNT**

(75) Inventor: **Jeffrey Whittemore**, Arlington, MA (US)

(73) Assignee: **Zipwall, LLC**, Cambridge, MA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/302,122**

(22) Filed: **Apr. 29, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 08/740,372, filed on Oct. 29, 1996, now Pat. No. 5,924,469.

(51) Int. Cl.$^7$ .................................................. A47H 13/00
(52) U.S. Cl. ...................... 160/368.1; 160/350; 160/351; 160/402; 24/92; 24/563; 248/200.1
(58) Field of Search ....................... 160/350, 351, 160/368.1, 330, 338, 329, 379, 380, 399, 402; 248/200.1, 354.1; 403/109.4, 109.5, 326, 329; 24/92, 113 R, 113 MP, 114, 459, 563, 570

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 827,000 | 7/1906 | Dinsmore | 160/402 |
| 2,219,169 | 10/1940 | Alter | 248/200.1 X |
| 2,474,158 | 6/1949 | Neeley | 160/402 |
| 2,816,769 | 12/1957 | Noble | 248/354.1 X |
| 2,903,227 | 9/1959 | De Kalb Key | 248/200.1 |
| 2,942,829 | 6/1960 | Stiffel | 248/200.1 X |
| 3,072,784 | 1/1963 | Mann | 248/200.1 X |
| 3,247,558 * | 4/1966 | Kaufman | 24/563 X |
| 3,327,310 | 6/1967 | Bethune et al. | 248/200.1 X |
| 3,333,808 | 8/1967 | Du Boff | 248/200.1 X |

| | | | |
|---|---|---|---|
| 3,350,120 | 10/1967 | Hinrichs | 248/200.1 X |
| 3,529,860 | 9/1970 | Jelley | 160/402 |
| 3,592,434 | 7/1971 | Murray | 248/200.1 X |
| 3,767,253 | 10/1973 | Kluetsch | 296/24 R |
| 3,792,510 | 2/1974 | Evett | 248/243 |
| 3,822,850 | 7/1974 | Elias | 248/200.1 X |
| 3,952,877 | 4/1976 | Kindl | 248/200.1 X |
| 4,139,101 | 2/1979 | Towfigh | 211/86 |
| 4,396,325 | 8/1983 | Joice-Cavanagh | 410/129 |
| 4,502,256 * | 3/1985 | Hahn | 24/459 X |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 29605222 U | 6/1979 | (FR) . |
| 2411282 | 7/1979 | (FR) . |

OTHER PUBLICATIONS

"Quickprop," Brochure by Protecta Screen LTD, Aug. 1996.

*Primary Examiner*—Bruce A. Lev
(74) *Attorney, Agent, or Firm*—Samuels, Gauthier & Stevens, LLP

(57) **ABSTRACT**

In a spring-loaded curtain mount, the mount includes a pole interface at a proximal end, a compressive mechanism, and a head at a distal end. The pole interface is adapted to receive the end of a standard length adjustable pole or a painter's pole. The compression mechanism is disposed between the proximal end of the mount and the head. The mount includes a coupling device adapted to receive a portion of a curtain. During installation, the curtain mount is coupled to the end of an extension pole and the length of the pole is adjusted such that the combined length of the pole and mount is slightly longer than the distance between the floor and ceiling. At ground level, a portion of the curtain is attached to the head of the curtain mount. The curtain and mount are raised to the ceiling and the mount and pole are compressed between the floor and the ceiling. This compressive force operates to urge the head toward the ceiling, securing the mount in place.

**30 Claims, 12 Drawing Sheets**



US 6,209,615 B1

Page 2

### U.S. PATENT DOCUMENTS

| 4,536,924 | * | 8/1985 | Willoughby | 24/563 X |
|---|---|---|---|---|
| 4,645,473 | | 2/1987 | Mochizuki | 403/314 X |
| 4,662,034 | * | 5/1987 | Cunningham | 24/92 X |
| 4,708,189 | | 11/1987 | Ward | 160/351 |
| 4,770,086 | | 9/1988 | Gabster | 98/50 |
| 4,794,974 | | 1/1989 | Melino | 160/330 |
| 4,874,028 | | 10/1989 | Lynch et al. | 160/332 |
| 4,969,241 | * | 11/1990 | Griffin | 24/92 X |
| 5,038,889 | | 8/1991 | Jankowski | 182/129 |
| 5,056,753 | | 10/1991 | Lunau et al. | 248/200.1 X |
| 5,129,774 | | 7/1992 | Balseiro et al. | 248/354.1 X |

| 5,308,280 | | 5/1994 | Dotson | 454/170 |
|---|---|---|---|---|
| 5,345,980 | | 9/1994 | Brophy | 160/354 |
| 5,375,303 | * | 12/1994 | Shenier | 24/92 X |
| 5,384,938 | * | 1/1995 | Frederick | 24/563 X |
| 5,388,283 | * | 2/1995 | Garnett | 24/563 X |
| 5,524,693 | | 6/1996 | Hamilton | 160/243 |
| 5,649,780 | * | 7/1997 | Schall | 403/109 |
| 5,884,424 | * | 3/1999 | Smith | 160/402 X |
| 5,897,085 | * | 4/1999 | Cronin | 248/200.1 |
| 5,940,942 | * | 8/1999 | Fong | 24/459 |

* cited by examiner



FIG. 1A



FIG. 5A          FIG. 5B

01042



FIG. 1B



FIG. 1C

01044



FIG. 2



FIG. 3A

FIG. 3B

FIG. 3C

01046



FIG. 4B

FIG. 4C

FIG. 4A



FIG. 6

01048



FIG. 7A

FIG. 7B

01049



FIG. 7C



FIG. 7D



FIG. 7E



FIG. 7F

01051



FIG. 8C

FIG. 8B

FIG. 8A

01052



FIG. 9B

FIG. 9A

FIG. 9C

01053

1

# PARTITION MOUNT

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 08/740,372, filed Oct. 29, 1996 now U.S. Pat. No. 5,924,469.

## BACKGROUND OF THE INVENTION

Partition systems are often employed to separate portions of a building or room. Partitions serve as a barrier to dust, noise, light, odors, and the like. In construction zones, partitions are useful for protecting a clean area from a work area, for example, protecting an area where furniture and rugs are temporarily stored from an area where wood floors are being refinished.

Workers at construction sites often use rudimentary techniques for installing partitions. Some simply nail, screw, or staple the curtain or partition material to the floor, ceiling, and abutting walls, resulting in damage to their surfaces. Others tape or otherwise adhere a curtain or plastic sheet to the walls and ceilings. The tape usually fails to stick, but if it does stick, as the tape is removed, paint usually pulls off with the tape or adhesive is left behind.

Others employ more clever techniques for constructing partitions. U.S. Pat. No. 4,794,974 discloses a curtain wall having spring-loaded extendable support legs which support header elements aligned along the ceiling. A curtain is mounted to the header elements with fasteners along the length of each header element. This design suffers from several limitations. The support poles, header elements, fasteners, and curtain all comprise dedicated hardware, increasing manufacturing costs. Particularly, the curtain must be designed to accommodate the fasteners. In addition, installation appears to be awkward and time consuming due to the multitude of fasteners and the system appears to be top-heavy during installation.

U.S. Pat. No. 4,708,189 discloses a spring-loaded curtain support having a plurality of support units extending from the floor to the ceiling. Each support unit includes a stackable extension member, a telescoping section, a lower batten, and an upper batten. The lower and upper battens extend along the floor and ceiling respectively and interlock so as to provide a continuous batten along the floor and ceiling. A curtain is designed to loop around the upper batten and accommodate the extension poles. This design again requires dedicated hardware, including a curtain which is designed specifically to accept a particular upper batten size and shape and a particular extension pole. The structure is bulky and appears tedious to install.

U.S. Pat. No. 5,308,280 discloses a coal mine ventilation curtain support. An adjustable extension pole is erected between the floor and ceiling of a mine. A curtain support member compresses between the extension pole resting on the floor, and the ceiling such that the compressive force urges the support member against the ceiling, thereby securing a curtain in place against the ceiling. Although this design accommodates any type of curtain material, it again suffers from the limitation of requiring dedicated hardware as the support member is designed for a particular extension pole. In addition, installation appears challenging in rooms with tall ceilings as the curtain is installed after the mount is raised and installed. Following installation of the support member, an installer must climb up to the ceiling and pull back a leg of the support member, insert a curtain and snap the support member back into the ceiling. In a home construction project, the snapping action may damage the

2

ceiling. In addition, for ceilings higher than the reach of the installer, this design may prove to be challenging to install. This design presents the further unfortunate possibility that the installer could jam his fingers between the support member and ceiling.

## SUMMARY OF THE INVENTION

The present invention is directed to a partition mount apparatus and method which overcome the limitations of the prior art. The inventive method and apparatus are applicable to use in construction zones in preventing contaminants such as dust and paint from entering clean areas in a home or office. The invention may also be used as a temporary visual, odor, or sound barrier, depending on the curtain material employed. The present invention offers the advantages of accommodating standard extension poles, for example, painters poles, with standard threads, and is compatible with a variety of commercially-available curtain or drape materials, for example plastic, cloth, or the like. The invention is a "clean" system designed to be installed and removed without damaging or otherwise marking the ceiling, floor or walls in the construction zone. Assembly is easy and fast and can be accomplished by a single individual. In a preferred method for assembling the partition of the present invention, the curtain mounts and curtain are first assembled on the floor and then raised to the ceiling permitting safe installation in rooms with high ceilings, for example cathedral ceilings.

One embodiment of the invention comprises a spring-loaded mount including a hole at a proximal end, a compression mechanism, and a head at a distal end. The hole is adapted to receive the end of a standard length-adjustable pole or painters pole. In a preferred embodiment, the compressive mechanism comprises a spring under compression between an inner wall of the mount and the head. The head is urged toward the ceiling by the compressive mechanism, providing longitudinal rigidity to the installed mount. The head preferably interfaces with the mount at a swivel joint so that the mount can be installed at a range of orientations relative to the ceiling.

The head preferably includes a coupling device, for example, a Velcro™ hook and loop fastener strip, a hook, or a clip, adapted to receive a portion of a curtain. In a first preferred embodiment of the invention, the face of the head includes a sheet of Velcro™ hooks which mates with a sheet of Velcro™ loops attached to the curtain. On the side of the curtain opposite the Velcro™ loops, a high-friction material provides friction between the mount and the ceiling, so that the curtain is less likely to slide relative to the ceiling thereby providing lateral rigidity. In a second preferred embodiment of the invention, a removable clip couples the curtain to the head. The clip is adapted to receive a section of curtain material and snap on or otherwise secure to the head. High friction material attached to the back of the clip provides lateral rigidity as described above.

In alternative embodiments, the curtain mount may be adapted to receive poles without threads, or may include a pin for interfacing with a corresponding hole in a pole. Furthermore, the elements of the curtain mount may be distributed along the pole. The extension poles do not necessarily need to be adjustable in situations where the ceiling size is standard or predetermined.

In the inventive method of the present invention, a spring-loaded curtain mount is coupled to the end of a standard adjustable pole, and the length of the pole is adjusted such that the combined length of the pole and mount is slightly

US 6,209,615 B1

3

longer than the distance between the floor and ceiling. A portion of the curtain is attached to the curtain mount. The curtain and mount are raised to the ceiling and the mount and pole are compressed toward the floor and ceiling. This compressive force operates to urge the head toward the ceiling. The same compressive force operating through the high friction material on the head or curtain provides lateral rigidity for the system.

The mount is free-standing and therefore does not require additional "destructive" mounting means, for example nailing or taping. Instead, the mount is installed and removed without permanent damage to the ceiling or floor.

By placing several mounts between the ceiling and floor, across a room or portions thereof, the room can be partitioned to protect furniture and the like during construction of other portions of the room. The curtain can also be installed along the ceiling and/or floor for constructing a tunnel or booth. The shape of the partition is variable depending on the respective spatial positions of the mounts.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features and advantages of the invention will be apparent from the following more particular description of preferred embodiments and the drawings in which like reference characters refer to the same parts throughout the different views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principals of the invention.

FIGS. 1A, 1B, and 1C illustrate installed partition configurations in accordance with the present invention.

FIG. 2 illustrates the primary components of two preferred embodiments of the present invention.

FIG. 3A is a cutaway side view of a curtain mount having a Velcro™-mount configuration in accordance with the present invention.

FIG. 3B is a perspective view of the head of the curtain mount of FIG. 3A interfacing with an appropriately configured curtain in accordance with the present invention.

FIG. 3C is a side view of a curtain mounted to the ceiling by the curtain mount of FIG. 3A in accordance with the present invention.

FIG. 4A is a cutaway side view of a curtain mount having a clip-mount configuration in accordance with the present invention.

FIG. 4B is a perspective view of the interaction of the clip and head of the curtain mount of FIG. 4A in accordance with the present invention.

FIG. 4C is a side view of a curtain mounted to the ceiling by the curtain mount of FIG. 4A in accordance with the present invention.

FIG. 5A is a perspective view of the head of a curtain mount including an extension loop in accordance with the present invention.

FIG. 5B is a side view of a clamped interface between the curtain mount body and an extension pole in accordance with the present invention.

FIG. 6 illustrates a curtain installation using various preferred and alternative embodiments of the present invention.

FIG. 7A–FIG. 7F illustrate an installation procedure in accordance with the present invention.

FIG. 8A–FIG. 8C are perspective views of alternative embodiments for coupling the curtain to the head.

FIG. 9A–FIG. 9C are perspective views of an alternative embodiment of a curtain mount in accordance with the

4

present invention illustrating an alternative curtain coupler, an alternative pole interface, and an alternative compression mechanism.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. 1A illustrates an installed partition extending from the floor 34 to the ceiling 32 of a room between opposed walls 36A, 36B. Three curtain mounts 24 in accordance with the present invention are mounted on extension poles 22. A foot 26 at the bottom of each extension pole interfaces with the floor and a head 28 at the top of each curtain mount interfaces with the ceiling 32. The contact or interface points of the foot and head preferably are covered with a soft friction material such as rubber to provide lateral rigidity of the system and to prevent marking of the ceiling and floor.

Each curtain mount includes a compression mechanism, for example a spring, which operates to urge the head 28 against the ceiling 32, thereby securing the curtain 30. The extension poles 22 are preferably adjustable such that before installation of the curtain 30, the pole length in combination with the fully extended curtain mount 24 can be made slightly larger than the distance from the floor 34 to the ceiling 32 at the point at which the curtain mount is to be installed. For example, if the compression range of the spring is 2–3 inches, then the total length of the pole 22 and mount 24 can be made 2–3 inches longer than the floor-to-ceiling 32 height, causing the spring to be compressed when the system is installed. Alternatively, non-adjustable standard poles such as painters poles sized for particular predetermined ceiling heights may be employed.

FIG. 1B illustrates the present invention installed to partition a portion of a room extending between adjacent walls 36B, 36C. In this illustration, the curtain 30 is installed to protect furniture 38 from dust and debris during painting or other construction in the open portion of the room.

FIG. 1C illustrates the present invention configured as a tunnel or booth. In this installation, the curtain 30 extends along the ceiling 32 between mounts 24A, 24B, 24C, and 24D, protecting the ceiling 32 from activity in the tunnel. The curtain 30 can be tucked under feet 26A–26D to secure the curtain to the floor 34. The curtain 30 may also be installed between the feet 26A–26D on the floor to provide an enclosed tunnel. The sides of the tunnel may be formed by a single continuous curtain 30 or multiple curtains 30, the edges of each held in place and raised by the mounts 24A–24D. This configuration is particularly well suited to serve as an asbestos removal tunnel or paint booth.

Note that for purposes of the present invention, the term "curtain" is defined to include any flexible material suited for partitioning, for example cloth sheets and drapes, or plastic tarps.

FIG. 2 illustrates two preferred curtain mount embodiments. In a first Velcro™-mount embodiment 21A, an extension pole 22A having a foot 26A, for example a rubber foot 26 is coupled to a first curtain mount 24A. The curtain mount 24A is spring-loaded as described above and as will be described in further detail below.

The curtain mount includes a head 28A. The head is preferably of sufficient surface area to accommodate curtain materials of a variety of strengths and weights. For example, if the head area is too small, the head may punch through a weaker curtain material when weighted by the curtain. In a preferred embodiment of the invention, a head size of approximately 5" by 2.5" was found to be sufficient to handle most curtain materials. The head 28A includes a strip

01055

US 6,209,615 B1

5

of Velcro™ loops or hooks attached thereto. The Velcro™ strip 40 on the head 28A mates with a corresponding Velcro™ strip 42 attached to a portion of the curtain 30. A strip of friction material 44 is attached to the face of the curtain 30 opposite that of the Velcro™ strip 42. In this manner, an installer can first mate the Velcro™ strips 42,40 of the curtain 30 and curtain mount 24A respectively and then raise the extension pole 22A and mount 24A such that the high friction material 44 interfaces with the ceiling. As the spring in the curtain mount 24A compresses, that compressive force operates outwardly through the head 28A, Velcro™ strips 40,42, curtain 30, and high friction material 44 against the ceiling, thereby securing the curtain 30 in place against the ceiling. A universal joint 56A at the head 28A allows for installation of a variety of angles. This allows for installation of the curtain mount of the present invention in rooms having pitched ceilings, for example cathedral ceilings.

In a second curtain mount embodiment 24B hereinafter referred to as a clip-mount, a curtain clip 64 is adapted to accept a portion 30A of a curtain 30. In a first embodiment, the clip 64 includes legs 65 adapted to snap over the body of the head 28B, thereby securing the clip 64 and curtain 30 to the head 28B. In a second embodiment, the clip 64 includes pins 112 (see FIG. 9A) which slide and lock in corresponding holes 110 in the head 28B. The top portion of the clip 64 preferably includes high friction material 44 as described above. In the clip-mount embodiment, an installer at floor level clips a portion of the curtain onto the head 28B of the curtain mount 24B and raises the curtain 30 to the ceiling using extension pole 22B. The high friction material 44 at the head 28B in combination with the rubber foot 26 provide lateral rigidity to the system, and the compressed spring in the curtain mount 24B provides longitudinal rigidity to the installed system. The clip embodiment of the curtain mount 24B offers the advantage of accepting any portion of any flexible curtain 30 material, offering an advantage over the Velcro™-mount embodiment 24A which can be coupled only to those portions of a curtain 30 having Velcro™ strips 42 previously installed thereon.

FIG. 3A is a cutaway side view of a Velcro™-mount embodiment of a curtain mount 24 in accordance with the present invention. The curtain mount 24 includes a body 48, a spring 50, a plunger 46, a head 28, and a hole 60 for receiving the end of an extension pole 22. The hole 60 includes internal threads 52 for mating with corresponding external threads 54 formed on the extension pole 22. The thread may comprise ¾ Acme thread, standard in the industry for painter's poles and other standard extension poles. This permits the curtain mount 24 to be compatible with commercially-available poles. When the extension pole 22 is inserted to a predetermined distance into the hole 60, a thread stopper 58 prevents the pole 22 from being inserted further.

A spring 50 rests in the body 48 of the curtain mount 24 between the rigid thread stopper 58 and the plunger 46. The spring is preferably extendable over a range of lengths, for example four inches, to accommodate extension poles of a range of lengths. The tension of the spring 50 must be high enough to support the weight of the installed curtain and low enough such that the head 28 of the curtain mount 24 does not push through the ceiling during installation. The plunger 46 and head 28 preferably interface at a universal joint 56 such that the curtain mount can be installed at a variety of angles relative to the ceiling. Velcro™ loops 40 are coupled to the outer face of the head 28. Preferred methods for coupling Velcro™ loops to the head 28 include self-adhesive Velcro™ strips and/or stapling.

6

The perspective view of FIG. 3B illustrates the head 28 and Velcro™ loops 40 coupled thereto. The Velcro™ loops 40 interface with Velcro™ hooks 42 stapled or otherwise adhered to a portion of the curtain 30. Friction material, approximately slightly larger in area than the surface area of the head 28 is disposed on the opposite face of the curtain. When the Velcro™ hooks 42 are mated to the Velcro™ loops 40, the curtain 30 is secured to the end of the curtain mount 24 and can be raised to the ceiling as shown in FIG. 3C.

In FIG. 3C, a force F generated by the compression of the spring operating on the plunger 46 urges the head 28 against the ceiling 32. The force transfers through the loops 40, the hooks 42, the curtain 30, and the high friction material 44, and operates on the ceiling 32. In this manner, the longitudinal compression of the spring acts outwardly to secure the curtain 30 against the ceiling 32.

FIG. 4A illustrates the clip-mount embodiment of the present invention. A curtain mount 24 includes a body 48 having a hole 60 for receiving an end of an extension pole 22, a plunger 62, a spring 50, and a fixed head 28. Note that the extension pole 22 of this embodiment is a standard thread-less pole and the hole 60 is adapted to receive the pole. In this embodiment, the pole 22 is slidable relative to the body 48 of the curtain mount 24, and communicates with the plunger 62 to compress the spring 50 against the spring stopper 51. The head 28 is longitudinally fixed, relative to the body 48. A universal joint 56 as shown in FIG. 3A may optionally be employed to couple the head 28 to the body 48 for reasons described above. A curtain clip 64 having legs 65 is adapted to snap onto the head 28, thereby clamping an inserted curtain therebetween. The clip legs 65 include tabs 67 which snap around the bottom face of the head 28 providing a secure fit. High friction material 44 is disposed on the top face of the clip 64 for interfacing with the ceiling, thereby providing lateral rigidity to the system as described above. Note that the clip design given above is merely illustrative of various clip designs which may be employed in accordance with the present invention.

FIG. 4B illustrates the relative positions of the head 28, curtain 30, and clip 64 during installation. An advantage of the clip-mount embodiment over the Velcro™-mount embodiment is that the clip-mount can be secured to any portion of a curtain or sheet available to the installer. This may include a center portion of the curtain 30 or a corner portion of the curtain 30 as shown in FIG. 4B. In contrast, the Velcro™-mount embodiment requires the curtain to have portions of Velcro™ attached to the curtain at predetermined locations.

FIG. 4C illustrates a curtain 30 installed against the ceiling 32 using the clip-mount. Before the curtain is raised, the clip 64 and curtain 30 are snapped and secured to the head 28. After raising the curtain against the ceiling 32, compression in the spring of the curtain mount generates a force F which operates through the head 28, curtain 30, clip 64, and high friction material 44 against the ceiling 32. The compressive force F of the spring and high friction material provide longitudinal and lateral rigidity to the system as described above.

FIG. 5A is a perspective view of the head 28 of a curtain mount having an extension loop 66. The extension loop 66 is attached to the head 28, universal joint 56, plunger 46 (shown in FIG. 5A), body 48, or other portion of the curtain mount. Following installation of the curtain, the extension loop 66 allows one to reposition the head 28 relative to the ceiling without moving the extension pole. This is especially helpful for fine-tuning the adjustment of the curtain mount

US 6,209,615 B1

7

position, for example where the curtain exhibits sag between two installed curtain mounts, without having to move the entire pole. Operation of the extension loop is explained below with reference to FIGS. 7D–7F. The extension loop 66 may comprise string, a chain, or rod for tugging on the head.

FIG. 5B illustrates an alternative interface between an extension pole 22 and body 48 of a curtain mount. In this example, the body 48 of the curtain mount includes a hole 60 for receiving the end of an extension pole 22. The rim of the hole 60 includes fingers 74 which are tapered outward slightly. The fingers 74 include an external thread 72 adapted for interfacing with an internal thread or a corresponding clamp nut 70. After a pole 22 is inserted in the hole 60, the clamp 70 is slid into position and tightened around the fingers 74. The taper in the fingers 74 produces a snug fit as the clamp 70 is tightened. In this manner, the curtain mount can accommodate extension poles 22 of a variety of widths.

FIG. 6 illustrates an installed curtain 30 using preferred and alternative embodiments of the present invention. The right mount 82 employs a curtain mount 24 as described above. The curtain mount 24A is coupled to a standard extension pole 22 having a foot 26 at its lower end for interfacing with the floor 34. The curtain mount includes a spring 50 in compression between the head 28 and the extension pole 22. The bead 28 is coupled to the plunger of the curtain mount 24 at a swivel joint 56 accommodating installation at an angle other than perpendicular to the ceiling as shown in FIG. 6.

The center mount 80 of FIG. 6 includes the various components of a preferred embodiment of the invention described above. However, in this example the components are distributed along the length of the mount. This embodiment includes a bead 28 as described above, a swivel joint 56, an extension loop 66 and an adjustable pole 90A, 90B. The pole is adjustable at a clamp 84 and is spring-loaded at spring 50. Operation of this mount is similar to those mounts described above.

Left mount 78 of FIG. 6 illustrates an alternative embodiment of the present invention. The left mount again includes the preferred embodiment of the invention including a head 28, extension loop 66, adjustable pole 76, curtain mount 24, spring 50, universal joint 56, and foot 26. However in this example, the curtain mount 24 is coupled to the lower end of the pole in position near the floor. The head 28 of the mount is attached directly to the opposite end of the pole and interfaces with the curtain 30 at the ceiling 32 as shown in FIG. 4 as described above. The pole in this example employs a rotational adjustment mechanism. Also note that in the illustration of FIG. 6, a corner of the curtain 30 is held under the foot 26 of center mount 80 to provide additional tension and rigidity to the curtain.

FIGS. 7A–7F illustrate a method for installing a curtain in accordance with the present invention. In FIG. 7A, an installer 86 decides which portion of the room to partition. The installer 86 selects a curtain 30 of appropriate size and attaches a curtain mount 24 to an extension pole 22 as shown. The combined length of the curtain mount 24 and pole 22 is sized to be slightly larger than the floor 34 to ceiling 32 distance, as described above.

In FIG. 7B, the installer 86 mounts the curtain 30 to the head of the curtain mount 24 before raising the curtain 30. The curtain is secured to the mount by either the Velcro™- mount or clip-mount style securing mechanisms as described above.

In FIG. 7C, the curtain 30 is raised to the ceiling 32 using the extension pole 22 and curtain mount 24. The pole 22 is

8

positioned appropriately and the installer 86 pushes the pole 22 against the ceiling 32 to compress the spring in the curtain mount 24.

In FIG. 7D, the first mount 92 is shown in position with the head of the curtain mount urging the curtain 30 against the ceiling 32. In this installation, the installer 86 also decided to tuck a lower portion of the curtain 30 under the foot 26 to add tension to the curtain and secure the curtain to the floor. Following this, in FIG. 7D, the installer 86 has coupled a second portion of the curtain 30 to a second mount 94 and is in the process of raising the second mount 94 into position a few feet from the first mount 92.

After positioning the second mount 94 as shown in FIG. 7E, the installer 86 noticed that a sag 88 is present in the curtain 30 between the first 92 and second 94 mounts which is undesirable for the installer's project. An extension loop 66 is coupled to the head of the curtain mount 24, thereby allowing the installer 86 to fine-tune the position of the second mount 94 relative to the first mount 92 to eliminate the sag 88 in the curtain 30.

The resulting installation is shown in FIG. 7F. It can be seen that the sag 88 exhibited in FIG. 7E has been eliminated in FIG. 7F by increasing the distance between the first mount 92 and the second mount 94, thereby tensioning the curtain 30 between the two mounts. Additional mounts may be added as described above resulting in partition configurations as shown in FIGS. 1A–1C.

FIGS. 8A–8C illustrate alternative coupler embodiments for coupling the curtain 30 to the head 28. In FIG. 8A, a hook 95 is installed on a side of the head 28. The hook 95 interfaces with a grommet 96 or other opening in the curtain 30 for supporting the curtain during and following installation. In FIG. 8B, a spring-biased clamp 97 secures the curtain 30 in its jaws. In FIG. 8C, the head 28 is formed in two sections which interface at a hinge 99. The sections join at jaws 98 to clamp the curtain 30, thereby securing it to the head 28. In the embodiments shown in FIGS. 8A–8C, the curtain 30, when installed, is not urged against the ceiling by the top face of the head 28. Instead, the curtain hangs from the side of the head 28.

A distinct advantage of the present invention over the prior art is its ability to interface with and utilize curtains, poles, and extension rods which are available off the shelf. Preferred curtain materials depend on the application and include cloth or canvas sheets, plastic sheets, and reinforced plastic tarps. Standard poles include extension poles, painter's poles, telescoping poles, and window washing poles. High friction materials include silicone, rubber, and non-skid material for carpeting. Compression mechanisms include springs, pneumatic devices and hydraulic devices.

More curtain mounts may be used for installations requiring heavier curtain materials or for installations which require the partition to be substantially air-tight, for example, asbestos removal and lead paint removal applications.

The present invention is also applicable for creating temporary private areas using standard sheets and blankets for curtains. This would be particularly useful in emergency shelters or in crowded hospitals.

While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and detail may be made therein without departing from the spirit and scope of the invention as defined by the appended claims.

An example of an alternative embodiment of the curtain mount is illustrated in FIGS. 9A, 9B and 9C. This curtain

9

mount embodiment includes a hydraulic or pneumatic device 107 serving as a compression mechanism. A proximal end of the mount includes a pole interface comprising a pin 102 which mates with a corresponding hole 104 on the extension pole 22. The head 106 is mounted to the plunger 46 as shown.

The head 106 includes at least one hole 110 adapted to interface with and receive at least one corresponding pin 112 located on a clip plate 108. The pins 112 and a portion of a curtain 30 together insert into the holes 110, and slide and lock in place in the keyhole slots 111 shown in FIG. 9B. A knob 113 at the end of each pin 112 prevents a mounted plate 108 from releasing from the head 106.

FIG. 9C illustrates the resulting installed configuration of the curtain mount of FIGS. 9A and 9B. A portion of the curtain 30 wraps around the pins 112 and is secured in holes 110. The outward force of the hydraulic plunger urges the curtain 30 toward the ceiling 32 as described above.

What is claimed is:

1. A mount attachable to an extension pole for installing a curtain comprising:

an interface at a proximal end of said mount adapted for coupling the mount to an extension pole;

a compression mechanism along a longitudinal axis of said mount;

a head at a distal end of said mount having an upper first engaging surface extending transverse to said longitudinal axis, said head and said interface coupled to opposite ends of said compression mechanism, said compression mechanism biased to urge said head away from said interface;

a clip having a lower second engaging surface adapted to substantially interface with said first engaging surface, and an upper surface; and

a retaining member for removably securing the first and second engaging surfaces, such that when in an engaged position, the first and second engaging surfaces substantially interface, and such that when in a disengaged position, the first and second engaging surfaces separate.

2. The mount of claim 1 further comprising a friction material applied to the upper surface of the clip.

3. The mount of claim 1 further comprising a universal joint between said head and said compression mechanism.

4. The mount of claim 1 wherein said interface comprises a hole having an internal thread.

5. The mount of claim 4 wherein said thread comprises ¾ inch diameter thread.

6. The mount of claim 1 wherein the interface comprises a hole having a rim comprising tapered fingers having an external thread formed thereon; and further comprising a clamp nut having internal threads adapted to interface with said external thread.

7. The mount of claim 1 further comprising an extension loop coupled to the head.

8. The mount of claim 1 wherein the compression mechanism comprises a spring.

9. The mount of claim 1 further comprising a length adjustable extension pole adapted to mate with the mount interface.

10. The mount of claim 1 wherein the interface comprises a hole.

11. The mount of claim 1 wherein the interface comprises a pin.

12. The mount of claim 1 wherein the retaining member comprises a pin extending from one of the first and second engaging surfaces, and further comprising a keyhole and slot adapted for mating with the pin formed in the other of the first and second engaging surfaces such that the pin is

10

insertable into the keyhole and slidable along said slot, for removably securing the first and second engaging surfaces.

13. The mount of claim 12 further comprising a knob on the end of the pin preventing release of the clip from the head when the pin is positioned in the slot.

14. The mount of claim 1 wherein the first and second engaging surfaces are substantially planar.

15. The mount of claim 1 wherein the retaining member comprises a plurality of legs extending from one of the clip and head, the legs including tabs which removably engage the other of the clip and head.

16. The mount of claim 15 wherein the legs extend from the clip and removably engage the head.

17. The mount of claim 1 further comprising a hinge rotatably coupling said clip and said head.

18. The mount of claim 1 wherein the upper surface of the clip is substantially planar.

19. A mounting system for installing a curtain comprising:

a pole having proximal and distal ends, said pole having a longitudinal axis;

a foot coupled to said proximal end of said pole;

a head having an upper first engaging surface extending transverse to said longitudinal axis, said head coupled to said distal end of said pole;

a compressive mechanism between said foot and said head; and

a clip having a lower second engaging surface adapted to substantially interface with said first engaging surface, and an upper surface; and

a retaining member for removably securing the first and second engaging surfaces, such that when in an engaged position, the first and second engaging surfaces substantially interface, and such that when in a disengaged position, the first and second engaging surfaces separate.

20. The mounting system of claim 19 further comprising a universal joint between said head and said clip.

21. The mounting system of claim 19 wherein said pole is adjustable in length.

22. The mounting system of claim 19 wherein the retaining member comprises a pin extending from one of the first and second engaging surfaces, and further comprising a keyhole and slot adapted for mating with the pin formed in the other of the first and second engaging surfaces such that the pin is insertable into the keyhole and slidable along said slot, for removably securing the first and second engaging surfaces, and further comprising a knob on the end of the pin preventing release of the clip from the head when the pin is positioned in the slot.

23. The mounting system of claim 19 further comprising a friction material applied to the upper surface of the clip.

24. The mounting system of claim 19 further comprising an extension loop coupled to the head.

25. The mount of claim 19 wherein the compressive mechanism comprises a spring.

26. The mount of claim 19 wherein the first and second engaging surfaces are substantially planar.

27. The mount of claim 19 wherein the retaining member comprises a plurality of legs extending from one of the clip and head, the legs including tabs which removably engage the other of the clip and head.

28. The mount of claim 27 wherein the legs extend from the clip and removably engage the head.

29. The mount of claim 19 further comprising a hinge rotatably coupling said clip and said head.

30. The mount of claim 19 wherein the upper surface of the clip is substantially planar.

* * * * *

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ZIPWALL, LLC,

                Plaintiff,

v.

FASTCAP, LLC.,

                Defendant.

Civil Action No.:  05-cv-11852-REK

## ZIPWALL, LLC'S ANSWERS TO FASTCAP, LLC'S
## FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, ZipWall, LLC
("ZipWall") hereby responds to the First Set of Interrogatories propounded by FastCap, LLC.
("FastCap").

ZipWall's investigations are ongoing, and ZipWall reserves the right to supplement,
amend, or modify these responses if additional or different information is discovered.

ZipWall's responses are not to be construed as a waiver of any right or objection, or as an
admission of relevance, materiality, or admissibility of any information or document.

General Objections

The following general objections are incorporated by reference into each Answer set
forth hereafter.

1.      ZipWall objects to interrogatories that call for information protected from discovery by the attorney-client privilege, work product immunity, and/or any other applicable privilege or protection.

2.      ZipWall objects to these interrogatories as overly broad, unnecessarily burdensome, and calling for information that is neither relevant nor reasonably calculated to lead to discovery of admissible evidence.

3.      ZipWall objects to providing information that ZipWall is under a legal or contractual duty not to disclose to a third party.

4.      ZipWall objects to these interrogatories to the extent that they impose any duty beyond that specified in the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Massachusetts.

5.      ZipWall objects to these interrogatories as unnecessarily burdensome to the extent they seek information already in FastCap's possession.

6.      ZipWall objects to these requests to the extent they seek information not readily in the possession, custody, or control of ZipWall.

7.      ZipWall objects to these interrogatories to the extent they seek information that ZipWall has sought from FastCap through its discovery requests of FastCap.

8.      ZipWall objects to these interrogatories to the extent they call for information that ZipWall requires a reasonable opportunity to discover and analyze before providing a complete response.

9.      ZipWall objects to these interrogatories to the extent they call for information not in existence at the time the suit was initiated.

10.     ZipWall objects to these interrogatories as vague and ambiguous.

11.     ZipWall objects to these interrogatories to the extent they seek ZipWall's

contentions on issues not raised in this suit and/or not material to an issue raised in this suit.

12.     ZipWall objects to these interrogatories to the extent they are premature.

13.     ZipWall's responses to these interrogatories are subject to and without waiver of

any objections, including claims of privilege and/or work product.

## Interrogatories

Interrogatory No. 1

For each claim of the patents-in-suit that ZipWall alleges is infringed by the accused
products, separately identify each such patent claim and state in detail how each limitation of
each such claim is met by the accused products.

ANSWER TO INTERROGATORY NO.1

ZipWall further objects to this interrogatory on the grounds that it is premature given that

FastCap has yet to provide any meaningful discovery concerning its products. ZipWall can only

fully develop its infringement positions after it has received from FastCap information relating to

the products described in its discovery requests. ZipWall also objects to this interrogatory on the

grounds and to the extent that it calls for the production of confidential, proprietary, and/or

privileged information, including information protected by the attorney-client privilege or the

work product doctrine. ZipWall states that it will likely assert direct or indirect infringement of

claims 1 - 3, 8 - 10, 14 - 16, 18 - 21, 23, 25 - 27, and 30 of the '615 Patent, claims 35 - 44 of the

'004 Patent, and claims 1 -5, 7 – 9, 12 – 16, 29, 64, 65, 67 – 72, 78 – 83, 85, 91 – 94, and 96 of

the '076 patent.

ZipWall further directs the Defendant to Appendix A, ZipWall's Claim Construction

Chart. Further, ZipWall believes that FastCap's "Little Hand HD" product employs the same

technology as FastCap's "3rd Hand HD" and infringes ZipWall's patents for the same reasons

disclosed in relation to FastCap's "3rd Hand HD." ZipWall is unable to state its contentions with

respect to the "Little Hand HD" with any greater specificity at this time because FastCap has

refused to provide any meaningful discovery relating to such product.

ZipWall expressly reserves the right to supplement this response as discovery progresses.


Interrogatory No. 2

For any ZipWall product ZipWall contends is covered by any claim of the patents-in-suit,
identify each such ZipWall products and state whether ZipWall gave notice to the public that the
same is patented and, if so, described in detail the manner in which ZipWall gave such notice to
the public.

ANSWER TO INTERROGATORY NO. 2

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily

burdensome, and calls for information that is not relevant to the claim or defense of any party.

ZipWall further objects to this interrogatory on the grounds that it is premature. ZipWall also

objects to this interrogatory as vague and ambiguous, and on the grounds and to the extent that it

calls for the production of confidential, proprietary, and/or privileged information, including

information protected by the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, and to the extent it is understood, ZipWall

states that it believes the ZipWall dust barrier system, product number KT12, is covered by at

least one claim of the '615 patent. The ZipWall dust barrier system is labeled with the relevant

patent number. ZipWall further states it provided actual notice of the '615 patent to Paul Akers

on March 28, 2003 at the Paint and Decoration Contractors of America ("PDCA") trade show.

ZipWall expressly reserves the right to supplement this response as discovery progresses.

Interrogatory No. 3

Identify each and every persons participating in the design, development, testing, marketing, sale, offer for sale, license, offer for license, or use of any ZipWall product you contend is covered by any claim of the patents-in-suit, including a summary description of their contributions thereto, the period during which they were associated therewith, and the persons to whom they reported and whom they supervised.

ANSWER TO INTERROGATORY NO.3

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily

burdensome, and calls for information that is not relevant to the claim or defense of any party

and for which discovery is underway and not complete at this time. ZipWall further objects to

this interrogatory as duplicative of other interrogatories. ZipWall also objects to this

interrogatory on the grounds and to the extent that it calls for the production of confidential,

proprietary, and/or privileged information, including information protected by the attorney-client

privilege or the work product doctrine.

Subject to the foregoing, ZipWall states that Jeffrey Whittemore has been the principal

participant in the design, development, testing, marketing, sale, offer for sale, license, offer for

license, or use of the ZipWall product(s) identified in Interrogatory No. 2. Jeffrey Whittemore

was the inventor of patents-in-suit. He designed and developed the ZipWall products identified

in Interrogatory No. 2. Jeffrey Whittemore also serves as the president of ZipWall, LLC. He

performs all the duties customary to that office, which specifically include the supervision of the

design, development, testing, marketing, sale, offer for sale, license, offer for license, or use of

any ZipWall products. He has been associated with ZipWall since its inception.

ZipWall expressly reserves the right to supplement this response as discovery progresses.

Interrogatory No. 4

Identify all persons participating in the preparation, filing, and prosecution in the United States Patent Office, of the patent applications, including without limitation, any provisional applications, that matured into the patents-in-suit, including without limitation, all patent attorneys and/or patent agents who participated in the preparation, filing, and prosecution said patent applications.

ANSWER TO INTERROGATORY NO. 4

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily burdensome, and calls for information that is not relevant to the claim or defense of any party. ZipWall further objects to this interrogatory as duplicative of other interrogatories. ZipWall also objects to this interrogatory on the grounds and to the extent that it calls for the production of confidential, proprietary, and/or privileged information, including information protected by the attorney-client privilege or the work product doctrine.

Subject to the foregoing, ZipWall states that Jeffrey Whittemore, as the listed inventor of the patents-in-suit, participated in the preparation, filing, and prosecution of the patent applications that matured into the patents-in-suit. Jeffrey Whittemore also participated in his role as President of ZipWall, LLC.

ZipWall further states that Samuels, Gauthier & Stevens, LLP participated in the preparation, filing, and prosecution of the patent applications that matured into the '615 patent. Mills and Onella, LLP participated in the preparation, filing, and prosecution of the patent applications that matured into the '004 and '076 patents. Specifically, Anthony Onello, Jr. participated in the preparation, filing, and prosecution on behalf of Mills and Onello, LLP.

ZipWall expressly reserves the right to supplement this response as discovery progresses.

Interrogatory No. 5

For each ZipWall product identified in ZipWall's answer to Interrogatory No. 2, state (a) the date such product was first manufactured, tested, offered for sale or license, actually sold or licensed; (b) the date such product was first delivered to a customer by or for ZipWall; (c) the total number of units of such product made, used, sold, offered for sale, licensed, or offered for license by or for ZipWall up to the present; and (d) the unit price or price charged for each such product.

ANSWER TO INTERROGATORY NO. 5

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily

burdensome, and calls for information that is not relevant to the claim or defense of any party.

ZipWall also objects to this interrogatory as vague and ambiguous, and on the grounds and to the

extent that it calls for the production of confidential, proprietary, and/or privileged information,

including information protected by the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, and to the extent it is understood, ZipWall

states that ZipWall's dust barrier product was first offered for sale in July of 1997, first

manufactured in August of 1997, and first shipped to a customer in September of 1997.

Documents sufficient to show unit prices of ZipWall's products will be produced.

ZipWall expressly reserves the right to supplement this response as discovery progresses.


Interrogatory No. 6

Identify any individual or entity involved in the manufacture of all or any part of each ZipWall product ZipWall identified in its answer to Interrogatory No. 2 above.


ANSWER TO INTERROGATORY NO. 6

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily

burdensome, and calls for information that is not relevant to the claim or defense of any party.

ZipWall also objects to this interrogatory as vague and ambiguous, on the grounds that this

interrogatory is duplicative of other requests, and on the grounds and to the extent that it calls for the production of confidential, proprietary, and/or privileged information, including information protected by the attorney-client privilege or the work product doctrine.

Subject to the foregoing, ZipWall states that Jeffrey Whittemore directed the manufacture of all or any part of the ZipWall products identified in Interrogatory No. 2. In addition, ZipWall manufactured its products in conjunction with a third-party manufacturer. ZipWall will produce information relating to the other parties involved in the manufacture upon proper assurance that such disclosures shall be treated as attorneys' eyes only until such time that an appropriate protective order is in place.

ZipWall expressly reserves the right to supplement this response as discovery progresses.

Interrogatory No. 7

Identify each customer and/or prospective customer for each ZipWall product ZipWall identified in its answer to Interrogatory No. 2 above.

ANSWER TO INTERROGATORY NO. 7

ZipWall objects on the grounds that this interrogatory is overly broad, and unnecessarily burdensome. ZipWall further objects to this interrogatory on the grounds that it is premature given that FastCap has yet to provide any meaningful discovery. ZipWall also objects to this interrogatory as vague and ambiguous, on the grounds that this interrogatory is duplicative of other requests, and on the grounds and to the extent that it calls for the production of confidential, proprietary, and/or privileged information, including information protected by the attorney-client privilege or the work product doctrine. ZipWall further objects to this interrogatory as unduly burdensome as specifying all customers is not calculated to lead to admissible evidence and sepcifically identifying all prospective customers would be impossible.

- 8 -

FastCap has declined to respond to interrogatories regarding damages-related

information, specifically including ZipWall's requests for customer information. As such,

ZipWall may supplement this response after FastCap has complied with its discovery obligations

and produced the documents and information necessary for ZipWall to fully develop its damages

positions or for FastCap to respond to those positions.

Interrogatory No. 8

Identify each past and present director, officer, employee, representative, or agent of
FastCap who you contend had knowledge of the patents-in-suit prior to the commencement of
this action, state the date on which each such person first acquired such knowledge, describe the
circumstances under which such knowledge was first acquired, and identify all documents and
things evidencing, supporting or relating to the foregoing.

ANSWER TO INTERROGATORY NO. 8

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily

burdensome, and calls for information that is not relevant to the claim or defense of any party.

ZipWall further objects to this interrogatory on the grounds that it is premature. ZipWall also

objects to this interrogatory as vague and ambiguous, duplicative of other requests, to the extent

that FastCap is in possession of the information responsive to this request, and on the grounds

and to the extent that it calls for the production of confidential, proprietary, and/or privileged

information, including information protected by the attorney-client privilege or the work product

doctrine.

Subject to and without waiving any objections, and to the extent is the interrogatory is

understood, ZipWall states that Paul Akers, President of FastCap was given actual notice of

ZipWall's patent rights on March 28, 2003 at the PDCA trade show. ZipWall will produce

responsive, discoverable, non-privileged, non-work product, non-cumulative documents in its

possession, custody, or control concerning Interrogatory No. 8, to the extent such documents

exist.

ZipWall expressly reserves the right to supplement this response as discovery progresses.


Interrogatory No. 9

Identify each past and present director, officer, employee, representative, or agent of
ZipWall who you contend had knowledge of FastCap's alleged infringement of the claims of the
patents-in-suit identified in ZipWall's response to Interrogatory No. 1 above, and for each such
patent claim, state the date on which each such person first acquired such knowledge, describe
the circumstances under which such knowledge was first acquired, and identify all documents
and thing evidencing, supporting or relating to the foregoing.

ANSWER TO INTERROGATORY NO. 9

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily

burdensome, and calls for information that is not relevant to the claim or defense of any party.

ZipWall further objects to this interrogatory on the grounds that it is premature. ZipWall also

objects to this interrogatory as vague and ambiguous, duplicative, and on the grounds and to the

extent that it calls for the production of confidential, proprietary, and/or privileged information,

including information protected by the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, and to the extent it is understood, ZipWall

states that Jeffrey Whittemore, President of ZipWall, first became aware of FastCap's products

on or about March 28, 2003. At approximately the same time, Jeffrey Whittemore discussed

FastCap's product with Dan Cassel, Chairman of ZipWall. ZipWall will produce responsive,

discoverable, non-privileged, non-work product, non-cumulative documents in its possession,

custody, or control concerning Interrogatory No. 9, to the extent such documents exist.

ZipWall expressly reserves the right to supplement this response as discovery progresses.

Interrogatory No. 10

Identify all persons, including without limitation, each past and present director, officer, employee, representative, or agent of ZipWall who answered these interrogatories (Interrogatory Nos. 1-10) or supplied information from which the answers were derived and specifically set forth the particular interrogatory or interrogatories which each such person answered or supplied information from which the answers were derived.

ANSWER TO INTERROGATORY NO. 10

ZipWall objects on the grounds that this interrogatory is overly broad, unnecessarily

burdensome, and calls for information that is not relevant to the claim or defense of any party.

ZipWall further objects to this interrogatory on the grounds that it is premature. ZipWall objects

to this interrogatory as duplicative. ZipWall also objects to this interrogatory as vague and

ambiguous, and on the grounds and to the extent that it calls for the production of confidential,

proprietary, and/or privileged information, including information protected by the attorney-client

privilege or the work product doctrine.

Subject to and without waiving any objections, and to the extent it is understood, ZipWall

states that Jeffrey Whittemore provided information from which the answers to these

Interrogatories were derived.

ZipWall expressly reserves the right to supplement this response as discovery progresses.

- 11 -

Respectfully submitted,

ZIPWALL, LLC.

Dated: February 1, 2006                by:

Matthew B. Lowrie, BBO No. 563,414
Aaron W. Moore, BBO No. 638,076
Lowrie, Lando & Anastasi, LLP
Riverfront Office Park
One Main Street - 11th Floor
Cambridge, MA 02142
Tel: 617-395-7000
Fax: 617-395-7070

- 12 -

## **VERIFICATION**

The undersigned states that he is President of ZipWall, LLC., that he has read ZipWall, LLC.'s Answers to FastCap, LLC.'s First Set of Interrogatories, that he is authorized to sign this Verification, and that he is informed and believes that the facts stated in such responses are correct, based on the records of ZipWall, LLC. and information reasonably available to its employees, agents, and/or legal representatives.

Dated this _____ day of _____, 2006.   ZIPWALL, LLC.,


_____
Jeffrey Whittemore, President

- 13 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2006, a true copy of ZipWall, LLC.'s Answers to FastCap, LLC.'s First Set of Interrogatories was served by First Class U.S. Mail to the following:

> Michael James Cronen (Cal. Bar No. 131087)
> LAW OFFICES OF HARRIS ZIMMERMAN
> 1330 Broadway, Suite 710
> Oakland, CA 94612
> Telephone: 510.465.0828
> Facsimile: 510.465.2041
> E-mail: mcronen@zimpatent.com

Matthew H. Grady

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

**US Patent No. 6,209,615**

| Zipwall '615 Patent | FastCap Products |
|---|---|
| **Claim 1** | |
| A mount attachable to an extension pole for installing a curtain comprising: | |
| an interface at a proximal end of said mount adapted for coupling the mount to an extension pole |  An interface at a proximal end of said mount adapted for coupling the mount to an extension pole. (Shown mount coupled to pole) |
| a compression mechanism along a longitudinal axis of said mount | A compression mechanism along the longitudinal axis of said mount, which generates compressive force along the directions indicated by the blue arrows. |
| a head at a distal end of said mount having an upper first engaging surface extending transverse to said longitudinal axis, said head and said interface coupled to opposite ends of said compression mechanism, | A head at a distal end of said mount having an upper first engaging surface extending transverse to said longitudinal axis, said head and said interface coupled to opposite ends of said compression mechanism. |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '615 Patent | FastCap Products | |
|---|---|---|
| said compression mechanism biased to urge said head away from said interface |  | The compression mechanism is biased to urge said head away from said interface in direction of the blue arrow. |
| a clip having a lower second engaging surface adapted to substantially interface with said first engaging surface, and an upper surface. |  | A clip having a lower second engaging surface adapted to substantially interface with said first engaging surface, and an upper surface. |
| **Claim 2.** | | |
| The mount of claim 1 further comprising a friction material applied to the upper surface of the clip. |  | A friction material applied to the upper surface of the clip. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '615 Patent | FastCap Products | |
|---|---|---|
| **Claim 3.** | | |
| The mount of claim 1 further comprising a universal joint between said head and said compression mechanism. |  | A universal joint between said head and said compression mechanism. |
| **Claim 8.** | | |
| The mount of claim 1 wherein said the compression mechanism comprises a spring. | | The compression mechanism includes a spring. |
| **Claim 9.** | | |
| The mount of claim 1 further comprising a length adjustable extension pole adapted to mate with the mount interface. | | A length adjustable extension pole is adapted to mate with the mount interface. (Shown is the mount mated to the adjustable extension pole) |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '615 Patent | FastCap Products |
|---|---|
| **Claim 10.** | |
| The mount of claim 1 wherein the interface comprises a hole. | The pole is coupled to the mount, the interface includes a hole. (Shown is the mount interfaced with a pole) |
| **Claim 14.** | |
| The mount of claim 1 wherein the first and second engaging surfaces are substantially planar. | The first engaging surface and the second engaging surface are substantially planar. |
| **Claim 15.** | |
| The mount of claim 1 wherein the retaining member comprises a plurality of legs, the legs including tabs which removably engage the other of the clip and head. | the retaining member comprises a plurality of legs, the legs including tabs which removably engage the other of the clip and head. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '615 Patent | FastCap Products |
|---|---|
| **Claim 16.** | |
| The mount of claim 15 wherein the legs extend from the clip and removably engage the head. |  The legs extend from the clip and removably engage the head. |
| **Claim 18.** | |
| The mount of claim 1 wherein the upper surface of the clip is substantially planar. | The upper surface of the clip is substantially planar. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '615 Patent | FastCap Products |
|---|---|
| **Claim 19.** | |
| A mounting system for installing a curtain comprising: | |



| Zipwall '615 Patent | FastCap Products |
|---|---|
| a pole having proximal and distal ends, said pole having a longitudinal axis | A pole having proximal and distal ends, said pole having a longitudinal axis. |
| a foot coupled to said proximal end of said pole | A foot coupled to said proximal end of said pole. |
| a head having an upper first engaging surface extending transverse to said longitudinal axis, said head coupled to said distal end of said pole | A head having an upper first engaging surface extending transverse to said longitudinal axis, said head coupled to said distal end of said pole. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '615 Patent | FastCap Products |
|---|---|
| a compressive mechanism between said foot and said head | A compressive mechanism between said foot and said head. |
| a clip having a lower second engaging surface adapted to substantially interface with said first engaging surface, and an upper surface | A clip having a lower second engaging surface adapted to substantially interface with said first engaging surface, and an upper surface. |
| a retaining member for removably securing the first and second engaging surfaces, such that when in an engaged position, the first and second engaging surfaces substantially interface, and such that when in a disengaged position, the first and second engaging surfaces separate. | A retaining member for removably securing the first and second engaging surfaces, such that when in an engaged position, the first and second engaging surfaces substantially interface, and such that when in a disengaged position, the first and second engaging surfaces separate. (Shown disengaged position) (Shown engaged Position) |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '615 Patent | FastCap Products |
|---|---|
| **Claim 20.** | |
| The mounting system of claim 19 further comprising a universal joint between said head and said pole. | A universal joint between said head and said pole. |
| **Claim 21.** | |
| The mounting system of claim 19 wherein said pole is adjustable in length. | A pole which is adjustable in length. |
| **Claim 23.** | |
| The mount of claim 19 further comprising a friction material applied to the upper surface of the clip. | A friction material applied to the upper surface of the clip. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '615 Patent | FastCap Products |
|---|---|
| **Claim 25.** | |
| The mount of claim 19 wherein the compressive mechanism comprises a spring. |  The compressive mechanism includes a spring. |
| **Claim 26.** | |
| The mount of claim 19 wherein the first and second engaging surfaces are substantially planar. | The first and second engaging surfaces are substantially planar. |
| **Claim 27.** | |
| The mount of claim 19 wherein the retaining member comprises a plurality of legs extending from one of the clip and head, the legs including tabs which removably engage the other of the clip and head. | The retaining member includes a plurality of legs extending from one of the clip and head, the legs including tabs which removably engage the other of the clip and head. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '615 Patent | FastCap Products |
|---|---|
| **Claim 28** | |
| The mount of claim 27 wherein the legs extend from the clip and removably engage the head. | <br>The legs extend from the clip and removably engage the head. |
| **Claim 30.** | |
| The mount of claim 19 wherein the upper surface of the clip is substantially planar. | The upper surface of the clip is substantially planar. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

*U.S. Patent No. 6,942,004 B2*

| Zipwall '004 Patent | Fastcap Products |
|---|---|
| **Claim 35** | |
| A mounting system for installing a sheet of material comprising: | |
| a pole having first and second ends |  |
| foot at a first end of the pole |  |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '004 Patent | Fastcap Products |
|---|---|
| a head at a second end of the pole, the head having an upper first engaging surface | A head at a second end of the pole, the head having an upper first engaging surface |
| an adjustment mechanism between the foot and head for adjusting the length of the pole there between | An adjustment mechanism between the foot and head for adjusting the length of the pole there between. |
| a clip having a lower second engaging surface that removably engages the upper first engaging surface of the head for mounting a sheet of material there between, and a plurality of legs extending transverse to the second engaging surface of the clip to removably secure the clip to the head, the plurality of legs | A clip having a lower second engaging surface that removably |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '004 Patent | Fastcap Products |
|---|---|
| extending about at least one side surface and a portion of a lower surface of the head when the clip is engaged with the head. | engages the upper first engaging surface of the head for mounting a sheet of material there between, and a plurality of legs extending transverse to the second engaging surface of the clip to removably secure the clip to the head, the plurality of legs extending about at least one side surface and a portion of a lower surface of the head when the clip is engaged with the head. |
| **Claim 36.** | |
| The mounting system of clam 35 wherein the legs include tabs which extend about the portion of the lower surface of the head. |  The legs include tabs which extend about the portion of the lower surface of the head |
| **Claim 37.** | |
| The mounting system of claim 35 wherein the head extends transverse to a longitudinal axis of the pole. |  The head extends transverse to a longitudinal axis of the pole. |
| **Claim 38.** | |
| The mounting system of claim 35 wherein the first and second engaging surfaces are substantially planar. |  The first and second engaging surfaces are substantially planar. |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '004 Patent | Fastcap Products |
|---|---|
|  |  |
| **Claim 39.** |  |
| The mounting system of claim 35 further comprising a compression mechanism between the foot and the head. |  A compression mechanism between the foot and the head. |
| **Claim 40.** |  |
| The mounting system of claim 39 wherein the compression mechanism comprises a spring. | The compression mechanism includes a spring. |
| **Claim 41.** |  |
| The mounting system of claim 35 wherein the legs are elastically deformable and snap about at least one side surface of the head. | The legs are elastically deformable and snap about at least one side surface of the head. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '004 Patent | Fastcap Products | |
|---|---|---|
| **Claim 42.** | | |
| The mounting system of claim 35 wherein the legs are configured such that the clip is slidable relative to the head. |  | The legs are configured such that the clip is slidable relative to the head. |
| **Claim 43** | | |
| The mounting system of claim 35 wherein the clip and head are rectangular in shape. | | The clip and head are rectangular in shape |
| **Claim 44.** | | |
| The mounting system of claim 35 further comprising high-friction material applied to an upper surface of the clip. | | High-friction material applied to an upper surface of the clip. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

## U.S. Patent 6,953,076

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 1** | |
| A method of installing a curtain to form a room partition between a floor and a ceiling using a partition mount having an elongated portion, a first end, and a second end, the second end having a mechanism to couple to the curtain, the method comprising: | |
| coupling a curtain to the mechanism on the second end, the mechanism at the second end interfacing with the elongated portion at a hinged joint such that the mechanism is pivotable with respect to the elongated portion |  FastCap couples a curtain to the mechanism on the second end, the mechanism at the second end interfacing with the elongated portion at a hinged joint such that the mechanism is pivotable with respect to the elongated portion |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products |
|---|---|
| mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the mechanism that couples the curtain at the second end of the partition mount directly engages the ceiling | FastCap mounts the partition mount such that a portion of the first end of the partition mount engages the floor. <br><br> A portion of the mechanism that couples the curtain at a second end of the partition mount directly engages the ceiling. |
| **Claim 2** | |
| The method of claim 1 further comprising adjusting a length of the elongated portion of the partition mount. | FastCap adjusts the elongated portion of the partition mount. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products | |
|---|---|---|
| **Claim 3** | | |
| The method of claim 1 wherein partition mount further includes a compression mechanism between the first end and the second end, and wherein mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling. | | A compression mechanism between the first and second end. |
| | | Compression Mechanism<br><br>FastCap compresses the first end and the second end of the partition mount between the floor and the ceiling |
| **Claim 4** | | |
| The method of claim 1 wherein the partition mount comprises a first partition mount and further comprising: | | |
| coupling a second portion of the curtain to a mechanism on a second end of a second partition mount having an elongated portion, a first end, and a second end, | | FastCap couples a second portion of the curtain to a mechanism on a second end of a second partition mount having an elongated portion, a first end, and a second end. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| and mounting the second partition mount such that a portion of the first end of the second partition mount engages the floor and a portion of the second end of the second partition mount engages the ceiling. |  FastCap mounts a second partition mount such that a portion of the first end of the second partition mount engages the floor and a portion of the second end of the second partition mount engages the ceiling. |
| **Claim 5** | |
| The method of claim 4 further comprising moving the second partition mount to a position on the ceiling to increase tension in the curtain between the second end of the first partition mount and the second end of the second partition mount. |  Second partition mount<br><br>FastCap moves the second partition mount to a position on the ceiling to increase tension in the curtain between the second end of the first partition mount and the second end of the second partition mount.<br><br>First partition mount |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 6** | |
| The method of claim 4 wherein a distance between the first partition mount and the second partition mount is variable. | Second partition mount<br><br>The distance between the first partition mount and the second partition mount is variable.<br><br>First partition mount |
| **Claim 7** | |
| The method of claim 4 further comprising adjusting a length of the elongated portion of the second partition mount. | FastCap adjusts a length of the elongated portion of the second partition mount |
| **Claim 8** | |
| The method of claim 1 wherein the mechanism at the second end of the partition mount includes a head that is coupled to the elongated portion and a clip that is removably coupled to the head. | The mechanism at the second end of the partition mount includes a head that is coupled to the elongated portion and a clip that is removably coupled to the head. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 9** | |
| The method of claim 8 wherein coupling the curtain to the mechanism on the second end comprises placing a portion of the curtain on the head and coupling the clip to the head such that the curtain is secured between the clip and the head. | <br><br>Coupling the curtain to the mechanism on the second end comprises placing a portion of the curtain on head and coupling the clip to the head such that the curtain is secured between the clip and the head. |
| **Claim 12** | |
| The method of claim 8 wherein the one of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and head. | <br><br>One of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and head. |
| **Claim 13** | |
| The method of claim 12 wherein the legs are elastically deformable and snap about the at least one outer surface. | <br><br>The legs are elastically deformable and snap about at least one outer surface |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 14** | |
| The method of claim 12 wherein the legs are slidable relative to the at least one outer portion of the head. |  The legs are slidable relative to the at least one outer portion of the head. |
| **Claim 15** | |
| The method of claim 14 wherein an upper surface of the clip includes a pad of high friction material applied thereto to prevent slipping when engaging the ceiling. | An upper surface of the clip includes a pad of high friction material applied thereto to prevent slipping when engaging the ceiling. Clip Engages the ceiling |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 16** | |
| The method of claim 1 wherein the second end of the partition mount includes a high friction material applied to an upper surface thereof to prevent slipping when engaging the ceiling. |  The second end of the partition mount includes a high friction material applied to an upper surface thereof to prevent slipping when engaging the ceiling.  Engages the ceiling |
| **Claim 29** | |
| A curtain mounting system comprising | |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products |
|---|---|
| a curtain | A curtain |
| a pole having first and second ends | A pole having first and second ends. |
| a coupling mechanism at the second end of the pole, the coupling mechanism including a head that is coupled to the pole and a clip that is removably coupled to the head, the clip and head having opposed substantially planar surfaces between which a portion of the curtain is secured when the clip is coupled to the head, the [c]lip including a pad of high-friction material applied to an upper surface thereof to prevent slipping when engaging a room surface. | High-Friction Material / Clip / Head / A coupling mechanism at the second end of the pole. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 64** | |
| A method of installing a curtain to form a room partition between a floor and a ceiling using a partition mount having an elongated portion with a first end and a second end, and having a head coupled to the second end of the elongated portion, the head having a first section coupled to the second end and a second that couples to the first section, comprising: | |
| installing a portion of a curtain between the first section and the second section, the first and second sections having cross-sectional areas in a direction parallel to the portion of the curtain that are substantially the same |  Installing a portion of a curtain between the first section and the second section, the first and second sections having cross-sectional areas in a direction parallel to the portion of the curtain that are substantially the same. |
| mounting the partition mount such that the first end engages the floor and the second section of the head engages the ceiling |  Mounting the partition mount such that the first end engages the floor and the second section of the head engages the ceiling. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products |
|---|---|
| | **DB Clip for 3rd Hand** — Take your 3rd Hand HD... add your visqueen... add a DB Clip... BRING ON THE CEILING!!! — Head engaging the ceiling |
| **Claim 65** | |
| The method of claim 64, wherein installing the portion of the curtain between the first section and the second section includes coupling the first section to the second section. | **DB Clip for 3rd Hand** — Take your 3rd Hand HD... add your visqueen... add a DB Clip... — Installing the portion of the curtain between the first section and the second section includes coupling the first section to the second section. |
| **Claim 67** | |
| The method of claim 64, wherein the elongated portion is substantially cylindrical and has a circular cross-section having a first area, and wherein mounting the partition mount includes positioning the second section of the head such that a contact area of engagement of the second section with the ceiling is greater than the first area. | **DB Clip for 3rd Hand** — Use multiple 3rd Hand HDs with DB Clips to form an extended dust barrier. — The elongated portion is substantially cylindrical and has a circular cross-section having a first area |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products |
|---|---|
| | Mounting the partition mount includes positioning the second section of the head such that a contact area of engagement of the second section with the ceiling is greater than the first area. |
| **Claim 68** | |
| The method of claim 64, wherein installing the portion of the curtain includes positioning a portion of the curtain such that a surface of the portion of the curtain is substantially parallel to a surface of the ceiling. | Installing the portion of the curtain includes positioning a portion of the curtain such that a surface of the portion of the curtain is substantially parallel to a surface of the ceiling. |
| **Claim 69** | |
| The method of claim 64, wherein mounting includes compressing a compression mechanism in the partition mount. | Mounting includes compressing a compression mechanism in the partition mount |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products | |
|---|---|---|
| **Claim 70** | | |
| The method of claim 64, further comprising adjusting a length of the elongated portion of the partition mount. |  | Adjusting a length of the elongated portion of the partition mount. |
| **Claim 71** | | |
| The method of claim 64, further comprising: | | |
| coupling the curtain to a head of a second partition mount and mounting the second partition mount such that a portion of a first end of the second partition mount engages the floor and a portion of a second end of the second partition mount engages the ceiling. | | Coupling the curtain to a head of a second partition mount and mounting the second partition mount such that a portion of a first end of the second partition mount engages the floor and a portion of a second end of the second partition mount engages the ceiling. |
| **Claim 72** | | |
| The method of claim 71, further comprising moving the second partition mount away from the partition mount with the curtain coupled to the second partition mount to increase tension on the curtain. | | Moving the second partition mount away from the partition mount with the curtain coupled to the second partition mount to increase tension on the curtain. |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 78** | |
| A method of installing a curtain to form a room partition between floor and a ceiling using a partition mount having an elongated portion, a first end, a second end, the second end having a mechanism to couple to the curtain, the method comprising: | |
| coupling a curtain to the mechanism on the second end, the mechanism including a high-friction upper surface |  High-Friction Material<br><br>Mechanism on the second end, which includes a high-friction upper surface, is used to couple a curtain. |
| mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the high-friction upper surface of the mechanism that couples the curtain at the second end of the partition mount directly engages the ceiling. |  Mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the high-friction upper surface of the mechanism that couples the curtain at the second end of the partition mount directly engages the ceiling. |

778907.1

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products | |
|---|---|---|
| |  | Mechanism that couples the curtain.<br><br>A portion of the high-friction upper surface of the mechanism that couples the curtain at the second end of the partition mount directly engages the ceiling. |
| **Claim 79** | | |
| The method of claim 78 the mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other. | | The mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 80** | |
| The method of claim 78 further comprising adjusting a length of the elongated portion of the partition mount. | Adjusting a length of the elongated portion of the partition mount. |
| **Claim 81** | |
| The method of claim 78 wherein the partition mount further includes a compression mechanism between the first end and the second end, and wherein mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling. | A compression mechanism between the first end and the second end, wherein the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling. (shown below)<br><br>Compressing the first end and the second end of the partition mount between the floor and the ceiling |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 82** | |
| The method of claim 78 wherein the mechanism at the second end of the partition mount includes a head that is coupled to the elongated portion and a clip at is removably coupled to the head. |  <br><br>The mechanism at the second end of the partition mount includes a head that is coupled to the elongated portion and a clip at is removably coupled to the head. |
| **Claim 83** | |
| The method of claim 82 wherein coupling the curtain to the mechanism on the second end comprises placing a portion of the curtain on the head and coupling the clip to the head such that the curtain is secured between the clip and the head. |  <br><br>Coupling the curtain to the mechanism on the second end includes placing a portion of the curtain on the head and coupling the clip to the head such that the curtain is secured between the clip and the head. |
| **Claim 85** | |
| The method of claim 82 wherein the one of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and head. |  <br><br>One of the clip and head includes at least one leg that extends about at |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| | least one outer surface of the other of the clip and head to secure the curtain between the clip and head. |
| **Claim 91** | |
| A method of installing a curtain to form a room partition between a floor and a ceiling using a partition mount having an elongated portion, a first end, and a second end, the second end having a mechanism to couple to the curtain, the method comprising: | |
| coupling a portion of a curtain to the mechanism on the second end, wherein the mechanism at the second end includes a head that is coupled to the elongated portion and a clip that is removably coupled to the head to secure the portion of the curtain between the clip and head, the clip and head having substantially the same cross-sectional area |  Coupling a portion of a mechanism on the second end, wherein the mechanism at the second end includes a head that is coupled to the elongated portion and a clip that is removably coupled to the head to secure the portion of the curtain between the clip and head.<br><br> The clip and head having substantially the same cross-sectional area. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products | |
|---|---|---|
| mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the clip of the mechanism directly engages the ceiling |  | Mounting the partition mount such that a portion of the first end of the partition mount engages the floor and a portion of the clip of the mechanism directly engages the ceiling. |
| |  | A portion of the clip of the mechanism directly engages the ceiling. |
| **Claim 92.** | | |
| The method of claim 91 wherein the mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other. |  | The mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart



| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 93.** | |
| The method of claim 91 further comprising adjusting a length of elongated portion of the partition mount. | Adjusting a length of elongated portion of the partition mount. |
| **Claim 94.** | |
| The method of claim 91 wherein partition mount further includes a compression mechanism between the first end and the second end, and wherein mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling. | A compression mechanism between the first end and the second end.<br><br>Mounting the partition mount further comprises compressing the first end and the second end of the partition mount between the floor and the ceiling. |

Zipwall, LLC. V. FastCap, LLC
D.Mass. No. 05-cv-11852 (REK)
Zipwall, LLC's Infringement Claim Chart

| Zipwall '076 Patent | Fastcap Products |
|---|---|
| **Claim 96.** | |
| The method of claim 91 wherein the one of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and the head. |   One of the clip and head includes at least one leg that extends about at least one outer surface of the other of the clip and head to secure the curtain between the clip and the head. |