IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ZIPWALL, LLC,

        Plaintiff,

v.

FASTCAP, LLC.,

        Defendant.

Civil Action No.:  05-CV-11852-JLT

**EXPERT REPORT OF
ALEXANDER SLOCUM
CONCERNING INFRINGEMENT**

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2006, I caused a copy of the foregoing **Expert Report of Alexander Slocum concerning Infringement,** by electronically filing with the court on that date:

Sarah Cooleybeck, Esq.
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA 02210
Telephone: 617.832.1000
Facsimile: 617.832.7000
E-mail: scooleybeck@foleyhoag.com

Michael James Cronen, Esq.
Law Offices of Harris Zimmerman
1330 Broadway, Suite 710
Oakland, CA 94612
Telephone: 510.465.0828
Facsimile: 510.465.2041
E-mail: mcronen@zimpatent.com

Dated: August 28, 2006                               /s/ Matthew B. Lowrie
                                                     Matthew B. Lowrie, Esq.

## SIGNATURE PAGE

I, Alexander Slocum, pursuant to Fed. R. Civ. P. 26(a)(2)(B), submit the following report concerning certain technical facts and issues pertinent to ZipWall, LLC v. FastCap, LLC, pending in the United States District Court for the District of Massachusetts, Civil Action No. 05-CV-11852-JLT.

I may adjust my analysis in light of the views offered by Defendant and/or based on information which is provided in the future and may provide additional views in an expert report submitted in reply to one or more expert reports submitted by Defendant.


Signed: _____    Dated:    August 28, 2006_
        Alexander Slocum

<u>Background</u>

1.      I am a Professor at the Massachusetts Institute of Technology in the Department of Mechanical Engineering and am a Mac Vicar Faculty Fellow.  I received my Ph.D. in mechanical engineering from M.I.T. in 1985, and have been a professor at M.I.T. since 1991.  I am a named inventor on over 60 patents and have authored or co-authored numerous technical articles.  A copy of my current curriculum vitae is attached at Exhibit A.

2.      Within the last four years, I have testified at trial or deposition in the following cases (with the party calling me as a witness underlined and the year I was retained in parentheses):

> <u>Cytologix</u> v. Ventana (2001)
>
> <u>Bayer</u> v. Abbott (2003)
>
> <u>Cannon, Inc. v.</u> GCC International, Inc.
>
> LSI Industries, Inc and LSI Kentucky LLC v. <u>Imagepoint, Inc. and Marketing Displays, Inc. (2006)</u>

3.      I have, and have had, no consulting or other professional relationship with ZipWall, other than in connection with serving as an expert in this case.

4.      I have been retained by ZipWall as an expert consultant and witness at my standard hourly rate of $500 per hour.  I understand that I am to be reimbursed for travel, lodging, and other reasonable expenses incurred in providing expert testimony in this

case. I understand that my compensation is in no way dependent on the outcome of this case or any issue that may emerge from it.

## Materials Reviewed

5.    In connection with formulating my opinions in this matter, I have reviewed the following materials:

- United States patent 6,209,615 and its prosecution history.
- United States patent 6,942,004 and its prosecution history.
- United States patent 6,953,076 and its prosecution history.
- A FastCap 3rd Hand pole with DB clip.
- The summary judgment motion filed by FastCap on July 17, 2006, and accompanying papers.
- Materials from the FastCap web site pertaining to the FastCap 3rd Hand pole and DB clip.
- Interrogatory answers from both ZipWall and FastCap.

## Subject Matter of Testimony

6.    I have been asked to testify on the following subject matter:

- Dust barrier plastic partition systems and their design.
- The nature of the patents in this suit, including how the systems described in them work and how that relates to claim language in the patent, as described below.
- FastCap's 3rd Hand pole with DB clip and how it works.
- Whether the FastCap 3rd Hand pole with DB clip (or the use of it) satisfies claim limitations as I understand them or as a court may subsequently interpret them.

Opinions and Bases for Opinions

*"Compressive mechanism" and "compression mechanism".*

7.    The first issue I have been asked to consider is the meaning of

"compression mechanism" (claim 1) or "compressive mechanism" (claim 19) in the '615

patent. These terms have a plain meaning; it is a mechanism or mechanical structure

(assembly) that may be used to create a compressive force. In the context of the patent,

the term refers to a mechanism to create a compressive force within a pole when the pole

is in use, to create tension within the pole to help hold it in place between the floor and

ceiling.

8.    In my view, this interpretation of compression mechanism is confirmed by

the description in the patent. The abstract describes the operation of the system as: "a

portion of the curtain is attached to the head of the curtain mount. The curtain and mount

are raised to the ceiling and the mount and pole are compressed between the floor and the

ceiling. This compressive force operates to urge the head toward the ceiling, securing the

mount in place." The patent also states: "Each curtain mount includes a compression

mechanism, *for example* a spring, which operates to urge the head 28 against the ceiling

32, thereby securing the curtain 30."

9.    I do not see any reason in the patent why the claim should be limited to

any particular form of compression mechanism. The patent lists as examples of

compression mechanisms springs, pneumatic devices and hydraulic devices. When used

on the end of a pole to drive the head of the pole toward the ceiling, each is a

"compression mechanism" because it is used to create a compressive force in the pole to

- 3 -

hold the pole (and what is being pushed) in place. Springs, pneumatic devices and hydraulic devices are also different mechanisms, indicating to me that there was an intention for the terms "compression mechanism" to broadly describe any form of compression mechanism.

10.    "Compression mechanism" is not, in my view, limited to springs or springy devices. A hydraulic mechanism in particular, such as a bottle jack-type cylinder, would not be springy in this particular context, and would serve to drive the head of a pole to the ceiling until the pole stopped expanding in length.

11.    The 3rd Hand pole has a "compression mechanism." In particular, it acts like a spreading clamp with a ratchet allowing the head of the pole to be ratcheted toward the ceiling. The ratchet and clamp are used to lengthen the pole to the point where it creates a compressive force within the pole to hold the pole in place; without that force, the pole could easily be knocked over.

12.    The 3rd Hand pole also does not necessarily expand by 3/8 of an inch, as claimed by the company, whenever the levers are squeezed to ratchet the pole up. When the pole encounters resistance from the ceiling, there is slippage in the clamping mechanism and, with a strong ceiling, the clamp will slip completely. A 3rd Hand pole would push through a ceiling if extended 3/8 inch each time the lever was squeezed, and this is no different than in any other compression mechanism. If the force generated by the compression mechanism (whether it is spring, hydraulic pump, or ratchet) is enough to extend the head of the pole through the ceiling, any of them will drive the head of the pole through the ceiling.

13.    In one example the patent describes a spring as the compression mechanism that generates force by compressing the spring 2-3 inches, however, this would not be the case for a hydraulic or pneumatic mechanism, which would operate like the ratchet and clamp. Any of these compression mechanisms extending the pole 2-3 inches past the height of the ceiling would drive the head of the device through the ceiling.

14.    The FastCap compression mechanism also includes a spring; in fact, it has two. The springs are used as part of the ratchet mechanism, however, and not to drive directly the head of the pole toward the ceiling.

*"Plurality of legs"*

15.    Claim 35 of the '004 patent recites a "plurality of legs". These legs help to hold the top clip in place. "Plurality" means a number greater than one (from www.dictionary.com ) and there is nothing in the patent specification to suggest to me that it should be given a different meaning. "Leg" means a projection or support extending from the clip.

16.    I understand that FastCap argues that its DB clip has only one leg. This is fundamentally incorrect. There are two legs, one on each side of the clip. A person has two legs, a dog has four legs, and each has a plurality of legs.

17.    Even were there only "one leg," in my view the DB clip is only insignificantly different from the specific example in the patent (which has two legs per side).



FIG. 4B

The DB clip is essentially the same with respect to the legs, except that the two legs on each side (in the patent) are joined together in the DB clip. That joining does not, in my view, make any significant difference in the way that the clip is used or how it performs.

*"Pivotable" "Hinged Joint"*

18.    Claim 1 of the '076 patent recites: "the mechanism at the second end interfacing with the elongated portion at a hinged joint such that the mechanism is pivotable with respect to the elongated portion." In the context of the '076 patent, the "hinged joint" describes the universal joint 56, as shown in FIG 5A, as one example.

19.    In my view, this interpretation of "hinged joint" is required by the context of the claim in which it appears. The "mechanism" must be pivotable with respect to the elongated portion. Another reading of this claim would not comport with the language of the claim.

20.    The head of the FastCap pole is certainly pivotable and uses a ball and cup joint, substantially the same as the one show in FIG. 5A of the '076 patent as 56, and repeated in numerous figures. (See e.g. FIGs. 3A-C).

- 6 -



FIG. 5A

21.    Claim 79 and 92 recite: "mechanism at the second end and the elongated portion interface at a hinged joint, such that the mechanism and the elongated portion are pivotable and can be positioned at an acute angle with respect to each other. The same construction for "hinged joint" is required.